UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

2014 APR -8  A 8: 33

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF RHODE ISLAND,

Defendant.

Case No.

COMPLAINT

CA 14 - 175

## INTRODUCTION

1.      The United States of America alleges that Defendant, the State of Rhode Island ("State") has discriminated against individuals with intellectual and developmental disabilities ("I/DD") by unnecessarily segregating them or by placing them at risk of unnecessary segregation in violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134.

2.      The State has unnecessarily segregated thousands of individuals with I/DD in sheltered workshops and facility-based day programs and in recent years has placed hundreds of individuals with I/DD at risk of unnecessary segregation in such programs by failing to provide them with employment, vocational, and day services in the most integrated setting appropriate to their needs.

3.      Sheltered workshops and facility-based day programs maintain many of the hallmarks of other segregated settings: the physical layout is institutional in nature; individuals work and participate in activities according to fixed, highly regimented schedules and routines; individuals exercise very limited choice over the work and activities that they engage in throughout the day; the duration of individuals' placements in the facility are for significantly

long periods of time; and, importantly, in both settings, individuals with disabilities are not able to interact with individuals without disabilities to the fullest extent possible.

4.      For example, individuals with I/DD in Rhode Island sheltered workshops perform rote, manual tasks, in facilities with only other individuals with I/DD except for paid staff, such as repetitively assembling cardboard jewelry boxes, putting tops on lotion bottles, placing stickers on boxes of dog biscuits, placing stoppers onto medical syringes, and taking wrappers off bars of soap. Persons with I/DD in sheltered workshops typically earn wages that are well below minimum wage. The average hourly wage of sheltered workshop participants in Rhode Island is approximately $2.21 per hour. Individuals with I/DD in Rhode Island typically remain in sheltered workshops for decades at a time.

5.      Likewise, in Rhode Island, individuals with I/DD in facility-based day programs typically perform organized group activities, in facilities with only other people with I/DD except for paid staff, like coloring, completing puzzles, watching movies, playing games, and doing arts and crafts. Like individuals in sheltered workshops, individuals in facility-based day programs typically remain there for decades at a time.

6.      By contrast, supported employment and integrated day services are designed with the purpose of allowing individuals with disabilities to interact with individuals without disabilities to the fullest extent possible. Supported employment services typically include the services necessary to find, place, maintain, and provide ongoing support to individuals with I/DD in integrated, competitive employment settings in the community. Such services include job discovery, vocational assessment, job coaching, and job training that enable individuals to access jobs in typical work settings in the community where they interact with non-disabled coworkers, customers, and peers.

7.  For example, the small portion of individuals with I/DD in Rhode Island receiving supported employment services have received services and supports to allow them to find, obtain, and maintain competitive wage jobs in clerical/office settings, food service and customer service venues, state and local governments, small businesses, and large corporations. Many of these individuals receive ongoing job coaching and job training from employment specialists in adjusting to ongoing workplace demands and in learning new skills on the job. Other individuals have acclimated to the competitive, integrated work setting to such an extent that their job coaches have partially or almost entirely faded as their on-site services and co-workers provide them with natural supports while on the job. Some individuals have requested specific training in particular tasks to allow them to qualify for advancement and promotion opportunities in the workplace. Individuals with I/DD who receive supported employment services earn competitive wages, sometimes receive retirement benefits and health insurance, and often live independently in their own apartments.

8.  Integrated day services are services that allow persons with I/DD to engage in self-directed activities in the community at times, frequencies, and with persons of their choosing, and to interact to the fullest extent possible with non-disabled peers when such persons are not working or receiving residential services. For instance, integrated day services allow individuals with I/DD to participate in and gain membership in mainstream community-based recreational, social, educational, cultural, and athletic activities, including community volunteer activities and training activities.

9.  For example, some individuals with I/DD receiving integrated day services in Rhode Island regularly participate in activities like cooking classes, volunteer opportunities, going to restaurants and to the movies, taking sailing lessons, bowling, and engaging in

impromptu activities with friends and family members. Many of these individuals also receive support in adjusting to unstructured community daytime activities, like running errands and learning new social and employment-related skills, such as money management.

10.    Statewide, persons who receive supported employment and integrated day services are far outnumbered by the individuals who remain unnecessarily—and often indefinitely—confined to facility-based settings, including sheltered workshops and facility-based day programs.

11.    Title II of the ADA prohibits the unnecessary segregation of persons with disabilities. 42 U.S.C. § 12132; Olmstead v. L.C., 527 U.S. 581, 600 (1999). It requires states and other public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); see also 29 U.S.C. § 794(a); 28 C.F.R. § 41.51(d).

12.    Rhode Island has discriminated against individuals with I/DD by planning, funding, structuring, and administering its system of providing employment, vocational, and day services in a manner that unnecessarily over-relies on segregated day activity services for individuals with I/DD, to the exclusion of integrated alternatives like integrated supported employment and integrated day services.

