# UNITED STATES DISTRICT COURT

# DISTRICT OF RHODE ISLAND

**UNITED STATES OF AMERICA,**  Case No. CA14-175

    Plaintiff,

v.  **DECLARATION OF TAMMY RUSSO**

**STATE OF RHODE ISLAND,**

    Defendant.

I, Tammy Russo, hereby declare:

1. I am the mother of Joey Russo, age 23, who is a member of the target population. Joey graduated from high school in 2014.

2. This declaration has been prepared to testify to the improvements that have been made by the state as well as the challenges that remain for creating a seamless transition from school to work for transition-aged youth in Rhode Island.

3. In 2006, before the Consent Decree was signed, I asked the school to request an Office of Rehabilitation Services (ORS) counselor attend Joey's IEP meeting when he turned 14 years old to explain how to develop work skills and engage with the developmental disability system.

4. No one from Department of Behavioral Healthcare, Developmental Disabilities and Hospitals (BHDDH) or ORS contacted me or anyone on Joey's individualized education plan (IEP) team before 2009. In 2009, ORS first attended Joey's IEP meeting. Joey was 17 years old at the time of that meeting. At the meeting, the ORS

counselor offered to do vocational exploration. We agreed. It took ORS two years to conduct vocational exploration.

5. In August 2011, Joey engaged in a vocational evaluation, using a pictorial inventory interest survey. Vocational exploration was based on the results of his evaluation, which showed an interest in office work. Through vocational exploration, Joey engaged in two work site visits in June 2011. The first was at the Department of Children, Youth and Families where Joey shredded documents for approximately two days. Joey's second work trial experience was at Briarwood Meadow apartment complex where he did janitorial tasks for approximately one day.

6. In 2011, when Joey was 19 years old, ORS conducted a technology evaluation. As a result of the technology evaluation, Joey was able to receive a voice output device for in-school use, to facilitate communication during school hours. Prior to ORS services, RIDE allowed him to use a computer to help communicate.

7. In 2012, Joey received his certificate of transition and continued on to an 18-21 year old transition program provided by Rhode Island Department of Education (RIDE).

8. Joey's ORS counselor promised a second vocational evaluation before he reached age 21. Despite my request that the evaluation be done, ORS never completed the evaluation.

9. On January 20, 2014, Joey turned 21 and his transition program ended.

10. I called ORS to ask about additional services, and Joey's ORS counselor suggested conducting another technology evaluation. As a result of this second technology evaluation, Joey received a tablet for home use. However, we received no training on how to use the tablet to assist Joey. The tablet did not include any preloaded

applications or information on what applications or other programs would be best for Joey. As a result, I had to do the research, identify and install applications that were appropriate to assist Joey. No one from ORS ever contacted us to follow up on the loaned tablet, how we were using the technology, or whether we needed any assistance.

11. On February 5, 2016, we received a letter from ORS indicating that Joey was no longer eligible for ORS services and that his case was being closed because Joey had not been placed in a job. The letter was signed, not by the ORS counselor who suggested Joey receive additional technology and vocational evaluations, but by a person we had never met. Joey never received the suggested vocational evaluation.

12. ORS could improve its services under the Consent Decree by: attending IEP meetings earlier to better understand each child's successes and needs; creating regular check ins to communicate status updates and/or reasons for any delays; and using the results of the vocational evaluation and following through with all of its recommendations, to craft a truly person-centered plan.

13. I submitted Joey's application for BHDDH services on February 22, 2011, when Joey was age 18, on the advice of a parent advocate. No one from the State contacted me to suggest that I apply.

14. I received a letter from BHDDH on July 9, 2013 stating that Joey was eligible for services. The letter indicated that, in order for services to begin, Joey would need to receive an evaluation and service intensity scale assessment (SIS). On July 24th, he completed a SIS evaluation. Tier designation was sent in a letter August 13, 2013 and

stated that those services would start on Joey's 21st birthday, January 20, 2014, giving me more than five months to find a provider.

15. In the Fall of 2013, I contacted about ten providers listed from a BHDDH certified list. Unfortunately the list was not limited to providers of DD services, and due to limited capacity some were not accepting new clients. I only received tours of three providers. By the end of December 2013, I had found a provider for services.

16. Joey's RIDE transition program services ended on January 20, 2014. BHDDH did not begin services until February 23, 2014. As a result of BHDDH's delay, Joey was without services for over one month.

17. I enrolled Joey in a day services program once BHDDH began services. Due to constant turnover in staff, none of the provider staff were familiar enough with Joey's individual service plan (ISP) goals, needs, and interests to be able to develop a daily plan for him.

18. Because the provider was unable create a daily service plan for Joey, I wrote the plan myself. I created a binder of information that included Joey's interests, ISP goals, and support needs. I used this information to develop an organized schedule of daily activities that would interest and challenge Joey. I wanted to ensure Joey interacted with people in the community other than his family and support staff. I included exercise at the YMCA through a subsidy, education at the local library using parent provided workbooks and supplies, bowling for entertainment, and volunteer experiences that I put in place using connections he had through school and our local community.

19. Within six months of volunteering to serve meals at a local senior center, due to my request that the non-profit develop Joey's work skills, Joey was given his own shift because he is such a dependable, hard worker.

20. Provider direct support staff have told me that the provider has since used the binder model I created for Joey to assist other individuals.

21. BHDDH and their certified provider agency could improve its services by employing more frequent case management and oversight, not just at the ISP development meeting. BHDDH should also develop college or trade school programs for life skill courses, and coordinate better with ORS to develop work skills through training as well as a better vocational interest evaluation that focuses on each individual's preferences, interests, needs, and strengths.

22. The most helpful services BHDDH provided were family input sessions, staffing for day supports, and transportation services.

*I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

DATED this ___4th_ day of _____April__, 2016 at Providence, Rhode Island.

s/ Tammy Russo