UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>STATE OF RHODE ISLAND<br><br>Defendant. | Case No. CA14-175 |

# DECLARATION OF CLAIRE ROSENBAUM
# OF THE PAUL V. SHERLOCK CENTER ON DISABILITIES

1. I am the Adult Services Coordinator at the Paul V. Sherlock Center on Disabilities. The Sherlock Center works to ensure that individuals with disabilities participate fully in their communities. I have been with the Sherlock Center since 2001.

2. In the course of my work, I monitor a listserv of approximately 250 individuals with disabilities and their families. I also host in-person meetings every other month, which are attended by an average of twenty individuals each meeting.

3. I am also the main presenter of two family outreach presentations. Since Spring 2015, I have presented *Family Employment Awareness Training* seven times to families of transition-age youth. I have also presented *A New Path: Family Employment Information Sessions* at former sheltered workshops two times this year, and I am scheduled to present an additional three times later this spring.

4. Furthermore, I draft Individual Support Plans for approximately thirty-five individuals each year.

5. In addition, my daughter currently receives disability support services from the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities and Hospitals (BHDDH) and the Rhode Island Office of Rehabilitation Services (ORS).

6. Based on my professional and personal experiences, I have identified several challenges to the successful implementation of the Consent Decree.

1

7. One of the greatest problems is the gap in services experienced by many individuals with disabilities as they transition from youth services to adult services.

8. This gap in disability services results, in part, from the fact that BHDDH does not begin reviewing an individual's eligibility for adult services early enough to ensure that adult services are in place when an individual turns twenty-one and is no longer eligible for youth services.

9. Individuals with disabilities may apply with BHDDH for adult services at the age of eighteen.

10. BHDDH does not begin to review applications until several months prior to an individual's twenty-first birthday or anticipated exit from high school, however.

11. According to some parents, BHDDH has confirmed that applications for adult disability services may sit untouched at the agency for a year or more. These parents applied for disability services on behalf of their children when they turned eighteen. When these parents called to follow-up, BHDDH indicated that although the applications were complete, it would not review them until several months before the applicants' twenty-first birthdays.

12. Entry into the BHDDH service system is lengthy and involves multiple steps, including but not limited to: reviewing an individual's eligibility for services, performing a Supports Intensity Scale (SIS) assessment, assigning an individual to a particular tier, and reviewing any requests for additional supports above the assigned tier.

13. Furthermore, after BHDDH completes its review process, an individual must still identify an appropriate provider and apply for services with that provider. This process can also be quite lengthy, especially since many providers are not currently accepting new clients.

14. If an individual chooses the self-directed supports option—which is often the only option available when providers are not accepting new clients in the individual's geographic region—there are several additional steps to be taken before an individual support plan can be established.

15. BHDDH's practice does not allow individuals sufficient time to establish appropriate adult services and to ensure a seamless transition between an individual's youth and adult disability services.

16. Consequently, I know individuals who have experienced a gap in disability services, spanning anywhere from a few weeks to a few months to a year or more.

17. Another significant challenge is the dearth of job development services available to individuals with disabilities.

18. Many individuals are unable to access job development services because providers are operating at capacity. I have spoken with families who have been told by providers that they are not accepting new clients.

19. Moreover, it may be particularly difficult for individuals with greater needs (e.g., individuals with more severe or complicated disabilities, who need customization, etc.) to access job development services.

20. One reason for this difficulty is that ORS reimburses job developers a flat rate for each individual they place in a job, regardless of the amount of time and effort spent placing the individual in employment. Therefore, job developers are incentivized to assist less challenging individuals find placement.

21. Rather than providing job placement services (or connecting individuals with providers that offer job placement services), individuals have reported that ORS's employment services tend to be largely limited to providing individuals with job assessments.

22. Many individuals find these assessments excessive and not beneficial to finding employment.

23. Another barrier to the successful implementation of the Consent Decree is the fact that BHDDH's standard package of services does not include an allocation for employment services.

24. After an individual is assigned a tier, BHDDH provides the individual with a package of services. The standard package of services allocates a certain number of hours to each of the following categories of service: residential/community, day supports, transportation, and professional supports during day program (if necessary).

25. The standard package of services does not set aside any hours for employment services, however.

26. Instead, providers are expected to utilize hours from other categories of service, such as day supports, to fund employment services.

27. This approach is not viable for individuals who need all of the designated supports in their service package and thus have no funding to shift for employment services.

28. This approach is also problematic because employment service rates, especially those for much needed job development, are significantly higher than standard day support rates.

29. The inaccuracy of SIS assessments and tier assignments is another persistent problem.

30. BHDDH administers a SIS assessment, which includes an interview component, to each individual who applies for adult disability services. Based on an individual's SIS assessment, BHDDH then assigns the individual to one of five tiers. Each tier

corresponds with a particular level of service, with individuals assigned to lower tiers receiving fewer services or services that assume a higher client to staff ratio. BHDDH reassesses individuals every three years.

31. I know individuals who have had their tier assignment lowered following a reassessment, despite the fact that the respondents' answers at the reassessment were very similar to their original responses.

32. Furthermore, I have heard complaints that some interviewers are not recording the respondents' answers as given and/or are challenging those responses during SIS assessments.

33. As a result of these inaccuracies in tier assignments, many individuals are not receiving sufficient levels of service.

34. Although there is a process to request additional supports, it is a cumbersome and time consuming process, which further delays the start of service when and if individuals choose to pursue it.

Date: April 6, 2016

Respectfully submitted,

*Claire Rosenbaum*

Claire Rosenbaum
Adult Supports Coordinator
Paul V. Sherlock Center on Disabilities
600 Mount Pleasant Avenue
Providence, RI 02908
(401) 456-8072
crosenbaum@ric.edu

4