UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　Plaintiff,<br><br>　　v.<br><br>STATE OF RHODE ISLAND,<br>　　Defendant. | C.A. No. 13-442-JJM-PAS |
| UNITED STATES OF AMERICA,<br>　　Plaintiff,<br><br>　　v.<br><br>STATE OF RHODE ISLAND,<br>　　Defendant. | C.A. No. 14-175-JJM-PAS |

**ORDER**

On January 6, 2021, this Court entered an order ("January 6th Order") following the Court Monitor, Dr. A. Anthony Antosh's November 2020 Fiscal Analysis, which assessed the funding needed to timely achieve the employment and integrated community activity benchmarks of the Consent Decree. Following the entry of the January 6th Order, the State began engaging with Dr. Antosh, Providers, and others to address the budget assumptions and issues detailed in the November 2020 Fiscal Analysis and summarized in the January 6th Order. Fiscal staff members from the Rhode Island House of Representatives and Senate, attended some initial meetings, but did not actively engage. The Court then received two *ex parte* letters, one from the Rhode Island House of Representatives, signed by Speaker K. Joseph

Shekarchi and Majority Leader Christopher R. Blazejewski and one from the Rhode Island Senate, signed by President Dominick J. Ruggerio and Majority Leader Michael J. McCaffrey.

The Court believes it should clarify both the January 6th Order and some of the requirements imposed on the State by the Consent Decree.

Based on their 2013 investigation of the State of Rhode Island, the United States Department of Justice concluded that "the State failed to provide employment, vocational and day services to persons with IDD in the most integrated setting ... in violation of the ADA." Multiple concerns were cited including "lack of resources"; "failure of the State's rate setting methodology and reimbursement model to promote integrated supported employment and day services"; and "the inflexibility of the State's reimbursement model." The connection between fiscal stability of the Developmental Disability system, workforce stability, and substantial compliance with the Consent Decree is described in the attached summary.

The Court reminds the State that the Consent Decree provides that "the State . . . will ensure that it supports and maintains a sufficient capacity to deliver Supported and Integrated Day Services to individuals [with I/DD], including qualified supported employment providers and integrated day providers . . ." Consent Decree at 20, XI.1. Furthermore, the Court's Order mandates that "The State shall timely fund the services and supports necessary to comply with this Consent Decree." Consent Decree at 24, XIV.3.

2

**To clarify the Parties to the Consent Decree[1]:**

The State of Rhode Island entered the Consent Decree on April 8, 2014. The Consent Decree defines "Rhode Island" or "the State" as "the State of Rhode Island, including BHDDH and the Office of Rehabilitation Services ("ORS"), as administered through the Department of Human Services, the Rhode Island Department of Education ("RIDE"), and the Executive Office of Health and Human Services ("EOHHS")." There is no limitation in this definition to only the identified State agencies. For clarification,[2] the State of Rhode Island, a party to the Consent Decree, is the entirety of the State.

**To clarify the January 6th order:**

There remain three years for the State to reach substantial compliance with the Consent Decree. This Court finds that systemic actions by the State are needed now to achieve substantial compliance. To that end, the Court finds that without an annual investment that supports and maintains sufficient Provider capacity and a stable workforce over each of the next three years, the State will violate this Court's January 6th Order and will not achieve substantial compliance by April 2024 as required by the Consent Decree.

The State shall continue to develop a three-year budget strategy. That strategy will address issues raised in the Court Monitor's Fiscal Analysis. Both the

---

[1] This clarification is not an amendment or change to what is memorialized in the Consent Decree. It is simply a restatement of who is bound by the terms of the Consent Decree.

[2] This clarification is not an amendment or change to what the Consent Decree memorializes. It is simply a restatement of who is bound under the Consent Decree.