13.    In addition, the State has correspondingly failed to plan, fund, structure, and administer integrated vocational and transition services for students with I/DD to allow students with I/DD to make the informed choice to work or to receive meaningful services that will allow them to work in integrated settings after exiting secondary school. Because the State does not make available adequate or effective integrated vocational and transition services, including supported employment services, to students with I/DD who qualify for and do not oppose such

services, such students are placed at serious risk of entering a sheltered workshop or facility-based day program after exiting school.

14.     For example, in recent years, hundreds of students with I/DD exiting secondary school have entered sheltered workshops and facility-based day programs, many without having received access to timely information prior to their exit from school about integrated supported employment and integrated day services, or access to the appropriate services and supports—like integrated transition and work-preparation services, including mentorships, internships, or trial work experiences—that would allow them to make a meaningful choice to work in postsecondary integrated employment settings or to participate in integrated activities at times when they are not working or receiving residential services.

15.     Many persons with I/DD who receive services and supports from the State are capable of, and not opposed to, receiving integrated supported employment and integrated day services where they would have the opportunity to access individual jobs in typical work settings that pay minimum wage or higher, and to participate in self-directed activities in the community when they are not receiving employment or residential services.

16.     The unnecessary segregation of people with I/DD in sheltered workshops and segregated day programs contravenes one of the primary purposes of the ADA—to end the isolation and segregation of individuals with disabilities. As Congress stated in the findings and purpose section of the ADA: "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).

## JURISDICTION AND VENUE

17.     This Court has jurisdiction of this action under Title II of the ADA, 42 U.S.C.

§§ 12131-12134, and 28 U.S.C. §§ 1331, 1345. The Court may grant the relief sought in this

action pursuant to 28 U.S.C. §§ 2201(a), 2202.

18.     Venue is proper in the District of Rhode Island under 28 U.S.C. § 1391 because a

substantial part of the acts and omissions giving rise to this action occurred in Rhode Island. 28

U.S.C. § 1391(b).

## PARTIES

19.     Plaintiff is the United States of America.

20.     Defendant is the State of Rhode Island, which is a public entity within the

meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42

U.S.C. § 12131 *et seq*., and its implementing regulations, 28 C.F.R. pt. 35.

## STATUTORY AND REGULATORY BACKGROUND

**A.**     **The Americans with Disabilities Act and *Olmstead v. L.C.*, 527 U.S. 581 (1999)**

21.     The ADA provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.

22.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive

national mandate for the elimination of discrimination against individuals with disabilities[.]" 42

U.S.C. § 12101(b)(1). Among the specific issues the ADA addresses are "segregation" and

actions that prevent persons with disabilities from "fully participat[ing] in all aspects of

society[.]" *Id*. §§ 12101(a)(1), (5).

23.     In enacting the ADA, Congress found that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; [and] the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals[.]" *Id.* §§ 12101(a)(6)-(7).  Congress explicitly recognized that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous[,]" therefore resulting in "dependency and nonproductivity." *Id.* § 12101(a)(8)

24.     The ADA was also intended to enable individuals with disabilities to gain economic independence and to "move proudly into the economic mainstream of American life." President George H.W. Bush, Remarks at the Signing of the Americans with Disabilities Act (July 26, 1990), *available at* http://www.eeoc.gov/eeoc/history/35th/videos/ada_signing_text.html.

25.     Title II of the ADA prohibits discrimination on the basis of disability by public entities. 42 U.S.C. § 12132. A "public entity" is any state or local government and any department, agency, or other instrumentality of a state or local government, and covers all services, programs, and activities provided or made available by public entities, including through contractual, licensing, or other arrangements. *See* 42 U.S.C. §§ 12131(1), 12132; 28 C.F.R. § 35.130. Accordingly, Title II's coverage extends to the State of Rhode Island and its respective agencies, departments, and programs.

26.     Congress directed the Attorney General to issue regulations implementing Title II of the ADA. 42 U.S.C. § 12134(a).

27.    The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "The most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." *Id*. pt. 35 app. B.

28.    Title II's regulations further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary segregation, or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" *Id*. § 35.130(b)(3).

29.    The Supreme Court has held that Title II prohibits the unjustified segregation of individuals with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 597-600 (1999).

30.    The Supreme Court's holding in *Olmstead* "reflects two evident judgments." *Id*. at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id*. at 601.

31.    Under *Olmstead*, public entities are required to provide community-based services, rather than segregated services, when such services (a) are appropriate, (b) are not opposed by the affected persons, and (c) can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id*. at 607.

B.   **Application of the ADA and *Olmstead* to Day Activity Services**

32.   The ADA's integration mandate applies to all of the programs, services, and activities of a public entity, including its day activity services. 28 C.F.R. § 35.130(d) ("A public entity shall administer *services, programs, and activities* in the most integrated setting . . . .") (emphasis added).

33.   Thus, under the ADA, states and localities must administer their employment and day services so as to ensure individuals with disabilities are offered those services in the most integrated settings appropriate for them, such as supported employment and integrated day settings.

34.   The unnecessary segregation of people with I/DD in sheltered workshops and facility-based day programs contravenes one of the primary purposes of the ADA: to end the isolation and segregation of individuals with disabilities.