November 2020 Fiscal Analysis and the January 6th Order illustrate the systemic fiscal issues that the State needs to address. They were based on the Court Monitor's fact-finding as well as State and stakeholder testimony at the November 24, 2020 Court hearing and are intended to be a framework for the three-year strategy. The January 6th Order requires a three-year budget strategy but allows the State flexibility to propose and negotiate with stakeholders in the development of the three-year budget strategy. In any proposal introduced by the State and/or stakeholders, proposals shall respond to the items described in the November 2020 Fiscal Analysis and outlined in the January 6th Order, with the recognition that the final negotiated three-year strategy may deploy different tactics for compliance with the Consent Decree that drive system change and improve outcomes for consumers. The Court is willing to adopt, by order, alternative proposals, so long as those proposals ultimately lead to timely substantial compliance with the requirements of the Consent Decree. The Court recognizes that some flexibility is required for the State when determining strategies for FY 22, FY23, and FY24.

The Court requires that the State collaborate with the Providers and advocate communities in the development of the three-year budget strategy that will support sufficient funding to timely achieve the requirements of the Consent Decree. The Court Monitor strongly recommends that the three-year budget plan be mutually agreed to by both the State and the Providers. The State of Rhode Island will report progress in developing this three-year budget proposal to the Court Monitor on April 30, 2021, May 31, 2021, and June 30, 2021. The Court will hold a status hearing in

April 2021 to publicly assess the extent to which the identified fiscal and capacity issues are being addressed and the extent to which the State and Providers have reached mutual agreement.

That said, if the State and stakeholders are unable to come to an agreement in these meetings, or if the State wishes to submit a three-year budget strategy proposal that differs from the specifics of the January 6th Order but would result in substantial timely compliance with the Consent Decree, the State and, if they so choose, stakeholders, may submit alternative proposals for consideration by the Court by May 17, 2021. If such proposals are submitted, the Court will hold a fact-finding hearing(s), where it will consider these proposals and may enter an order either adopting the proposal it finds reasonable, or some combination of proposals presented.

In summary and recognizing the flexibilities the Court assumes in the details, the State shall continue to develop a negotiated three-year budget strategy and shall address issues raised in the Court Monitor's Fiscal Analysis and in the January 6th Order, as well as address other measures that will support the requirements of the Consent Decree. The strategy shall include, but will not be limited to, the following:

1. Address the problem of low compensation and high turnover that prevents maintaining a stable and competitive workforce and sufficient Provider capacity to provide supported employment services and integrated day services to individuals with intellectual and developmental disabilities.

2. Establish mechanisms to support and address:

5

  a. Development of individualized service plans and individual budgets that promote access to individualized employment and day and other community activities in integrated settings.
  b. Adequate transportation.
  c. Technology acquisition.
  d. Transition to a community-based model.

3. Given that the Consent Decree requires the State to "maintain sufficient capacity" to ensure substantial compliance, provide for longer term strategies that address:

  a. Alignment of the funding and reimbursement rate system with plans for a community-based model.
  b. Ensure that future payment models align with federal standards for Medicaid eligible services.
  c. Establish consistent data collection and reporting requirements to facilitate proper forecasting of costs, including strategies such as including the Developmental Disability population in the semi-annual caseload estimating conferences.

IT IS SO ORDERED.

/s/ John J. McConnell, Jr.

John J. McConnell, Jr.
Chief Judge
United States District Court

March 16, 2021

6

## Summary – Connection Between Fiscal Stability in the Developmental Disability System and Workforce Stability and Compliance with the Consent Decree

**Findings Letter.** Based on their 2013 investigation of the State of Rhode Island, the United States Department of Justice concluded in the January 6, 2014 Letter of Findings that "the **State failed** to provide employment, vocational and day services to persons with IDD in the most integrated setting…in violation of the ADA".[1] Multiple findings were cited including "**lack of resources**"[2]; "failure of the **State's rate setting methodology and reimbursement model** to promote integrated supported employment and day services"; and "the **inflexibility** of the State's reimbursement model"[3].