## FACTUAL ALLEGATIONS

A.   **Defendant's Systems for Providing Employment, Vocational Rehabilitation, Day, and Transition Services to Persons with I/DD Unnecessarily Over-rely on Segregated Employment and Day Service Settings**

35.   The State manages its training, vocational, Medicaid, employment, and day services for persons with I/DD, through its Executive Office of Health & Human Services ("EOHHS"). EOHHS coordinates several State agencies responsible for the delivery of services to adult individuals with I/DD, including: (a) the Department of Human Services, of which the Office of Rehabilitation Services ("ORS") is a sub-agency; and (b) the Department of Behavioral Healthcare, Developmental Disabilities and Hospitals ("BHDDH"), including its Division of Developmental Disabilities. These agencies determine the amount and allocation of funding for these services, including the types of employment and day services available, the licensing of

employment and day service providers, and the levels of funding for sheltered workshops and facility-based day programs versus integrated supported employment and integrated day programs.

36.    The State, through BHDDH, determines reimbursement rates for services and supports for individuals with I/DD, facilitates data collection with respect to the statewide day activity service system, and oversees the development and implementation of Individual Support Plans ("ISPs") and ISP meetings for service recipients to plan for and set forth the services and supports that individuals will access within the day activity service system. *See* 46-1-14 R.I. Code R. § 37.0.

37.    The types of services that the BHDDH-licensed service providers may provide to individuals with I/DD include (a) residential support services, 46-1-14 R.I. Code R. §§ 39.0-42.0; and (b) non-residential supports, which are called "day activity services," *id.* §§ 43.0-45.0.

38.    "Day activity services" may include (a) "[d]ay program service;" (b) "[p]revocational training;" (c) "[s]upported employment;" or (d) "[j]ob development." *Id.* § 43.01. Day program services can be offered either on-site at a facility, or in a community setting. *See id.* § 44.01; *see also id.* §§ 1.14 (defining "Center-Based Day Program Service"), 1.17 (defining "Community-Based Day Program Service").

39.    The State's reimbursement model for I/DD services, has historically provided few, if any, incentives for providers to expand or convert their service structures to include more supported employment and integrated day services. Since June 2013, BHDDH has stated a willingness to incentivize supported employment services through its current rate structure; nevertheless, these efforts have just begun, do not presently provide sufficient flexibility to

providers in billing for services in community settings, and have yet to reverse the State's significant overreliance on segregated employment and day service settings.

40.     The State, through BHDDH, also has failed to support adequate opportunities for training, professional development, or introduction to best practices in supported employment or integrated day services for its staff and the staff of day activity service providers. This failure has resulted in the lack of a professionalized workforce trained to respond to the specific needs of individuals with I/DD who seek services in integrated daytime settings. For example, unlike the detailed training qualifications the State maintains for employment professionals in the field of mental health and substance abuse services, the State currently mandates no particular certification or training for employment professionals in the field of I/DD direct services. *Compare* 46-1-14 R.I. Code R. § 45.08 *with* 46-1-13 R.I. Code R. § 9.14.

41.     The State, through BHDDH, has structured its day activity service system to exclude individuals with the most severe disabilities from accessing supported employment services, without individualized consideration of such persons.

42.     Further, the State, through its BHDDH social workers and case managers, fails to interact with supported employment and integrated day providers to identify and locate opportunities for individuals with I/DD. For instance, BHDDH social workers typically do not provide information or individualized counseling to service recipients and their families about supported employment and integrated day service options.  Instead, individuals are routinely given a publicly available BHDDH provider agency flyer that includes a list of approximately 40 state-licensed Developmental Disability Organizations ("DDOs"), the majority of which are facility-based providers. BHDDH social workers have taken new or prospective entrants to the

11

system on tours of facility-based programs in their geographic area, without ever introducing such persons to integrated alternatives.

43.     The State uses the Supports Intensity Scale ("SIS") as a tool for allocating the personal budgets of individuals with I/DD who receive services and supports from BHDDH. However, the State, including BHDDH, administers the SIS assessment in a manner that serves as a barrier to individuals' access to integrated supported employment and integrated day programming..

44.     ORS provides services to individuals with disabilities, including individuals with I/DD, through its Vocational Rehabilitation Program. The services provided through this program focus on initial job readiness and placement. *See* 39-1-112 R.I. Code R. § 101.2(II)(B).

45.     The vocational rehabilitation services provided by ORS pursuant to an Individual Plan for Employment ("IPE") are time-limited to a maximum of eighteen months. *See id.* § 115.14(III)(B)(1); *see also* 34 C.F.R. §§ 363.6(c)(2)(iii)–(iv).