**Consent Degree**[4]. Two of the primary outcomes for compliance with the Consent decree are that (1) "The State will provide **Supported Employment Placements** and Integrated Day Services, as described in Sections V-VI, for individuals in the…target populations" (Section IV) and "**Integrated Day Services** will be provided to all individuals in the…Target Populations…**for the remainder of all time set forth in an individual's ISP in a 40-hour work week** in which such individuals are not in school or supported employment" (Section VI). The Consent Decree lists multiple actions to be taken by the State to support these outcomes including "The **State shall timely fund the services and supports necessary to comply** with this Consent Decree for the eligible members of the…Target Populations according to the standards and timelines set forth in this Consent Decree" (Section XIV, 3) and "the State… will **ensure that it supports and maintains a sufficient capacity** to deliver…" the services described in the Consent Decree. (Section XI, 1)

The State reports that there are 3,682 individuals currently active in the Consent Decree populations – 2,469 adults and 1213 youth in transition.[5] To date, 941 adults have experienced a supported employment placement (this meets the Consent Decree 12/31/2020 benchmark for the day population, but not for the youth exit population or the sheltered workshop population).[6] 271 adults in the Consent Decree target population currently have individual jobs in integrated settings, 7 are self-employed and 111 have provider-paid individual or group employment. 1335 adults participate in integrated day activities for an average of 9.8 hours per week.[7] 271 adults in the target population participate in a combination of employment and integrated day activities for more than 10 hours – short of the Consent Decree benchmark.[8]

Conclusion – Rhode Island is seven years into the Consent Decree. **With three years remaining there is significant work still to be completed.**

---

[1] January 6, 2014 U.S. Department of Justice Findings Letter, page 5.
[2] January 6, 2014 U.S. Department of Justice Findings Letter, page 22.
[3] January 6, 2014 U.S. Department of Justice Findings Letter, pages 25-26.
[4] Consent Decree, United States of America v. State of Rhode Island; April 2014.
[5] Consent Decree Quarterly Report, January 31, 2021-Census Data.
[6] Consent Decree Quarterly Report, January 31, 2021 – Employment Data.
[7] Sherlock Employment and Day Activity Survey, data collected in October 2020.
[8] Sherlock Employment and Day Activity Survey, data collected in October 2020.

**Barriers to Implementation.** 399 family members and staff who support target population members responded to a series of surveys during Summer, 2020. Among other questions, they were asked to identify barriers to implementation of and compliance with Consent Decree goals and benchmarks. The need for a **stable high-quality workforce** and **additional funding** were identified by every group of respondents as two of the most significant needs. These themes were reinforced by a survey of adults who have an intellectual disability, the Employment First Task Force (a Consent Decree required stakeholder group) and the Legislative Commission on Project Sustainability.

**Fiscal Fragility of the Rhode Island Developmental Disability System.** The state funded New England States Consortium Systems Organization (NESCSO) Report[9] documents the overall fiscal instability of the provider system. The report examines three indicators of financial health – net income margin, liquidity, and solvency. Re: Net Income Margin - In more than half of the 27 fiscal years reviewed, agencies reported losses. Re: Liquidity – Only 2 agencies met the standard of three months available cash as recommended by the Non-Profit Finance Fund, 8 agencies had 1-2 months of available cash and 12 agencies had less than one month of available cash. Re: Solvency – 2 agencies reported liabilities greater than assets, 17 reported assets greater than liabilities. The critical portion of those assets are in non-liquid property and equipment that are part of services and corporation. NESCSO's conclusion is that these **agencies are "fragile and profoundly undercapitalized".**

**Relationship Between Staff Stability and Outcomes Achieved by Adults with Intellectual and Developmental Disabilities.** There is a growing pool of research documents that a stable, well trained workforce is a major factor that contributes both to program quality and to the outcomes achieved by adults with intellectual and developmental disabilities.[10]