46.     The State, through ORS, has failed to assist service recipients who have been in segregated sheltered workshops and facility-based day programs, some for many years, and other individuals with I/DD who are at risk of placement in sheltered workshops and facility-based day programs, with the services and supports necessary to access integrated employment settings. Specifically, the State, through ORS, has denied numerous Rhode Islanders with I/DD who are unnecessarily segregated in sheltered workshops and facility-based day programs, and many other individuals at risk of such settings, the opportunity to access and benefit from ORS' established resources, including: ORS' vocational assessment process; vocational rehabilitation counselors; job developers; job coaches; and other employment professionals to facilitate the transition from segregated to integrated employment settings. For example, in a 2012 State-

commissioned survey, approximately 94% of respondents of the day activity system were not

ORS clients within the past year. Just 2.8% had been ORS clients during the same period. Paul

V. Sherlock Ctr., 2012 RI DD Employment and Day Activity Data Summary (on file with the

Paul V. Sherlock Center). Moreover, ORS has similarly failed to assist students transitioning

from school to work, as the same 2012 State-commissioned survey stated that just 14% of youth

age 24 and under had an open case with or even applied for services from ORS within the past

year. *Id.*

47.     The State, including BHDDH, has failed to develop a uniform, statewide,

professionally appropriate vocational assessment, discovery, and career development planning

process for individuals with I/DD. Consequently, many individuals with I/DD in Rhode Island

have been evaluated in segregated settings, given few opportunities to discover their career

interests in integrated settings, and referred to segregated facilities, including sheltered

workshops and facility-based day programs, as a matter of course.

48.     The State, through BHDDH and ORS, has additionally failed to link individuals

who have been in segregated sheltered workshops and facility-based day programs, some for

many years, with supported employment and integrated day services. For instance, the State has

failed to provide integrated vocational assessment, discovery, and career planning services to

individuals with I/DD in facility-based programs who can and want to leave such programs to

work and participate in the community. A State-commissioned survey showed that, in 2011 and

2012, approximately 5% of individuals in state-licensed facility-based DDO programs reported

spending any time looking for a job. *Id.*

49.     In addition to delivering services to adult individuals with I/DD, the State,

through the Rhode Island Department of Education ("RIDE"), BHDDH, and ORS, administer,

oversee, and provide transition services for students with I/DD in secondary schools to prepare students to leave school and enter postsecondary employment and/or education. Transition services are "a coordinated set of activities for a young person with a disability, designed within an outcome oriented process, that promotes movement from school to post-school activities including postsecondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation." R.I. Gen. Laws § 16-24-18(e)(1); 29 U.S.C. § 705(37) (the Rehabilitation Act of 1973, as amended); *see also* 20 U.S.C. § 1401(34) (the Individuals with Disabilities Education Act ("IDEA")).

50.     The State, including RIDE, has failed to ensure, through its rules, policies, regulations, and guidance, that local school districts plan for and allow students with I/DD to access the services and supports— including vocational rehabilitation, transition, and supported employment services— necessary for students to make meaningful and informed choices about postsecondary integrated employment and day services.

51.     The State, including BHDDH and ORS, has failed to ensure that students with I/DD are provided with meaningful and informed choices and preparation for work in integrated settings, and has failed to ensure that such students are provided timely information and access to appropriate services and supports to allow them to choose to work in integrated settings. As a direct consequence of these acts and omissions by the State, students with I/DD are at serious risk of unnecessary placement in segregated sheltered workshops.

52.     In February 2013, BHDDH adopted an Employment First policy, which states:

[E]mployment opportunities in fully integrated work settings shall be the first and priority option explored in the service planning for working age adults with developmental disabilities in Rhode Island. While all options are important and valued, integrated employment is more valued than non-employment, segregated

employment, facility-based employment, or day habilitation in terms of employment outcomes for individuals with developmental disabilities.

Department of Behavioral Health, Developmental Disabilities and Hospitals, "Rhode Island

Employment First Policy: A Time for Action" (Feb. 2013), *available at*

www.riddc.org/downloads/BHDDHEmploymentFirstPolicy21213.doc. The Rhode Island

Employment First Policy and Five Year Implementation Plan, adopted in February 2013, states:

> It is expected that through implementation of this policy, individuals will be
> engaged primarily in paid employment. However, it is recognized that for
> individuals who are working on a part time basis, employment may not fully
> occupy their weekday hours. For these individuals, it is expected that the priority
> for activities during non-working daytime hours should be on supporting
> individuals in other typical adult activities in the community, including volunteer
> work, recreation, and daily living activities.

Department of Behavioral Health, Developmental Disabilities and Hospitals, "Employment First

Rhode Island State Policy and Five Year Implementation Plan" (Feb. 2013) (on file with

BHDDH).

53.     Nevertheless, the State, including BHDDH, only recently issued this Employment

First Policy, after the United States informed the State of its investigation. Prior to this policy's

issuance there was no state level policy that prioritized integrated employment or day services

for persons with I/DD as service planning options in Rhode Island. The State's Employment

First Policy has not, as implemented to date, succeeded in remedying the State's overreliance on

segregated employment and day services for people with I/DD. The State's Employment First

Policy does not constitute a comprehensive effectively working Olmstead plan, because, *inter*

*alia*, it does not include concrete and reliable commitments to expand integrated opportunities; it

lacks specific and reasonable timeframes and measurable goals for which Rhode Island will be

accountable to remedy its over-reliance on segregated service settings; it correspondingly has

failed to demonstrate success in actually moving such individuals to more integrated settings

from sheltered workshops and/or facility-based day programs; and it does not have funding specifically identified for the purpose of carrying out the policy.