**Increased Difficulty in Recruiting and Retaining Direct Support Staff.**
- Organizations that support adults with intellectual and developmental disabilities in RI were asked for data on staff vacancies. 20 organizations responded. Cumulatively these organizations have 2,194 Direct Support Professionals positions, of which **447 (20.3%) are currently vacant.**[11]
- Those same organizations reported a mean **turnover rate for the past six months of 29.94%.** 14 of the organizations reported turnover rates higher than 25%.
- Adults and Families who participate in the Self-Directed Supports Users Group were asked about difficulties in recruiting staff. 120 individuals responded. **80% reported difficulty in recruiting and finding staff**, 53% reported "a lot" of difficulty.[12]
- **68% of the self-directing individuals reported difficulty in retaining staff.** The primary barriers to retaining staff reported were **low wages** and **lack of benefits**.

---

[9] NESCSO; RI-BHDDH-Division of Developmental Disabilities System and Payments Methodologies and Rates – A Quantitative and Qualitative Review; July 2020.
NESCSO Overview of the Fiscal Health of the Developmental Disabilities System; January 2020.
[10] Friedman, (2018); Bogenschutz et al (2014); Houseworth J. et al (2020); other references available on request.
[11] Monitor Survey, week of February 8, 2021.
[12] Monitor Survey, week of February 1, 2021.

2

**Direct Support Staff Wage Equity.**
- **Current hourly rate** for Direct Support Staff in RI is **$13.08**.
- The **Self-Directed Users** cited above reported paying staff a **mean hourly rate of $17.37**. Same respondents, when asked what they would like to pay, reported a **preferred mean hourly rate of $21.71**.
- The current hourly **starting rate** for equivalent direct support staff (Community Living Aide) for **state operated RICLAS homes in $18.46**.[13]

**Relationship Between Minimum Wage and Direct Support Staff Wage.** Legislation introduced in RI (S-0271, H-5130) propose to increase the RI minimum wage. The functions and responsibilities of staff who provide direct support to adults who have intellectual and developmental disabilities are significantly more challenging than many minimum wage positions. The increase in RI minimum wage is a factor in developing an equitable wage. In several state, the wage for direct support staff is considerable higher than the minimum wage (e.g., in Utah the DSP rate is 72% higher than the state minimum rate).[14]

**Additional Costs Associated with Systemic Revision of Services and Supports.** The requirements of the CMS Home and Community-Based Services (HCBS) Rule and the Consent Decree will result in a major change in how services and supports are provided to individuals who have intellectual and developmental disabilities. Both mandate that all services be person-centered and occur in integrated community settings. Operationally that means that provider organizations need to **transition from traditional center-based models with staffing patterns of 1-5 or greater to a service model of 1-1 or 1-2 in community settings**. There are **additional costs** associated with this transition including (a) the need for additional staff supports, (b) the need to redefine staff functions and provide appropriate training and supervision, (c) the need for new methodologies that facilitate comprehensive individual planning and (d) the need to provide services that will provide community access (e.g., transportation, technology, others).

**Conclusions:**
- There are only three years remaining to achieve substantial compliance with the Consent Decree. Systemic actions are needed to achieve substantial compliance.
- The NESCSO Report, the Legislative Commission on Project Sustainability and other sources have documented the fiscal fragility of the Developmental Disabilities System.
- The foundational element of system stability, both for individuals who self-direct and for provider organizations, is the capacity to recruit and retain qualified staff.
- It is the opinion of the Court that without rate restructuring and an annual investment that "…**supports and maintains a sufficient capacity**"[15] and a stable workforce over each of the next three years, the State will not achieve substantial compliance by April 2024.

---

[13] Schedule 300, Council 94, Step 1.
[14] ANCOR, UCP, Included Supported Empowered; The Case for Inclusion 2020 –Key Findings Report.
[15] Consent Decree, United States of America v. State of Rhode Island; April 2014.

3