54.    As a direct result of the actions and inactions of the State, the current training, vocational, Medicaid, employment, and day services systems for persons with I/DD are unnecessarily over-reliant on segregated sheltered workshops and facility-based day programs to the exclusion of supported employment and integrated day programs.

**B.    Rhode Island Unnecessarily Serves Thousands of Individuals with I/DD in Segregated Sheltered Workshops and Facility-Based Day Programs**

55.    Through its day activity service system, Rhode Island delivers services, programs, and activities to persons with I/DD. The State plans, funds, administers, licenses, manages, and oversees the day activity service system by, among other things, determining what employment and day services to provide, what rates are to be paid for services, who will provide the services, in what settings to provide them, and how to allocate funds among various services and settings.

56.    In Rhode Island, approximately 2,700 people with I/DD receive employment and/or day services in segregated sheltered workshops and facility-based day programs. After entering a sheltered workshop, individuals with I/DD tend to remain in the sheltered workshop for decades, representing a permanent placement. According to a 2012 State-commissioned survey, nearly half (46.2%) of individuals in Rhode Island facility-based employment have received services in that setting for ten or more years, and just over one-third (34.2%) of individuals in facility-based employment have been there for fifteen or more years. Paul V. Sherlock Ctr., 2012 RI DD Employment and Day Activity Data Summary (on file with the Paul V. Sherlock Center).

57.     Rhode Island's day activity service system for people with I/DD includes sheltered workshops, facility-based day programs, group employment, individual supported employment, and integrated day services. 46-1-14 R.I. Code R. § 43.01.

58.     A sheltered workshop is a facility-based service setting that congregates individuals with I/DD who perform work tasks inside of the facility. Sheltered workshops are operated by service provider entities. In general, a sheltered workshop employs only individuals with I/DD or other disabilities except for service support staff. Individuals with I/DD are frequently paid far less than minimum wage for work performed in sheltered workshops. In sheltered workshops, individuals with I/DD have limited or no engagement with nondisabled peers, except for provider agency support staff.

59.     Group or enclave employment typically consists of up to eight individuals with I/DD who work as a group in the community and are supervised by staff from a service provider. Group employment includes "crews," such as cleaning or janitorial crews. While such individuals' work is physically located in the community, the individuals generally lack non-disabled co-workers, customers, or peers; work only with other members of the group; are typically not employees of the businesses or entities where they work; and often earn below minimum wage.

60.     By contrast, supported employment services are the services necessary to find, place, maintain, and provide ongoing support to an individual with I/DD in a competitive, integrated employment setting in the community. A competitive, integrated employment setting is a typical job in a community-based setting where employees have the opportunity to work alongside non-disabled co-workers and earn at least minimum wage.

17

61.     A facility-based day program is a segregated facility-based service that congregates individuals with I/DD.  Facility-based day programs, like sheltered workshops, are institutional facilities that are operated by service provider entities in which persons with I/DD have little to no contact with non-disabled persons besides paid staff. In facility-based day programs, individuals are not paid a wage for the activities that they perform. Facility-based day programs may be co-located with sheltered workshops, where some individuals spend part of their time performing organized group activities in the day program, and part of their time performing work tasks in the nearby sheltered workshop.

62.     As part of facility-based day programs, some individuals with I/DD may be transported from the day program facility to public spaces in a group, typically in vans, with only other individuals with I/DD, other than paid staff, also providing individuals with limited or no engagement with non-disabled peers.

63.     The State's sheltered workshops are typically co-located with facility-based day programs, and a significant portion of service recipients split their daytime hours between both settings. According to a 2012 State-commissioned survey, approximately 86% of individuals in sheltered work also spend one or more hours in facility-based and/or home-based non-work activities per week.

64.     By contrast, integrated day services (*e.g.*, day program services provided in a community setting) are services and supports that allow persons with I/DD to engage in self-directed activities in the community at times, frequencies, and with persons of their choosing, during hours when they are not receiving employment or residential services. Integrated day services are designed to allow individuals with I/DD to interact to the fullest extent possible with non-disabled peers.

65.    Similarly, individuals with I/DD often receive services in facility-based day programs for multiple decades, and at some provider facilities individuals receive services from the same provider from the time they are young children until well into adulthood.

66.    Approximately 220 persons with I/DD receive employment services in group employment throughout Rhode Island. *Id.*

67.    Many individuals with I/DD receiving sheltered workshop, facility-based day, and/or group employment services are capable of working in individual supported employment and receiving integrated day services and would not be opposed to doing so if offered a meaningful and informed choice.

68.    Only approximately 385 individuals, or approximately 12% of individuals in the State service system, participate in individualized, integrated employment. Rhode Island provides some integrated alternatives to segregated sheltered workshops and facility-based day programs, including integrated supported employment services and integrated day services, though not in sufficient supply to serve all those who qualify for and are not opposed to such services.

69.    Consequently, persons with I/DD across Rhode Island are unnecessarily forced to obtain employment services in segregated sheltered workshops or group employment or are placed at risk of segregation in sheltered workshops, even though they could be appropriately served in integrated employment settings. Other persons with I/DD in Rhode Island are unnecessarily forced to obtain day services in segregated facility-based day programs or are placed at risk of segregation in facility-based day programs, even though they could be appropriately served in integrated employment and/or integrated day settings. *Id.*

70.     Individuals with I/DD in sheltered workshops in Rhode Island earn exceedingly low wages. According to a State-commissioned survey, the average hourly wage of sheltered workshop participants in Rhode Island is approximately $2.21 per hour. *Id.*

71.     Individuals with I/DD in facility-based day programs in Rhode Island are cut off from earnings altogether during the hours that they spend in facility-based day program.

72.     By contrast, individuals with I/DD in Rhode Island who receive individualized supported employment services in integrated settings earn approximately $8.92 per hour, which is higher than the State's minimum wage of $8.00 per hour. *Id.*

73.     Consequently, unnecessary segregation in sheltered workshops and facility-based day programs has negatively impacted the ability of individuals with I/DD in the State to achieve economic self-sufficiency, personal independence, and autonomy.

74.     The State's data demonstrates Rhode Island's overreliance on segregated sheltered workshops and facility-based day programs. State data indicates that in July 2011, 83% of Rhode Islanders with I/DD in the day activity service system accessed "non-integrated day activities." Dep't of Behavioral Health, Developmental Disabilities & Hosps., Project Sustainability: Funding Initiatives Supporting Inclusion, Community Integration and Supported Employment, Feb. 14, 2013, at 7 (on file with the BHDDH).

75.     A 2012 State-commissioned survey shows that, of 3,235 respondents in the employment and day service system, approximately 80% reported participating in facility-based day programs. Paul V. Sherlock Ctr., 2012 RI DD Employment and Day Activity Data Summary (on file with the Paul V. Sherlock Center).

76.     By contrast, the same 2012 State-commissioned survey shows that of 3,235 respondents in the employment and day activity service system for persons with I/DD,

approximately 12% reported that they participated in individualized, integrated paid

employment. *Id.*

77.     The State's over-reliance on segregated settings is also evident in the number of

hours that participants spend in each service setting. State documents report that: "[o]nly a small

portion of all hours billed for day activities (less than 10%) are for supported employment or

prevocational training." Dep't of Behavioral Health, Developmental Disabilities & Hosps.,

Project Sustainability: Funding Initiatives Supporting Inclusion, Community Integration and

Supported Employment, Feb. 14, 2013, at 7 (on file with the BHDDH). Accordingly, Rhode

Island's day activity service program participants spend the vast majority of their daytime hours

in segregated settings.

**C.     Each Year, Rhode Island Places Hundreds of Youth with I/DD at Serious Risk of
Unnecessary Segregation in Sheltered Workshops and Facility-Based Day Programs**

78.     According to State data, in recent years, hundreds of Rhode Island youth with

I/DD have transitioned from secondary school to Rhode Island adult day and employment

service providers. Yet only approximately 5% of the youth with I/DD who transitioned from

Rhode Island secondary schools between 2010 and 2012 transitioned into jobs in integrated

settings.

79.     Instead, the majority of youth with I/DD who leave Rhode Island secondary

schools transition to segregated sheltered workshops and day programs to receive adult services.

Many of these youth are able to work in integrated employment settings and are not opposed to

doing so.

80.     Recently-transitioned youth with I/DD represent a portion of the overall

population served by the State's licensed DDOs, including sheltered workshop and facility-based

day programs. In 2012, almost 8% of individuals in such programs were reported to be youth age 24 or under. *Id.*

81.     The State's failure to promote the timely availability of sufficient integrated transition services or to link students in school districts across Rhode Island with appropriate postsecondary services and supports (like supported employment or integrated day services) has placed youth with I/DD at serious risk of entering segregated sheltered workshops and facility-based day programs.

82.     The State, including RIDE, has failed to include in State policy, and to inform and set standards for school districts throughout Rhode Island, that integrated work placements and work-based learning experiences are critical to mitigating the risk of unnecessary postsecondary placement in sheltered workshops and facility-based day programs.

83.     The State, through its vocational rehabilitation counselors and BHDDH social workers, frequently fails to present transition-age students with I/DD with viable alternatives to segregated sheltered workshops and facility-based day programs.

84.     The State, including BHDDH and ORS, often fails to provide the appropriate transition services necessary to inform the employment-related recommendations contained in students' post-secondary planning documents.

85.     BHDDH social workers often take youth with I/DD to visit facility-based programs, including sheltered workshops and day programs, rather than integrated employment and day programs, as part of the referral process directly from high school.

86.     Students are often assessed by vocational rehabilitation counselors in segregated settings to determine their eligibility for ORS services, frequently leading to permanent placement in segregated rather than integrated employment settings.

87.     Despite Rhode Island's express requirement that transition planning begin at age 14, the State has often failed to ensure that students are given meaningful information about, and opportunities to experience, integrated employment and day services early enough to make an informed choice to transition to an integrated setting following their exit from school. Individuals become eligible for ORS services at age 16, and for services through BHDDH at age 18. *See generally*, U.S. Dep't of Educ., Office of Special Educ. & Rehabilitative Servs., Rehab. Servs. Admin., "Fiscal Year 2012 Monitoring Report on the Rhode Island Department of Human Services, Office of Rehabilitation Services Program" (July 16, 2012), *available at* http://www.ors.ri.gov/PDFfiles/2012%20ri%20monitoring%20visit.pdf; Rhode Island Disability Law Ctr., Inc., "A Consumer's Guide to Rhode Island State Vocational Rehabilitation Services," *available at* http://www.ridlc.org/publications/Consumers_Guide_to_RI_Voc_Rehab.pdf; 46-1-5:4 R.I. Code R. § 4.1; 46-1-5:2 R.I. Code R. § 2.8.  Yet many students throughout Rhode Island only receive employment-related transition planning or are enrolled in ORS or BHDDH services one year or less before their exit from school, if at all.

88.     Even students with I/DD who receive some transition planning services generally do not have access to services and supports that will allow them to make the informed choice to participate in postsecondary competitive, integrated employment settings, such as integrated transition work placements and work-based learning experiences such as site visits, job shadowing, soft skill and job skill development, internships, part-time employment, summer employment, youth development and leadership, peer and adult mentoring, and benefits planning.

89.     The State's failure to prepare students with I/DD for integrated employment and community-based day settings results in such students' acculturation and training in segregated

sheltered workshops and facility-based day programs, often resulting in students' permanent placement in such settings. For instance, some Rhode Island students with I/DD perform in-school jobs designated for students with disabilities (instead of performing those same jobs in the community); others acquire work-related skills in a special education classroom without ever being presented with the choice to exercise those skills in a community job. Still other students with I/DD receive work-related transition services from facility-based adult service providers, including segregated sheltered workshops and facility-based day programs.

90.     Even though individuals become eligible for Medicaid services at age 18, BHDDH does not administer services to eligible youth with I/DD until they are 21 years old. This service gap has caused many students who exit high school prior to age 21 to either sit at home without services, or to have to enroll in sheltered workshop and day programs in order to receive employment services at all.

91.     The State has failed to provide integrated, transition-related adult services to many students with I/DD who are eligible for them, creating the serious risk that such students will transition to segregated settings following their exit from school.

**D.     Individuals with I/DD in or At Risk of Placement in Sheltered Workshops or Facility-Based Day Services Are Qualified for and Are Not Opposed to Receiving Services in More Integrated Settings**

92.     Individuals who are in or at risk of placement in sheltered workshops and facility-based day programs are largely indistinguishable from individuals with I/DD who receive supported employment and integrated day services. These individuals have similar diagnoses and support needs as individuals who work and access day services in integrated settings with the types of services and supports that currently exist in Rhode Island's day activity service system.

93.     Rhode Island service providers are capable of providing services in integrated settings and they report that, historically, they served a larger percentage of persons with I/DD in their programs in integrated settings.

94.     Numerous individuals with I/DD in Rhode Island have expressed their desire to receive the supported employment and integrated day services that would allow them to work and participate in integrated settings. Many Rhode Islanders with I/DD in or at risk of placement in sheltered workshops and facility-based day services would not oppose receiving supported employment and integrated day activity services if such services were available and if these individuals had fully-informed choices and realistic opportunities to receive such services.

E.      **With Reasonable Modifications to Its Existing Services, Rhode Island Can Provide Day Activity Services in Integrated Settings**

95.     Providing integrated services to adults and youth in or at risk of entering sheltered workshops and facility-based day programs can be reasonably accommodated. The types of services needed to support adults and students with I/DD in integrated employment and day settings—including individualized transition services, supported employment, and integrated day services—already exist in Rhode Island's employment and day activity service system.

96.     The State provides supported employment and integrated day services to some persons with disabilities, though not in sufficient capacity to serve all those who qualify for such services. For thousands of other individuals with similar diagnoses and needs, the State's day activity service system has left them with no choice but to enter sheltered workshops and facility-based day programs to receive services.

97.     Individual supported employment and integrated day services are a cost-effective alternative to sheltered workshops and facility-based day programs.

98.     The actions needed to remedy the State's employment, transition, vocational rehabilitation, and day service systems to ensure compliance with the ADA could be achieved through the redirection, reallocation, expansion, and coordination of existing resources.

**F.     The United States' Investigation**

99.     Following an investigation, on November 6, 2013, the U.S. Department of Justice presented statewide findings to counsel for the State and State officials at an in-person meeting. The Department provided the State notice of its failures to comply with the ADA with respect to the State's day activity service system for individuals with I/DD, and outlined the steps necessary for the State to meet its obligations under the ADA. The Department also communicated that, in the event that resolution could not be reached by voluntary means, the Department may initiate a lawsuit.

100.     On January 6, 2014, the Department provided the State with a Letter of Findings which described the minimum remedial measures necessary for the State to address the statewide ADA violations identified therein. The Letter of Findings memorialized the Department's previously communicated extensive oral findings about the State's day activity service system for persons with I/DD.

101.     Over the course of the next several months, the Department met with State officials and exchanged written proposals in an attempt to reach a resolution to the deficiencies identified in the Department's statewide oral and written findings.

102.     All conditions precedent to the filing of this Complaint have occurred or have been performed.

## COUNT I

### VIOLATION OF TITLE II OF AMERICANS WITH DISABILITIES ACT
(42 U.S.C. § 12131 *et seq.*)

103.    Paragraphs 1 through 102 of this Complaint are hereby re-alleged and incorporated by reference.

104.    Defendant State of Rhode Island is a public entity subject to Title II of the ADA, 42 U.S.C. § 12131(1).

105.    The following persons have a disability covered by Title II of the ADA, 42 U.S.C. §§ 12102, 12131(2), and qualify for receiving or participating in employment, vocational rehabilitation, day activity, and/or transition-related educational services, programs, or activities provided by the State: (a) individuals with I/DD who are eligible, or likely to be found eligible, for services or supports from BHDDH and/or ORS; and (b) students with I/DD currently or recently enrolled in a Rhode Island secondary school.

106.    The State has violated and continues to violate the ADA and, accordingly, has injured numerous individuals with I/DD, by (a) administering and delivering its employment, vocational rehabilitation, day activity, and transition services in a manner that has unnecessarily caused service recipients to be denied the opportunity to receive the benefits of the State's services in the most integrated setting appropriate to their needs, and has unnecessarily caused Rhode Island secondary school students with I/DD to be placed at serious risk of segregation; and (b) failing to reasonably modify its administration and delivery of these services in a manner that would avoid discrimination against, and unnecessary segregation of such individuals with disabilities.

107.    Defendant's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. pt. 35.

108.    Providing day activity services in integrated settings to persons with I/DD and ensuring that students with I/DD in Rhode Island secondary schools are not placed at serious risk of segregation can be reasonably accommodated.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

A.    Grant judgment in favor of the United States and declare that Defendant State of Rhode Island has violated Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, by

1.    Failing to provide employment services, programs, or activities for persons with I/DD in the most integrated setting appropriate to their needs; and

2.    Placing Rhode Island students with I/DD at serious risk of unnecessary segregation in sheltered workshops and/or facility-based day programs;

B.    Enjoin Defendant State of Rhode Island to:

1.    Cease discriminating against individuals with I/DD in the State's day activity service system;

2.    Cease putting students with I/DD in Rhode Island secondary schools at serious risk of unnecessary segregation upon their exit from school;

3.    Provide each qualified individual with I/DD served by BHDDH and ORS, who does not oppose such services, with vocational rehabilitation, integrated supported employment and community-based day services programs, or activities, that are consistent with his or her individual needs and that are designed to allow him or her to secure, maintain, and succeed in integrated employment settings and otherwise engage in self-directed activities in the community at times and frequencies and with persons of his or her own choosing when not receiving employment or residential services;

        4.      Ensure that each and every student with I/DD in Rhode Island secondary schools is provided with vocational rehabilitation, day activity services, including integrated supported employment and integrated day service programs, and transition-related educational services, programs, or activities, which are consistent with his or her individual needs and which are designed to allow him or her to secure, maintain, and succeed in integrated employment and community-based day settings following his or her exit from school; and

        C.      Order such other appropriate relief as the interests of justice may require.

Dated:  April 8, 2014                                    Respectfully submitted,


PETER F. NERONHA                                         JOCELYN SAMUELS
United States Attorney                                   Acting Assistant Attorney General
District of Rhode Island

                                                         EVE L. HILL
RICHARD B. MYRUS                                         Deputy Assistant Attorney General
Assistant United States Attorney
United States Attorney's Office
Chief, Civil Division
50 Kennedy Plaza, 8th Floor
Providence, RI 02903                                     REBECCA B. BOND
Phone: (401) 709-5000                                    Section Chief
Fax: (401) 709-5001                                      SHEILA M. FORAN
richard.myrus@usdoj.gov                                  Special Legal Counsel
                                                         ANNE S. RAISH
                                                         Deputy Chief


                                                         REGINA KLINE (Md. #0812170152)
                                                         H. JUSTIN PARK
                                                         Trial Attorneys
                                                         Disability Rights Section
                                                         Civil Rights Division
                                                         United States Department of Justice
                                                         950 Pennsylvania Avenue, NW - NYA
                                                         Washington, DC 20530
                                                         Phone: (202) 307-0663
                                                         Fax: (202) 305-9775
                                                         regina.kline@usdoj.gov

                                                         *Counsel for Plaintiff United States of America*

30