# Monitor's Report (USA v. Rhode Island)
## November 22, 2021

This is not intended to be a typical Monitor's Report. The recent Court ordered Action Plan has generated questions re: the expectations for implementation and monitoring of both the Consent Decree and the Action Plan. Thus, this report will focus on four topics:

1. Clarifying expectations for community-based supports, systems transformation, workforce transformation and technology as an individualized support;
2. Clarifying expectations for implementation of the Action Plan;
3. Clarifying the indicators of change listed in the Action Plan and how they will be monitored;
4. Establishing a 2021 baseline for Consent Decree related individual outcomes. Subsequent reports will measure change against this baseline.

## I. Clarifying Expectations for Community-Based Supports, Systems Transformation, Workforce Transformation and Technology as an Individualized Support

### Interconnection of the Consent Decree and the Action Plan

The Consent Decree and the "Action Plan" are inherently connected. The "Wages and Workforce Stability" section of the Action partially addresses the capacity requirements and benchmarks defined in Section XI of the Consent Decree. The "One Time Transformation Costs" section of the Action Plan specifically addresses the "timely funding" benchmark defined in Section XIV of the Consent Decree and the Quality Improvement benchmarks defined in Section XV of the Consent Decree. The "removal of administrative barriers" section in both the Action Plan and in earlier court orders addresses the barriers to accessing employment and integrated community activities that were identified by multiple stakeholder groups. The "Statewide Infrastructure and Recruitment" section of the Action Plan aligns both with the Training benchmarks defined in Section IX of the Consent Decree and the capacity benchmark in Section XI of the Consent. The Rate Review, Caseload Estimating (and the whole Action Plan) sections address both the short-term and long-term funding strategies (Section XIV) necessary to achieve the core outcomes of the Consent Decree as defined in section IV through VIII. Finally, the "indicators of change" section of the Action Plan aligns with the outcomes defined in Section IV and the data collection and reporting defined in Section XVI of the Consent Decree.

Section XVII (3) of the Consent Decree requires the Monitor to "provide a written report to the parties regarding compliance with the terms of the Consent Decree". Given that the initiatives detailed in the Action Plan have just begun, the Monitor does not believe that there is any fair and accurate way to make a judgement about compliance at this time. The Monitor has also repeatedly stated that, given the impact of COVID and the workforce crisis, there is a need to define a 2021 baseline and document progress in complying with the Consent Decree benchmarks from that baseline. Section III of this report identifies how both the Consent Decree and the Action Plan will be monitored. Section IV of this report, based on currently available data, begins to establish that baseline. Additional data will be collected prior to the Monitor's next report. Having said that, the State (and other stakeholders) is making significant good faith effort to implement the components of the Action Plan and the Consent Decree.

**Primary Focus – The Individual**

Given the range of priorities and opinions expressed by parties and stakeholders before and after the Court ordered Action Plan, **it is important to reaffirm that the primary focus of the Consent Decree (and the related efforts for systems transformation) is change in individual lives.** As a point of trivia, the word "individual" appears 241 times in the Consent Decree and "individuals" appears 156 times. Although the Court has focused on needed systemic changes during the past 18 months, the ultimate outcomes need to be achieved by individuals. Individual life change(s) will be the focus for the remainder of the Consent Decree.

The Consent Decree is clear in its intended outcomes. Sections IV through VI define individual lives comprised of individual employment in integrated settings and community activities "of the person's choosing". Section VIII defines the components of transition needed to achieve described in Section IV through VI for youth. Section VII details the need for individualized planning to achieve those outcomes. Sections IX through XV, in essence, describe structural components that are necessary to support achievement of these outcomes.

During the past several years significant effort and attention has been given to "person-centered thinking". The Rhode Island Person-Centered Thinking Guide[1] identifies three components of person-centered thinking:
- Each person **taking greater control** of their lives;
- Each person thinking about **all of life**;
- Each person **being in the world**…and knowing the opportunities and supports that exist in their communities.

These concepts align with the requirements of the Consent Decree.

Inherent in all of these concepts and requirements is the idea of choice – not only lifestyle choices, but choices about how each individual wishes to be supported. Through countless anecdotal conversations with individuals and families, most people fall into one of three categories:
- Individuals who want to manage their own lives through self-direction;
- Individuals who want or need to receive their supports through a provider organization;
- Individuals who want a hybrid model that provides more guidance than self-direction, but relies on the development of personal networks and a broader array of community supports.

Thus, **capacity to efficiently implement all three of these models** is essential to achieving the goals and benchmarks of the Consent Decree. Thus, the requirement "to support and maintains a sufficient capacity to deliver Supported Employment and Integrated Day Services to individuals" as described in Section XI of the Consent Decree needs to **include an array of options aligned with individual choices and preferences**.

In support of these three models, the practices of (a) independent facilitation of a comprehensive life plan; (b) development of individual budgets aligned with that plan that facilitate individual

---

[1] Rhode Island Person-Centered Thinking Guide; February, 2018; page 2.

choices about how and from whom each individual wishes to receive support; and (c) assessment by both the individual and an independent source of the impact of the plan and the budget on each life are the structural components that will **give each individual greater control of their own lives**. These practices are embedded in the work on eliminating administrative barriers.

The Action Plan includes components that strengthen self-direction, that will help to stabilize the provider networks and that will facilitate development of new hybrid models of support.

**Individual Outcomes**

There are several models that describe the breadth of individual outcomes that should be embedded in Individual Service Plans and Career Development Plans. Two examples.

The American Association on Intellectual and Developmental Disabilities (AAIDD) and the Association of University Centers on Disability (AUCD) summarized 50 years of research on community living. They identified "characteristics of high quality community living".[2]
1. Where and with whom a person lives;
2. Where a person works and how he or she earns money;
3. What a person does during the day;
4. The quality of relationships developed with others during daily activities;
5. What and with whom a person does activities of personal interest;
6. An individual's health, both physical and mental;
7. If, where and with whom they worship;
8. Their opportunities and interest to engage in learning and personal growth; and
9. Their ability to make informed decisions about their lives.

The National Core Indicators-IDD Quality Indicators defines and measures outcomes in several domain. The outcomes included in the Individual Outcomes Domain includes:
- Employment
- Community Inclusion and Belonging
- Community Participation
- Choice and Decision-Making
- Relationships
- Satisfaction.

There is an obvious overlap between these two lists (and other similar reports). These are the outcomes that should be included in Individual Service Plans and Career Development Plans…and measured as indicators of change in individual lives (see later section – Monitoring).

---

[2] Community Living and Participation for Individuals with Intellectual and Developmental Disabilities: What the Research Tells Us; AAIDD and AUCD; July, 2015.

## Models for Providing Community Supports

It is important to remember the investigation that preceded the Consent Decree. The Findings Letter[3] stated that "individuals are in, or at risk of entering, segregated...programs due to systemic actions and policies, which include...failure to develop sufficient quantity of transition, employment, vocational and day services and supports for individuals with IDD...". Thus, stated differently, the core issue was the lack of integrated community services and supports. Thus, it is important to answer the question – what are quality, integrated community services and supports.

In preparation for this report, the Monitor consulted with several national leaders and advocates and asked them to refer me to organizations that provided high quality supports. I interviewed the leadership of several himganizations in several states (including organizations frequently referenced in Rhode Island – KFI in Maine, Neighbours Inc. in New Jersey, Starfire in Ohio, Community Visions in Oregon) about the logistics of providing services and supports – staff functions and structures, administrative hierarchies, funding sources, etc.. All of these organizations shared similar characteristics.[4]

- Most were small – the largest supports 86 people, the average was between 30-40. Several set limits on the number of people they would support.
- None owned buildings with the exception of one that established a technology resource center.
- Few owned vehicles, most supported the use of staff vehicles through mileage reimbursement, insurance enhancements and most helped individuals use community and/or personal transportation options.
- All had limited hierarchies – typically one level between the agency director and direct support staff with a few staff charged with specialty functions (budget director, grant writer, etc.).
- Only one uses agency staff to provide direct support to individuals. Most have transitioned to a hybrid model that uses advisors or independent facilitators to assist individuals to develop plans, community lives and schedule and personal support networks. The number of individuals advised by each advisor ranges between 3-8.
- Individual support networks use a variety of supports, including but not limited to paid staff. Some of the organizations serve as fiscal intermediaries to pay staff, others do not.
- None of the organizations reported large vacancy or turnover rates. They attribute this to staff being dedicated to individuals; thus, loyalty is to the individual, not the organization. Recruitment focuses on individual's personal networks. Leadership of those organizations had several other ideas about recruitment and retention.
- Waiver funds were the primary source of funding for direct support staff. An array of other sources were used to supplement waiver funds and/or to provide other services or supports. One CEO reported selling the organization's buildings to create an endowment that supported a percent of their annual budget.

---

[3] United States" Title II ADA Investigation of Employment, Vocational and Day Services for Persons with Intellectual and Developmental Disabilities in Rhode Island; January 6, 2014, page 5.
[4] Personal discussions with the Monitor.

- Several of the organizations reported initial resistance when they began the transformation. Resistance came both from families (some of whom went to other agencies) and from other provider organizations in their states.

Thus, these interviews suggest the characteristics both of quality individualized community-based services and supports and of a hybrid model for providing employment and community supports.

Although not the focus of the Consent Decree, the organizations referenced above stressed the **critical importance of increasing housing options** for individuals who have intellectual and/or developmental disabilities. Most of these organizations pursued housing as a foundational need and developed strategies for promoting home ownership, negotiating with financial institutions for low interest loans, providing grants for down payments, developing partnerships with non-profit housing entities, building tiny houses in property owned by families or friends, individuals sharing resources and other ideas.

**Transformation of Services and Supports**

A hypothetical question has been posed to me by several state and national leaders. **Will there ever be enough staff and enough funding to provide community-based individual supports for all individuals for all the activities that comprise their lives?** The current system of supports is dependent on staff as the primary way of providing supports. Thus, staff vacancies and turnover rates become critical barriers to individuals achieving their life goals. If the answer to the hypothetical question is "No, there will most likely never be enough staff or enough funding", then alternatives must be developed. To quote Marc Gold – "Try Another way".

The current labor market, the trend towards remote work, the shrinking populations from which direct support staff are traditionally recruited and other factors – all indicate the need to develop other support models. Implementation Science research reinforces that systemic change begins with a clear definition of the intended outcome and of new (or revised) models. The Action Plan is intended to be a stimulus for developing new models. For a period of time there will be need to maintain both the current support models and the new models.

In addition to a comprehensive fiscal analysis, the NESCSO Report[5] identifies a variety of practices and models used by other states. One of the models they reference is Charting the Life Course".[6] Charting the Life Course advocates a system of integrated supports. In order, these supports include:
- Personal Strengths and Assets -- i.e., what can the person do?
- Support from Relationships -- Family, Friends, Others.
- Technology as Support.
- Other Community Resources.
- Paid Goods and Services – i.e., staff.

In this model, **paid goods and services are only one component of an integrated support strategy.**

---

[5] NESCSO – RI BHDDH Division of Developmental Disabilities: A Quantitative and Qualitative Review; July, 2020.
[6] For more information about Charting the Life Course see www.lifecoursetools.com.

An anecdote. I often ask hypothetical questions – What would you do if an earthquake destroyed your buildings? What would you do if waiver funding ended? One mother answered the second question saying that "she would go home and cry for three days and then would call everyone she knows and develop a plan". Implied in her answer is the suggestion that there is more than one way to provide support.

Perhaps the "other way" is to (a) change how we think about and plan for individual supports; (b) actively embed personal assets, relationships, technology and community supports into person-centered plans; (c) **honestly assess the breadth and limits of support that can be provided through paid goods and services** and (d) let individuals and families decide how to use the available goods and services. In essence, that is what the programs referenced earlier do.

### Direct Support Workforce – Issues and Ideas

The expert consultants who provided information related to the Action plan emphasized **the need to address three factors connected to workforce issues**:
- Wages and Benefits
- Professionalizing the workforce through training and credentialing
- Creating a statewide infrastructure to address recruitment and retention.

The following sources provide an indepth discussion of issues connected to the direct support workforce.

Focus has been primarily on wages. Based on analysis of an analysis of RI labor market, expert testimony prepared for the tentative Court hearing recommended an hourly wage of $17.50 for entry-level candidates with little to no experience.[7] There is also evidence that one of the primary reasons direct support workers stay is because they feel "they are **making a difference**" in someone's life.[8] In addition to wages, the ANCOR report cited below identifies **difficulties and stress** associated with the work and **lack of advancement opportunities** as common reasons for leaving. The President's Committee for People with Intellectual Disabilities[9] offers several recommendations for addressing workforce issues:
- Including compensation packages in rate-setting methodologies,
- Promote the use of technology in long term services,
- Promote training and technical assistance to employers (i.e., Developmental Disability Organizations) that focus on improving business acumen,
- Expand the pool of direct support workers to include greater participation by people with disabilities, retirees and young adults across diverse cultural groups,
- Expand utilization of self-direction in long term supports.

**The answer to the workforce crisis is multi-dimensional.**

---

[7] Skills for Rhode Island's Future; August, 2021.
[8] Quote from a RI direct support worker.
[9] Report to the President – America's Direct Support Workforce Crisis: Effect on People with Intellectual Disabilities, Families, communities and the U.S. Economy; 2017.

The **American Network of Community Options and Resources (ANCOR)** issued a 2017 report[10] that identified issues and possible solutions connected to the direct support workforce crisis. Highlights from this report include:

- Without qualified staff provider organizations are limited in their capacity to deliver client-driven services.
- Turnover rate for direct support staff in the United States is approximately 45%. 56% leave their position within one year. 35% leave within six months.
- 88.54% report inadequate pay as a reason for leaving, 66.88% report difficulties and stress associated with the work, 49.68% report lack of advancement opportunities.
- The need for sick leave and other benefits compound pressure for staff to find other employment.
- There is inadequate data on wages and working conditions.
- Women aged 25-64 are the main group of people who enter the direct support profession and similar occupations. ANCOR projects the demand for direct support staff will increase by 48% in the next decade. During that time only 2 million women aged 25-64 will enter the labor market compared with 6.3 million in the early 2000s.
- Existing technologies could assist in filling vacancies and in assisting individuals with IDD to succeed.
- ANCOR provides a DSP Recruitment Toolkit.[11] Recommended recruitment strategies include (a) public service announcements, (b) customizable recruitment flyers targeted to specific demographics, (c) realistic job previews and other strategies.
- Strategies for decreasing burnout and increasing retention include (a) realistic previews of work to increase candidate understanding of the position, (b) adequate orientation, (c) mentoring of new employees, (d) positive supervision and feedback from trained supervisors, (e) accurately descriptive titles and job descriptions.
- ANCOR provides several examples of Career Path Models. Many of these models focus on (a) entry-level apprenticeships, (b) developing further skills connected to certification, and (c) additional training in specialized areas.
- Identifying new populations for recruitment including creating mentorships and apprenticeships for high school and college students.
- ANCOR also advocates for paying family caregivers for their work….and for leveraging other natural and community supports.

The **Institute on Community Integration, Research and Training Center on Community Inclusion** at the University of Minnesota identifies strategies for recruitment, retention and training[12] that are similar to those described in the ANCOR report.

A number of **nationally validated competency sets** have been created specifically for the direct support workforce that supports individuals with disabilities in the community. These competencies have been identified as essential for all employees in direct support roles and or supervisory roles. The most commonly used competencies are the NADSP core Competencies

---

[10] Addressing the Disability Services Workforce Crisis of the 21st Century; ANCOR, 2017.

[11] www.ancor.org/toolkit

[12] https:/ici.umn.edu/program-areas/community-living-and-employment/direct-support-workforce

(2002), Centers for Medicare and Medicaid Services Core Competencies (2014) and the National Frontline Supervisor Competencies (2013).

*NADSP DSP Core Competencies.*[13] NADSP includes the following broad competency areas: 1) participant empowerment, 2) communication, 3) assessment, 4) community and service networking, 5) facilitation of services, 6) community living skills and supports, 7) education, training & self-development, 8) advocacy, 9) vocational, educational and career support, 10) crisis prevention and intervention, 11) organizational participation, 12) documentation and 13) building, maintaining friendships and relationships, 14) providing person centered supports, and 15) supporting health and wellness.

*Centers for Medicare and Medicaid Services DSP Core Competencies[14].* CMS Core competencies include the following competency areas: 1) communication, 2) person centered practices, 3) evaluation and observation, 4) crisis prevention and intervention, 5) safety, 6) professionalism and ethics, 7) empowerment and advocacy, 8) health and wellness, 9) community living skills and support, 10) community inclusion and networking, 11) cultural competency, and 12) education, training and self-development.

*National Frontline Supervisor Competencies.*[15] The National Frontline Supervisor (FLS) Competencies are intended to be used to frame training targeted to supervisors of DSPs. These core competencies include the following broad competency areas: 1) direct support, 2) health, wellness and safety, 3) individual support plan development, monitoring and assessment, 4) facilitating community inclusion across the lifespan, 5) promoting professional relations and teamwork, 6) staff recruitment, selection and hiring, 7) staff supervision, training and development, 8) quality assurance, 9) advocacy and public relations, 10) leadership, professionalism and self-development, and 11) cultural responsiveness and awareness.

Additional **competencies for employment specialists** are provided by the Association of Community Rehabilitation Educators (ACRE) and by the Association for People Supporting Employment First (APSE). Both offer **examples of credentialing programs**.

*Association of Community Rehabilitation Educators (ACRE).*[16] ACRE offers two types of Certificates: an Employment Services Certificate and an Employment Services Certificate with an emphasis on Customized Employment. Each of these certificates may be offered at a basic level (40 hours of training), or at professional level (an additional 20-40 hours of training). These Certificates are awarded based on individual successful completion of all training requirements. Their programs are framed around specialized competencies.

---

[13] National Alliance on Direct Support Professionals. (2016). Direct support professional competency areas: The foundation of direct support practice. Author. https://nadsp.org/wp-content/uploads/2017/07/National -Direct - Support -Professional-Competency-Areas-Brochure-FINAL.pdf

[14] Centers for Medicare & Medicaid Services. (2014). CMS direct service workforce core competencies final competency set. National Direct Service Workforce Resource Center. https://www.medicaid.gov/medicaid/ ltss/downloads/workforce/dsw-core-competencies-final-set-2014.pdf

[15] https://rtc.umn.edu/docs/National_Frontline_Supervisor_comp_7-2-13.pdf

[16] http://acreducators.org/certificates

*The Association of People Supporting Employment First (APSE)*.[17] APSE offers a Certified Employment Support Professional (CESP) credential recognizing individuals who have demonstrated a sufficient level of knowledge and skills to provide integrated employment services to a variety of populations of people with disabilities. CESP certification is awarded after the learner passes the CESP Examination. This examination is designed to show a sufficient level or knowledge and skills to provide integrated employment services. APSE's CESP credential is a certification, which requires ongoing training to maintain it.

The APSE and/or ACRE credential/certification programs are used by 14 states that require these programs for disability support professionals (APSE/ACRE, 2020) with the goals being to increase competitive integrated employment.[18]

The **Administration for Community Living in the United States Department of Health and Human Services** recently completed a *Blazing New trails for Community-Based Direct Support Professionals Challenge.*[19] ACL recognized five programs as winners of the challenge.

- Able South Carolina brings a unique perspective to the DSP recruitment and retention process. Their proposed solution is a two-pronged approach: an innovative marketing campaign for recruitment that offers a fresh perspective on the DSP role paired with disabilities rights training for new and current DSPs. By **framing the role of the DSP as an advocate and ally**, Able South Carolina aspires to reinvent the purpose and value of the DSP field.
- The Collaborative for Citizen Directed Supports developed an **Interactive Map** as an innovative way to indicate where self-directed employees (SDEs) and Direct Support Professionals (DSPs) are located, so that clients can contact them about their services. DSP agencies submit lists of their available staff to the Map each week and SDEs can submit information about their staffing preferences as needed. The Collaborative has built a network of over 700 people who can share and promote the MAP and DSP/SDE support solutions.
- The National Alliance for Direct Support Professionals, Inc. (NADSP) created the **E-Badge Academy to provide a path to credentialing**. The academy provides DSPs with the opportunity to earn electronic badges, which demonstrate the acquisition and development of knowledge, skills, and values that otherwise go unacknowledged.
- Revitalizing Community Membership of Washington created a DSP Academy which offers customized vocational training to **certify people with ID/DD to work as DSPs by using classroom and on-the-job training to complete state DSP training requirements**. RCM believes that certifying unexpected groups as DSPs will revolutionize the standard labor supply.
- In partnership with the Maryland Direct Support Professional Training Consortium, the Supported Employment Enterprise Corporation established a **professional development program for DSPs**. The Building Tomorrow's DSP WorkFORCE (Fostering Opportunities, Recognition, Competencies & Excellence) initiative is a

---

[17] https://apse.org/cesp-central/

[18] The Association of Community Rehabilitation Educators (ACRE) and The Association of People Supporting Employment First (APSE). (2020). APSE/ACRE State Guidelines for Employment Services Personnel Training Certificates or Certification.

[19] www.acl.gov/DSPchallenge

comprehensive career pathway and socioeconomic advancement program that includes elevated training, formal credentialing, and a variety of on-the-job mentoring opportunities.

Finally, the quality organizations (referenced earlier in this report) interviewed by the Monitor reinforced many of the ideas and suggestions from the sources summarized above. Most of these agencies reported vacancy and turnover rates less significant than national data. Their recruitment and retention efforts highlighted these practices:

- Similar to Able South Carolina, most of these organizations cast the DSP position in a civil rights advocacy context; i.e., being an advocate and making a difference in individual lives (as suggested earlier).
- Staff from all of the organizations were dedicated to individuals. They report that loyalty to individuals (rather than the organization) increased retention.
- Recruitment of new staff focused on recruiting from individual's personal networks and communities – again, focus on the individual and individually-designed support networks.
- Most of the organizations reported a retention focus on assisting and supporting each staff to develop a plan for their own personal and career growth. Investing in personal staff growth both conveyed value and increased retention…thus, addressing the lack of advancement opportunities cited earlier.

In summary, the Statewide Workforce Initiative described in the Action Plan should address the following topics:

1) Redefining the Position to Reflect Community-Based Responsibilities.
2) Effective Recruitment – Broadening Recruitment Populations and Demographics, Realistic Job Previews, Broad Public Campaigns, Creating Apprenticeships and Pathways for Secondary and Post-Secondary Students and other strategies referenced above.
3) Training Requirements based on the various core competency sets listed above and unique needs of the Rhode Island workforce.
4) Credentialing Aligned with Training Requirements.
5) Effective Retention Strategies – Strategies that support personal and career growth including facilitating completion of degree programs, exploration of public service loan forgiveness, supporting staff to develop plans to achieve personal career goals.

## II.  Clarifying Expectations for Implementation of the Action Plan

### Expectations for Transformation Funds

Applications for transformation funds should include the following:

- Focus on change in individual lives; specifically, increased participation in employment and other community activities in integrated settings;
- Aligned with the goals and outcomes expressed in each individual's plan;
- Identification and participation by individuals in increased number and variety of community opportunities;
- Development of models of support similar to those described earlier in this report;

- Support strategies that reflect personal responsibility, support from relationships, technology as support, other community resources in addition to paid staff;
- Support strategies should include individuals with pervasive support needs and individuals with complex behavioral and/or medical needs;
- Support strategies should include individuals who currently have limited support networks;
- Partnerships with other community organizations;
- Combining transformation funds with other funding or resources;
- Staff roles and patterns that reflect individualized, community-based supports;
- Assessment of impact and change aligned with the monitoring strategies defined later in this report.

Applications for **first four million** of the transformation fund should be open only to current providers with particular emphasis on building and/or expanding a community-based workforce. The application process should be simple. Monitor will approve the application process. Disbursement of funds should be efficient – (a) funds will be available immediately after the application is approved, (b) implementation funds will be available at defined intervals during the duration of the project. Application process should be announced by December 3, 2021. Applications should be received by December 17, 2021 and awarded by December 31, 2022 with funding immediately available. If requested by applicants, additional time can be provided. The State will review all applications. Additionally, the Monitor will review all applications.

Applications for **the remaining six million** of the transformation fund should be open to all interested parties and should focus on developing hybrid models of support that use advisors or independent facilitators to assist individuals to plan and implement individualized community lives. The intent is to increase the capacity of the entire system by diversifying the types of supports available. The application process should be simple. Monitor will approve the application process. Disbursement of funds should be efficient – (a) some funds available once application is approved, (b) implementation funds available at defined intervals during the duration of the project. Application process should be announced by February 1, 2022. Monitor will approve the application process. Applications should be received by February 28, 2022 and awarded by March 15, 2022 with funding immediately available. The State will review all applications. Additionally, the Monitor will review all applications.

In collaboration with individuals and families who self-direct, priorities should be established for **the two million in transformation funds dedicated to strengthening supports for self-direction** by March 31, 2022. Applications should be open to all interested parties, including individuals and/or organizations. The application process should be simple. Monitor will approve the application process. Disbursement of funds should be efficient – (a) some funds available once application is approved, (b) implementation funds available at defined intervals during the duration of the project. Application process should be announced by April 15, 2022. Applications should be received by April 30, 2022 and awarded by May 15, 2022 with funding immediately available. The State will review all applications. Additionally, the Monitor will review all applications.

**Expectations for Technology Fund**

The technology fund is specifically intended for individuals to acquire technology (hardware or software) that will facilitate attainment of the goals and outcomes expressed in each individual's plan. The monitor recommends that funds be disbursed in two ways.

    (1) Discussion of technology as support should be part of every individual's annual plan. A simple request form should be developed that asks for (a) the intended outcomes, (b) the technology requested, (c) a statement demonstrating the role of technology in facilitating that outcome, (d) cost. Technology funds are intended to be additional to other amounts in the individualized budget.

    (2) The assumption is that there are select individuals who are now ready to submit a technology request prior to their next plan date. The simple request form described above should be used.

Guidance re: the process for requesting and disbursing the technology fund should be available by December 15, 2021. Funds should be available beginning January 1. 2022.

**Expectations for Statewide Workforce Initiative**

An initial meeting should be convened by December 3, 2021. Topics to be addressed should include (but not limited to) the following, as detailed earlier in this report..

- Redefining the Position to Reflect Community-Based Responsibilities
- Effective Recruitment – Populations, Strategies
- Training Requirements
- Credentialing Aligned with Training Requirements
- Retention – Strategies for Fostering Personal Growth

The Action Plan calls for a contract with a private organization to coordinate and implement an intensive statewide recruitment initiative. This contract should be awarded by January 31, 2022.

## III.  Monitoring

The Action Plan defines "indicators of change". The following monitoring plan aligns both with the Consent Decree and the Action Plan. Given the differing views on several of these questions, to the greatest extent possible the Monitor will rely on **independently gathered data**.

Indicator 1 – Documenting **Changes and Trends in the Direct Support Workforce** (*Action Plan and Sections XI and XIV of the Consent Decree*).

The National Core Indicators Staff Stability Survey[20] is currently used by 26 states to measure changes and trends in the direct support workforce. The Monitor is finalizing an agreement with

---

[20] Staff Stability Survey. Human Services Research Institute and National of State Directors of Developmental Disabilities Services; www.nationalcore.org

NCI staff to collect workforce data using the Staff Stability Survey every six months. The following data will be reported:

- Number of Direct Support Staff – Full Time, Part Time
- Vacancy Rate
- Turnover Rate
- Reason for Separations
- Average Starting Wage
- Relation of Starting Wage to State Minimum Wage
- Number (percent of providers) who Supplement Wages with Bonuses or Other
- Benefits Offered
- Recruitment Strategies
- Retention Strategies.

The intent for the first data collection to be January/February, 2022 for the six month period July-December, 2021. Data collection repeated every six months for the remaining period of the Consent Decree. The Monitor's Budget will provide a stipend to each agency and to agencies that serve as fiscal intermediaries to support data collection.

Currently, there is not an accurate methodology for collecting this information from individuals who self-direct. Outreach will be made through the Fiscal Intermediaries (and/or other sources) to collect this data. The schedule will be the same as for provider organizations.

Indicator 2 – Statewide **Participation in Employment, Other Supported Employment Activities, Integrated Community Activities** (*Action Plan and Sections IV, V, VI of the Consent Decree*).

Data will be reported from two sources – (a) the State's Quarterly Report and (b) The semi-annual Sherlock Employment and Day Activities Survey. The following data will be reported:

- Number (Percent) of Consent Decree class members who are employed
- Number of new positions in the most recent quarter
- Average Hours per Week
- Average Hourly Wage
- Employment Tenure
- Types of Positions (by Department of Labor Categories)
- Number (Percent) of Individuals Employed Who Also Receive Other Supported Employment Services
- Number (Percent) of Individuals Currently Not Employed Who Receive Supported Employment Services
- Number (Percent) Who Participate in Integrated Community Activities
- Average Hours Per Week of Community Activity
- Total Combined Hours of Employment and Integrated Community Activity.

Sherlock data will be available in February and August. State Quarterly Reports are available January 31, April 30, July 31, October 31.

Indicator 3 – **Change in the Individual Lives** of Consent Decree Class Members (*Action Plan and Sections IV, V, VI of the Consent Decree*).

Data will be collected in two ways. First, a metric aligned with community-based outcomes will be selected (or developed) by March 31, 2022. This metric will be embedded into each individual service plan beginning July 1, 2022. Data from this metric will be entered into Therap. Currently individuals who self-direct do not have access to Therap – an alternative strategy needs to be developed by the State. Aggregate data (all individuals) will be included in the State's July Quarterly Report.

Second, a random sample of approximately 30 individuals will be selected every 90 days. The sample will be stratified by age. Each individual will be interviewed to determine (a) if they are employed, (b) the extent to which they participate in integrated community activities, (c) whether or not their expectations and plans are being adequately supported and (d) the extent to which they have increased control of their lives. Additionally, each Individual Service Plan will be reviewed. The first sample will be selected in January, 2022

Indicator 4 – The **Actual Cost of Transformation and/or New Models of Service or Support** (*Action Plan and Section XIV of the Consent Decree*).

The actual cost of all transformational and/or new models of service or support funded by the transformation funds will be assessed though an independent audit of those projects. The Monitor will hire an **independent auditor** for this task. The audit will be completed 6 months and 12 months after funds have been awarded.

Indicator 5 – **Transformation of Services and Supports** (*Action Plan and Section XI of the Consent Decree*),

The Monitor will employ three Instate Experts to visit each provider organization at least once during 2022 and once during 2023. The *Guidance for Monitor Review of Provider Organizations* distributed in March, 2021 (Appendix A) details the intent and focus of these visits and the criteria for review. The Instate Experts will provide the Monitor with (a) a summary of each visit with particular focus on the development and implementation of new community-based models of services and supports and (b) recommendations for areas requiring additional efforts. These visits will begin in January, 2022.

On a parallel track, the Monitor will visit each high school to assess the quality and efficacy of transition planning and to listen to issues and recommendations from students, families and school personnel. These visits will begin in January, 2022.

Indicator 6 – **Quality of Person-Centered and Career Development Plans** (*Action Plan and Sections VII and VIII of the Consent Decree*).

Both the visits to provider organizations and to high schools will include a review of a sample of plans. As outlined in the *Guidance for Monitor Review of Provider Organizations*, the review of the plans will focus on the following:

- Preparing the Person and the Team for the planning process.

(a) Is there a description of how the person communicates and strategies for increasing the person's capacity to understand what is being discussed and to express preferences;

(b) Has the person received instruction in self-determination and supported decision-making; does the person have experience with choice-making and with developing and using a personal network of supporters;

(c) Has there been a broad discussion of life domains/interests – does the organization use a format/guide/tool to guide these discussions;

(d) Has there been sufficient community mapping to identify and develop new opportunities for developing community presence and participation;

(e) Has there been sufficient community mapping to identify opportunities that allow the person to explore personal interests and personal growth;

(f) Has there been a discussion of the person's relationships and discussion of strategies for broadening the person's relationship network.

- The Plan.
  (a) Does the plan reflect a variety of life domains?
  (b) Are the goals or life directions clearly stated?
  (c) Are there defined action steps to implement the goals?
  (d) Are the logistical details sufficient to ensure implementation – identified places(s), time, transportation, accommodations, other?
  (e) Do the supports identified for each goal or life direction reflect a variety of support strategies?
    (1) What can the person do?
    (2) What supports can family/friends provide?
    (3) Role of technology,
    (4) Use of generic resources, community resources,
    (5) Role of paid staff.
  (f) Is there a strategy for measuring progress?
  (g) Is there an individual budget? Does it align with the plan goals?

Summary of the quality of plans will be included in the Monitor's semi-annual reports.

Indicator 7 – **Timely Completion of the Actions Specified in the Action Plan** and in the Monitor's Report (*Action Plan*).

Monitor will review any/all actions taken by the State to implement the components and timelines specified in the Action Plan.

## IV.    2021 Baseline

The intent of this section is to summarize the most recent data pertinent to the indicators and measures outlined in the Monitoring section. **From this point on, all data collected will be compared to this baseline data either presented below or gathered during the first quarter of 2022.** The Monitor acknowledges that there is no current data for some of the indicators and limited data for others; thus, the data collected in the first quarter of 2022 will serve as baseline.

**Indicator 1 - Changes and Trends in the Direct Support Workforce**

There is limited independent data available for most of the fields listed for Indicator. The first Staff Stability Survey will provide a more complete data set.

|  | Vacancy Rate | Turnover Rate |
|---|---|---|
| Approach Group 4th Quarter 2020 | 21.7% | 33.8% |
| Hearing April, 2021* | 20.3% | 29.94% |
| Monitor Gathered 10/2021* | 27.9% | 20.9% |

*The 4/21 and 10/21 vacancy and turnover rate data in the table above is from a partial sample of providers. Although not complete, these data document a continuing workforce crisis.

Base DSP rates were increased to $15.75 beginning July, 2021. The Action Plan provides for rates to ne increased to $18 in July, 2022 and $20 in July, 2023. The Staff Stability Survey will assess impact of these rate increases.

There is also anecdotal information that all providers use a variety of recruitment strategies, signing bonus being the most frequent. There is need for a comprehensive statewide approach to recruitment and retention….aligned with the issues and suggestions outlined earlier in this report.

All providers offer some benefits, although the breadth varies. Providers project the average cost of benefits is 35.9%. Access to benefits is one of the factors most associated with retention; thus, the possibility of providing access to comprehensive benefits for both DSPs employed be agencies or by people who self-direct (either through a statewide methodology or through individual providers) should be explored.

**Indicator 2 - Participation in Employment, Other Supported Employment Activities, Integrated Community Activities**

As indicated earlier, there are two primary sources for this data – the State's Quarterly Consent Decree Report and the Sherlock Employment and Day Activity Survey.

**State of RI Quarterly Consent Decree Report[21]**

|  | Youth Exit | Sheltered Workshop | Day Program |
|---|---|---|---|
| Placement Benchmark | 436 | 500 | 525 |
| Cumulative Placements | 284 | 261 | 421 |
| % of Benchmark | 65.1% | 52.2% | 80.2% |
| Hours Per Week | 8 | 7 | 6 |
| Average Hourly Wage | $12.12 | $12.07 | $12.23 |

---

[21] Quarterly Consent Decree Report – Quarter Ending September 30, 2021

**Sherlock Employment and Day Activity Survey[22]**

| | Youth Exit | Sheltered Workshop | Day Program |
|---|---|---|---|
| Number Employed | 72 | 96 | 169 |
| Hours Per Week Employer Paid | 10.59 | 12.38 | 8.44 |
| Average Hourly Wage Employer Paid | $13.01 | $12.28 | $12.24 |
| New Jobs in Quarter | 10 | 2 | 13 |

*Note -- The State Report is cumulative data; the Sherlock Survey is point in time data.*

| Most Common Employment Type by Industry – Employer Paid Individual Jobs | |
|---|---|
| Retail Trade | 39.3% |
| Accommodation and Food Services | 25.7% |
| Health Care and Social Assistance | 11.3% |

| Individuals Not Currently Working Who Receive Supported Employment Services | | | |
|---|---|---|---|
| | Youth Exit | Sheltered Workshop | Day Program |
| Number | 53 | 56 | 80 |
| Hours Per Week | 2.98 | 2.64 | 1.95 |

| Community-Based Non Work Hours | | | |
|---|---|---|---|
| | Youth Exit | Sheltered Workshop | Day Program |
| Number Participating | 186 | 353 | 853 |
| Hours Per Week | 13.15 | 12.03 | 11.52 |

| Individuals Participating in Employment and Community Activities – Combined Hours Employer-Paid Individual Employment | | | |
|---|---|---|---|
| | Youth Exit | Sheltered Workshop | Day Program |
| Less Than 1 Hour | 1 | 1 | 3 |
| 1-10 Hours | 16 | 9 | 39 |
| 10-21 Hours | 38 | 27 | 43 |
| 21+ Hours | 21 | 18 | 33 |
| Total | 76 | 55 | 118 |

| Individuals Participating in Employment and Community Activities – Combined Hours Self Employment | | | |
|---|---|---|---|
| | Youth Exit | Sheltered Workshop | Day Program |
| Less Than 1 Hour | 0 | 0 | 2 |
| 1-10 Hours | 0 | 1 | 2 |

---

[22] Sherlock Employment and Day Activities Survey; Data Collection Period May 16-May 29, 2021.

| | | | |
|---|---|---|---|
| 10-21 Hours | 1 | 2 | 5 |
| 21+ Hours | 1 | 0 | 1 |
| Total | 2 | 3 | 10 |

| Individuals Participating in Employment and Community Activities – Combined Hours Provider-Paid Individual Employment | | | |
|---|---|---|---|
| | Youth Exit | Sheltered Workshop | Day Program |
| Less Than 1 Hour | 0 | 0 | 1 |
| 1-10 Hours | 0 | 2 | 11 |
| 10-21 Hours | 1 | 9 | 8 |
| 21+ Hours | 0 | 4 | 3 |
| Total | 1 | 15 | 23 |

| Individuals Participating in Employment and Community Activities – Combined Hours Provider-Paid Group Employment | | | |
|---|---|---|---|
| | Youth Exit | Sheltered Workshop | Day Program |
| Less Than 1 Hour | 0 | 0 | 1 |
| 1-10 Hours | 0 | 8 | 7 |
| 10-21 Hours | 0 | 14 | 12 |
| 21+ Hours | 2 | 4 | 3 |
| Total | 2 | 26 | 23 |

*Note – Although there is consensus that Provider-Paid Group Employment is not individual employment, these data are included to illustrate time in the community for this group.*

Collectively, these tables document the continuing impact of COVID and the workforce shortage. The Monitor (and others) believe that it is important to define a new baseline and measure change from that baseline. Acknowledging that, there are several interesting trends.

- The cumulative number of placements (documented in the Quarterly Report) remains stationary.
- The number of individuals currently working is lower than pre-COVID numbers. Currently there are 337 individuals employed. (*Sherlock Survey*)
- The most common job types are (1) retail, (2) accommodations and food services, (3) Health Care and Social Assistance. (*Sherlock Survey*)
- The number of individuals participating in community-based non-work has also decreased in comparison to pre-COVID numbers. Currently there are 1392 individuals in the Consent Decree populations who report participating in non-work community activities. (*Sherlock Survey*)
- Perhaps most striking, there are only 247 individuals who are BOTH employed and participating in non-work community activities for a combined total of more than 10 hours per week. (*Sherlock Survey*)

The intent of the Action Plan and other activities being initiated by the State is to increase the resources and supports available so that these numbers will increase. For example, three state agencies (Labor and Training, Office of Rehabilitation Services and Developmental Disabilities) and the Conversion Institute are integrating resources and will meet with each provider organization to discuss strategies for increasing employer outreach and increasing employment

in the industries with workforce shortages. It is anticipated that the next Monitor Report will document positive changes across all metrics.

**Indicator 3 – Change in the Individual Lives of Consent Decree Class Members**

There is currently no data pertinent to this indicator. Information gathering will begin in 2022.

**Indicator 4 – The Actual Cost of Transformation and/or New Models of Service or Support**

There is currently no data pertinent to this indicator. Information gathering will begin in 2022.

**Indicator 5 – Transformation of Services and Supports**

Visits to provider organizations and secondary schools will begin in January, 2022. These visits will be the basis for reporting on how services and supports are being transformed to address the individualized goals of class members.

The State's Quarterly Report includes several examples of initiatives that have begun. Appendix B is an executive summary of the highlights from the State's Quarterly Report.

Aligned with Section VII of the Consent Decree, there are several transition initiatives that should be highlighted:

- In response to school administrators' request for greater confluence of transition supports, all three agencies (RIDE, DD, ORS) are collaborating more closely to integrate services and supports during the two years before school exit, to develop user-friendly materials for students and families and to increase access to Pre-ETS and other services.
- In collaboration with the Conversion Institute on training and implementing the strategies in the RI Person-Centered Thinking Guide.
- RIDE and the Transition Centers are collaborating with Griffin&Hammis to launch a "School to Work Customized Employment Implementation Pilot".
- RIDE, ORS, BHDDH have created a "Transition Work Group" focused on improving collaboration between the three agencies, school districts and adult providers.
- In response to the Monitor's request, RIDE has begun to collect data on the type of work experiences students have during the last two years before school exit. Although only a sample, the data documents that approximately 80% of the sample students participated in long or short term work experiences, approximately 50% participated in at least one long term experience, 40% participated in two or more long term experiences and one student had a paid experience.
- ORS provided Pre-ETS services to 1169 students.

**Indicator 6 - Quality of Person-Centered and Career Development Plans**

Career Development Plans by Consent Decree Populations.

| | Youth in Transition | Youth Exit | Sheltered Workshop | Day Program |
|---|---|---|---|---|
| Actual | 1213 | 420 | 625 | 1370 |
| % of Benchmark | 100% | 100% | 100% | 100% |

All Consent Decree class members have career development plans. As indicated in the Monitoring Section of this report, beginning in January, 2022 a sample of plans from all populations will be reviewed for content, process and potential impact.

**Indicator 7 – Timely Completion of the Actions Specified in the Action Plan**

The Action Plan is less than one month old. There have been several discussions between the Monitor and the State Parties re: implementation of the Action Plan. The first two sections of this report outline (a) expectations for transforming services and supports and (b) expectations and timelines for implementation of the Action Plan.

The contract for the Rate Review has been delayed due to review issues related to Purchasing process.

Per the Action Plan, all changes to the administrative process and elimination of identified administrative barriers will be completed by March, 2022. Appendix C contains the proposal for implementing the administrative changes recommended by the four workgroups and modified to by the State to conform to CMS requirements. Also attached is a spreadsheet of the tasks to be accomplished to implement these recommendations.

Several discussions have occurred pertinent to the Statewide Workforce Infrastructure Initiative. Discussions focused on topics/issues to be addressed and potential partners. The first two sections of this report outline expectations for this initiative. An invite for an initial December 2 meeting was sent from the Governor's Office.

**Conclusion**

As stated earlier, this is not a typical report. The primary intent of this report is to outline and clarify expectations for systems transformation necessary to achieve the Consent Decree benchmarks, for workforce enhancement, for implementation of the Action Plan and for how the Action Plan will be monitored. **The Monitor believes that RI is at a critical point at which significant transformational issues need to be addressed. The cooperation of all partners is needed.**

### Appendix A - Guidance for Monitor Review of Provider Organizations
### Linking Monitor Reviews with Agency Quality Improvement Plans

Section XV of the Consent Decree states "...the State will develop and implement a statewide quality improvement initiative to ensure that individual, integrated Supported Employment Services and Supported Employment Placements, and Integrated Day Services and Integrated Day-Only Placements as defined and described in Sections V-VI, are developed in accordance with this Consent Decree; to evaluate the quality and quantity of Supported Employment and Integrated Day Services provided to persons with I/DD under this Consent Decree; and to ensure that individuals in the...Target Populations who receive Supported Employment Placements and Integrated Day Services under this Consent Decree receive services and supports that are adequate and sufficient to achieve integration, increased independence, and increased economic self-sufficiency."

The Monitor's Court Report (October, 2020) stated "...Beginning in 2021, the Monitor (or monitoring Team member) will visit each provider organization. A small sample of target population members will be selected. The Monitor (or monitoring Team member) will review selected individuals' plans, daily and weekly schedules as indicators of community activity, and documentation of personal growth. Focus will be on determining whether individuals have integrated community-based lives that include, at the individual member level, a combination of both integrated employment and integrated community-based activities. Monitor will develop a quality rubric. Monitor (or monitoring Team member) will meet with staff and families to discuss how individual changes and needs have been addressed in the plan, including whether individuals are receiving appropriate supported employment and integrated day services to achieve community integration."

For the remaining years of the Consent Decree the Quality Improvement Plans required by BHDDH will be integrated with an annual review of each provider organization by the Court Monitor. The intent is two-fold. First, to create a unified approach to systems change that focuses on facilitating person-centered, person-directed lives and transitioning organizational models for providing services and supports from center-based group models to community-based individualized models. Second, to increase the efficiency of organizational planning. The process for implementing these reviews is outlined in the following.

### Monitor Review of Person-Centered Individual Service Plans and Career Development Plans

Prior to the Monitor's scheduled visit, the Monitor will provide the organization with a randomly selected list of names. The ISPs and CDPs (if they are separate) of the selected individuals will be provided to the Monitor approximately two weeks before the visit. In reviewing the plans, the Monitor will focus on the following:

- Preparing the Person and the Team for the planning process.
    - (g) Is there a description of how the person communicates and strategies for increasing the person's capacity to understand what is being discussed and to express preferences;

     (h) Has the person received instruction in self-determination; does the person have experience with choice-making;

     (i) Has there been a broad discussion of life domains/interests – does the organization use a format/guide/tool to guide these discussions;

     (j) Has there been sufficient community mapping to identify and develop new opportunities for developing community presence and participation;

     (k) Has there been sufficient community mapping to identify opportunities that allow the person to explore personal interests and personal growth;

     (l) Has there been a discussion of the person's relationships and discussion of strategies for broadening the person's relationship network.

- The Plan.
    - (h) Does the plan reflect a variety of life domains?
    - (i) Are the goals or life directions clearly stated?
    - (j) Are there defined action steps to implement the goals?
    - (k) Are the logistical details sufficient to ensure implementation – identified places(s), time, transportation, accommodations, other?
    - (l) Do the supports identified for each goal or life direction reflect a variety of support strategies?
        - (6) What can the person do?
        - (7) What supports can family/friends provide?
        - (8) Role of technology,
        - (9) Use of generic resources, community resources,
        - (10) Role of paid staff.
    - (m) Is there a strategy for measuring progress?
    - (n) Is there an individual budget? Does it align with the plan goals?

## Review of Data provided by the State, the Sherlock Employment and Day Activity Survey, the Organization or other applicable source.

The most recent agency report from the Sherlock Survey will be reviewed. Any other data or reports the agency wishes to share should be provided with the selected ISPs.

## Monitor Visit

- Review of the daily/weekly schedules for the individuals whose ISPs were reviewed to determine alignment between the plans and the schedules.

- Meeting with plan facilitators to discuss:
    - (a) strategies they use to prepare individuals and to facilitate plans,
    - (b) ideas and strategies to improve quality of plans.

- Meeting with individuals and families to discuss:
    - (a) satisfaction with services and supports,
    - (b) suggestions or ideas for improving supports.

- Meeting with organizational leaders (and anyone interested) to discuss:
  (a) agency model(s) for increasing employment and community activity;
      (1) What's new
      (2) Strategies for broadening outreach to employers
      (3) Strategies for broadening access to community, community membership, personal networks
      (4) Next steps -- steps to be implemented during next year.

  (b) Changes in staffing patterns -- functions, revised job descriptions, supervision.

  (c) Administrative structure changes, barriers, needs, suggestions.

  (d) Ideas, needs, suggestions.

  (e) Summary of Monitor's review of plans, observations...recommendations.

**Monitor Summary**

Approximately one week after the visit the Monitor will provide each organization with a written summary. The Monitor will also provide a list of topics to BHDDH to serve as the basis for developing a Quality Improvement Plan. Any information and/or data collected during the review will be used to provide a statewide summary in the Monitor's semi-annual reports to the Court.

**The BHDDH Quality Improvement Unit will provide technical assistance to the provider organization re: QI plan development and a format for documenting change.**

Following the Monitor's review, BHDDH Quality Improvement staff will contact the organization and agree to the logistics for the developing the Quality Improvement Plan. The Quality Improvement Plan will be based on three components.
- Implementation of changes in model for providing services and supports, changes in staffing patterns or other personnel issues, changes in administrative structure, other changes -- as identified in the Monitor discussion with agency leadership.
- Other areas identified by the Monitor.
- Other areas determined collaboratively by agency/BHDDH.

**Appendix B - 12/1/21 CD State Executive Summary Highlights**

- In response to school administrators' request for greater confluence of transition supports, all three agencies (RIDE, DDD, ORS) are collaborating more closely to integrate services and supports during the two years before school exit; to develop user-friendly materials for students and families; and to increase access to Pre-ETS and other services.

- RIDE, ORS, and BHDDH have created a "Transition Work Group" focused on improving collaboration between the three agencies, school districts, and adult providers.

- ORS, in collaboration with FedCap/NCISI, West Bay Collaborative and partnerships with LEAs, is providing Pre-ETS work readiness programming to 8th grade students with disabilities. This program is the earliest Pre-ETS service that ORS provides, and is focused on introducing career awareness to Middle School-aged youth, discussing strengths and abilities and career paths.

- ORS is in the process of finalizing Technical Assistance for the Integrated Resource Team (IRT) Model and the Individual Placement and Support (IPS) Model. It is anticipated that this training and utilization of the evidence-based employment models will increase competitive integrated employment outcomes.

- ORS is also working with Boston University on some targeted TA around working with Providers to prioritize supported employment, help them better understand the billing process, sequenced funding and assist them to identify and establish other funding sources than Medicaid.

- ORS continues to evaluate and develop a fee-for-service model which will enhance payments to community rehabilitation providers. ORS will be introducing the proposed fee schedule and reporting changes to a select group of Providers that will Pilot these new changes. This pilot will be a quick one in that once the new process is evaluated in the first month, the new procedures will then be implemented for all Providers ORS has requested information from CSAVR regarding other State VR Fee schedules and will do an extensive review to compare ORS fees to other VR State Agency fees and determine if the Supported Employment Fee Schedule needs to be adjusted.

- In August 2021, RIDE in collaboration with the Regional Transition Centers and Griffin-Hammis Associates launched the initial phase of the 'RI School to Work Pilot Customized Employment Implementation Project' to build educator capacity and advance systems collaboration when guiding students to secure meaningful community employment. This pilot will include students, families, and collaboration with LEAs, ORS, DDD, and Adult Service Providers.

- The State is collaborating with the Sherlock Center Conversion Institute on training and implementing the strategies in the RI Person-Centered Thinking Guide.

- RIDE, in collaboration with the Regional Transition Centers has developed a new partnership with LAZO, a family support and advocacy organization. This partnership will focus on developing a "Charlas" pilot that will expand the current use of the

"Charlas" model to additional LEAs. The outcome of this work is to better address the cultural concerns of diverse families that focuses on individualized family employment awareness training, and specific transition needs that is customized to the needs of Spanish speaking families. Additionally, a "Charlas" Guidebook in both English and Spanish will be developed to guide personalized and culturally competent transition discussions with families.

- RIDE has begun to collect data on the type of work experiences students have during the last two years before school exit. Although only a sample, the data documents that approximately 80% of the sample students participated in long- or short-term work experiences, approximately 50% participated in at least one long term experience, 40% participated in two or more long term experiences and one student had a paid experience.

- Over the past year, DLT has focused on providing resources specifically for the training and placing of DSPs. One particularly successful program was a collaboration between five community provider agencies and Crossroads RI. The partnership connected women who were at-risk of, or experiencing homelessness, with intensive supports, job training, and placement as DSPs, including extensive wraparound services. The program has completed two cohorts with a nearly 70% enrolled-to-hired ratio.

- Beginning in August 2021, BHDDH held multiple meetings with Stakeholders to develop the scope of work in the Request for Proposal (RFP) for the Payment Methodology Review. From the beginning of this process, the State worked diligently to collaborate with Stakeholders and ensure that all parties felt as through this was and continues to be a transparent process. Once the RFP was finalized, The Division of Purchasing worked expeditiously to process the RFP though the necessary channels. The RFP was posted on September 14th, 2021, and a contract will be awarded shortly. This Rate Methodology Review work is expected to be completed by December 1, 2022.

- The FY 2022 Enacted Budget designated $39.7 million to increase Medicaid rates for Developmental Disability Organizations (DDOs) licensed by BHDDH. The purpose of this Medicaid rate increase was to provide funding to the DDOs for the purpose of increasing wages currently paid to Direct Support Professionals, Direct Support Professional supervisors, and Direct Care overnight staff. The new rates took effect July 1, 2021. The actual implementation of the rate increase occurred in September 2021, and all DDO payments were retro to July 1, 2021. This increase was significant. The base wage for DSPs at all DDOs is now $15.75/hour.

- During this past quarter, BHDDH worked with RIPTA to assist them in becoming a RI Medicaid Provider. This would allow for a federal match on funding paid to RITPA for individuals' transportation. This also allowed us to access additional funding under transportation because the agency successfully advocated for all of the transportation funding to remain in the DD budget. Certification Standards needed to be developed. These standards were sent to Medicaid for approval. There are ongoing discussions with RIPTA to find ways to expand access to transportation.

## Appendix C – Administrative Barriers

**Proposal for Implementing Annual Authorizations (Work Group 1)**

**Proposal for Implementing Billing and Fiscal Recommendations (Work Group 2)**

**Proposal for Implementing Consumer Support Recommendations (Work Group 3)**

**Proposal for Implementing Operational Processes Recommendations (Work Group 4)**

**Administrative Barriers Master Task List**

# PROPOSAL FOR IMPLEMENTING ANNUAL AUTHORIZATIONS

| 7/30/2021 | Consent Decree Workgroup Plan #1 |
|---|---|

This document is the proposed implementation approach to implement the annual authorization process to reduce administrative barriers for providers and to enhance uninterrupted access to services for adults with disabilities. The plan addresses the recommendations that came out of the five Fiscal and Administration Barrier workgroups that resulted from the July 31, 2020 Consent Decree Court Order. It details the specific goals, operational changes including those requiring Medicaid and legislative authority, resources needed, stakeholder input, and steps to be taken to fully develop, evaluate, and implement needed changes.

# BACKGROUND AND INTRODUCTION

On July 31, 2020 the State was ordered to develop workgroups to address 16 specific fiscal and administrative barriers that the Court Monitor and Judge had heard about from the DD Community. These barriers were grouped into 5 categories, with each category assigned to a workgroup. The five workgroups met to develop recommendations to address each concern and comply with the Court Order.

When all members of the five workgroups met to review the final recommendations, they identified the interrelatedness of the issues and recommendations, and pointed to the need for further coordination to address the implementation of changes. As a result, the recommendations from the former workgroups have been assigned to one of 4 new workgroups focused on implementation impact areas:

1. Annual Authorizations

2. Billing and Fiscal

3. Consumer Support

4. Operational Processes

This document focuses on Workgroup 1: Annual Authorizations. It provides a detailed overview of the relevant recommendations from the original workgroups that this new workgroup will address, then outlines the approach that will be used to develop the implementation plan and define the resource needs.

# OVERVIEW OF RECOMMENDATIONS

**Overall Goal: Reduce provider administrative burden and allow increased consumer access to services.**

The following recommendations came out of the 5 initial workgroups:

1. **Complete Implementation and Tracking Plan for Annual Authorizations**

   a) Produce monthly reconciliation reports for adults with disabilities to identify individual status updates on spending compared to authorizations and flag cases that are in danger of overspending.

       i. SCWs will reach out to individuals who are in danger of overspending to assist with planning for the ISP year.

   b) Develop a procedure to review cases, with individuals and families, that are at risk of overspending.

## PROPOSED APPROACH TO ADDRESS CHANGES

1. Bring together a diverse working group of partners to develop a final implementation plan.

2. Develop ongoing resources needed for full implementation.

3. Prepare a fiscal impact analysis to quantify any long-term budget changes.

4. Engage internal and external stakeholders in the development of the final products and processes.

5. Coordinate with the consumer support workgroup to address needs rising out of this work, and add items as needed to the implementation plan.

6. Full implementation will include system and process changes to integrate the overall goal into the ongoing work and structure of the Division.

## RESOURCE NEEDS

The full implementation plan will detail the specific resources needed to evaluate the recommendations and deliver the final products. Ongoing resource needs will be included to ensure the overall goal is integrated into the Division's overall operations rather than being a short-term initiative. The anticipated resource needs fall into the following categories.

1. **BHDDH and Other State Staff:** BHDDH will assign staff the responsibilities to develop, review, and revise information and processes related to billing and fiscal issues. As needed, this will be done in coordination with staff from other State agencies. All new initiatives will be evaluated for impact on consumers, families, and providers. Liaisons to other agencies and community groups will be identified to ensure ongoing coordination of services.

2. **Contracts:** Any contracts related to billing and fiscal issues will be identified, maintained and actively managed.

3. **Budget:** Develop budget requirements to ensure implementation and address other identified needs.

4. **Stakeholders:** Identify and develop ongoing advisory and input options from stakeholders.

# PROPOSAL FOR IMPLEMENTING BILLING AND FISCAL ISSUES RECOMMENDATIONS

**7/31/2021** | **Consent Decree Workgroup Plan #2**

This document is the proposed implementation approach to improve the billing and fiscal related processes to reduce administrative barriers for providers. It also includes improving the experience of individuals and families related to budgets and funding processes. The plan addresses the recommendations that came out of the five Fiscal and Administration Barrier workgroups that resulted from the July 31, 2020 Consent Decree Court Order. It details the specific goals, operational changes including those requiring Medicaid and legislative authority, resources needed, stakeholder input, and steps to be taken to fully develop, evaluate, and implement needed changes.

# BACKGROUND AND INTRODUCTION

On July 31, 2020 the State was ordered to develop workgroups to address 16 specific fiscal and administrative barriers that the Court Monitor and Judge had heard about from the DD Community. These barriers were grouped into 5 categories, with each category assigned to a workgroup. The five workgroups met to develop recommendations to address each concern and comply with the Court Order.

When all members of the five workgroups met to review the final recommendations, they identified the interrelatedness of the issues and recommendations, and pointed to the need for further coordination to address the implementation of changes. As a result, the recommendations from the former workgroups have been assigned to one of 4 new workgroups focused on implementation impact areas:

1. Annual Authorizations

2. Billing and Fiscal

3. Consumer Support

4. Operational Processes

This document focuses on Workgroup 2: Billing and Fiscal Issues. It provides a detailed overview of the relevant recommendations from the original workgroups that this new workgroup will address, then outlines the approach that will be used to develop the implementation plan and define the resource needs.

# OVERVIEW OF RECOMMENDATIONS

**Overall Goal: Reduce provider administrative burden and allow increased consumer access to services.**

The following recommendations came out of the 5 initial workgroups:

1. **Billing Day Program at Community Rates**

   a) Billing and reimbursement of all-day program services to be billed at the community-based rate when the services are provided in the community.

      i. This will simplify billing by eliminating the need to identify and track time between center-based and community-based settings when service is provided in the community.

      ii. Eliminate the 40/60 split when services are provided in the community.

   b) Tracking should be done through case notes as it is not a billing issue.

   c) Determine if a service location modifier needs to be used for the DDOs, working closing with RI Medicaid to ensure compliance with Medicaid rules and standards.

2. **Reduce Billing Ratios to 2 categories**

   a) Address recommendations and changes that will require CMS approval and RI Medicaid authorization and compliance approval.

   b) Reducing billing ratios into two buckets:

      i. 1-2 participants to 1 staff will be billed at the 1:1 rate;

      ii. 3-5 participants to 1 staff will be billed at a rate to be determined.

3. **Provide an aggregate amount for funding**

   a) Address and account for fiscal impact by anticipating that adult with disabilities will be using more dollars being reimbursed at a higher rate.

   b) Provide an aggregate amount vs itemized services in order to allocate funds freely rather than resubmitting a PO/requesting approval to reallocate.

   c) Allow unutilized funds for residential, SLA, and other categories to be used for other services without submitting a new Purchase Order.

   d) Change terminology to replace "day" with "community-based supports".

   e) Separate employment services from day/community-based supports on Purchase Order and in billing.

   f) If there are multiple providers, ensure budget changes are only within the funds allocated to that provider. Shifting funds between providers requires new PO (requires conversation among providers and individual).

4. **Develop ability for all to view participants total authorizations and billed amounts**

   a) Ensure individuals have access to their total budget with a billed through date.

   b) Explore potential conflict of interest of providers seeing funds allocated to other providers.

5. **Allow for individuals receiving agency-based services to utilize Goods and Services**

   a) Determine a mechanism to support agency-based individuals to have the same access as self-directed individuals to options like participant-directed goods and services, technology, and transportation, without additional bureaucratic barriers or having to engage and pay an FI for the flexibility.

   b) Create a hybrid model of service delivery with classification of billing for DDOs vs self-direct.

   c) Continue to allow for purchase of enabling technology, assistive technology, and connecting technology.

6. **Create Individualized Budgets**

   a) Develop processes that are simplified, streamlined and clear to adults with disabilities and providers.

   b) Ensure all processes and billing methods incentivize the person-centered approach.

   c) Eliminate the one-size-fits-all budgets that are currently in place within the funding level "buckets" based on tier and living arrangement. Not everyone within the same "bucket" has the same needs or wants for services.

   d) Develop a process in which development of person-centered budget follows the ISP development and addresses how the proposed budget is needed to meet the goals.

       i. Empower individuals to develop their own budgets based on their plan by providing support to those who may need assistance in developing and managing their budget.

    e) Establish a process to review the person-centered budget and accept, revise, or reject it.

**7. Align additional funding (L9) request dates with ISP plan year dates**

**8. Develop Definition and Use of Support Coordination**

    a) An individual's need for support coordination should not result in a reduction in direct support funding.

    b) Consider payment for families that provide support coordination.

        i. Will require federal CMS and state legislative authority.

    c) Consider making support coordination hourly rather than a monthly set rate. This will allow for those who are currently not providing the service to not be funded and those who are providing significant hours to be funded appropriately.

    d) Keep support coordination separate from case management due to the day-to-day nature of the needs for support coordination (e.g. medical appointments). The services will be clearly and distinctly defined in the revised DD regulations.

**9. Build additional indirect service time into existing rate structure**

    a) Build in additional indirect time into the rate to account for documentation. The amount of time should be ½ hour per 3.5 hours of service.

**10. Maximize Access to Funding Streams**

    a) Explore braiding of funds, e.g. DLT, ORS, LTSS, Managed Care/Medicaid, DD while ensuring that there is no double-dipping.

    b) Determine how to use DD and other funding sources for wrap-around services rather than all or nothing enrollment.

**11. Address recommendations and changes that will require CMS approval and RI Medicaid authorization and compliance approval.**

    a) List all the options that need Medicaid/CMS approval or require a Waiver change.

## PROPOSED APPROACH TO ADDRESS CHANGES

1. Bring together a diverse working group of partners to develop a final implementation plan.

2. Develop ongoing resources needed for full implementation.

3. Develop budget and timeline for short-term implementation costs.

4. Develop purchasing timeline for those action items requiring procurement.

5. Prepare a fiscal impact analysis to quantify any long-term budget changes.

6. Engage internal and external stakeholders in the development of the final products and processes.

7. Coordinate with the consumer support workgroup to address needs rising out of this work, and add items as needed to the implementation plan.

8. Full implementation will include system and process changes to integrate the overall goal into the ongoing work and structure of the Division.

## RESOURCE NEEDS

The full implementation plan will detail the specific resources needed to evaluate the recommendations and deliver the final products. Ongoing resource needs will be included to ensure the overall goal is integrated into the Division's overall operations rather than being a short-term initiative. The anticipated resource needs fall into the following categories.

1. **BHDDH and Other State Staff:** BHDDH will assign staff the responsibilities to develop, review, and revise information and processes related to billing and fiscal issues. As needed, this will be done in coordination with staff from other State agencies. All new initiatives will be evaluated for impact on consumers, families, and providers. Liaisons to other agencies and community groups will be identified to ensure ongoing coordination of services.

2. **Contracts:** Any contracts related to billing and fiscal issues will be identified, maintained and actively managed.

3. **Budget:** Develop budget requirements to ensure implementation and address other identified needs.

4. **Stakeholders:** Identify and develop ongoing advisory and input options from stakeholders.

# PROPOSAL FOR IMPLEMENTING CONSUMER SUPPORT RECOMMENDATIONS

| 7/30/2021 | Consent Decree Workgroup Plan #3 |

This document is the proposed implementation approach to improve the experience of consumers and families. The plan addresses the recommendations that came out of the five Fiscal and Administration Barrier workgroups that resulted from the July 31, 2020 Consent Decree Court Order. It details the specific goals, operational changes, stakeholder input, resources needed, and steps to be taken to fully develop, evaluate, and implement needed changes.

# BACKGROUND AND INTRODUCTION

On July 31, 2020 the State was ordered to develop workgroups to address 16 specific fiscal and administrative barriers that the Court Monitor and Judge had heard about from the DD Community. These barriers were grouped into 5 categories, with each category assigned to a workgroup. The five workgroups met to develop recommendations to address each concern and comply with the Court Order.

When all members of the five workgroups met to review the final recommendations, they identified the interrelatedness of the issues and recommendations, and pointed to the need for further coordination to address the implementation of changes. As a result, the recommendations from the former workgroups have been assigned to one of 4 new workgroups focused on implementation impact areas:

1.  Annual Authorizations

2.  Billing and Fiscal

3.  Consumer Support

4.  Operational Processes

This document focuses on Workgroup 3: Consumer Support. It provides a detailed overview of the relevant recommendations from the original workgroups that this new workgroup will address, then outlines the approach that will be used to develop the implementation plan and define the resource needs.

# OVERVIEW OF RECOMMENDATIONS

**Overall Goal:  Improve accessibility for adults with I/DD, families, and stakeholders.**

The following recommendations came out of the 5 initial workgroups:

1.  **Complete Authorization Letters**

    a)  Develop a new quarterly statement to inform participants about the status of their annual authorization, spending year-to-date, and alert(s) to significant over/under spending.

    b)  Revise the current letter informing participants of any changes to their authorization. Letters to those who have changes will be generated monthly.

2.  **Develop and Revise Guidance Documents**

    a)  Develop a guidance document to clarify who in the system will provide support prior to agency involvement and include contact information and other resources and to clarify services and financial benefits available to adults with disabilities across the system.

    b)  Create, revise, and update transition information to be more comprehensive

    c)  Identify direct pathway for adults with disabilities and families considering self-direction to have timely and up-to-date information.

    d)  Ensure information for Sherlock Plan is easily accessible.

    e) Update and Simplify Appeal Documents/Description

       i. Decision Letter to include a notice of Appeal, contact person, and reason for decision

       ii. Create a Notice of the Right to Appeal and an appeal form to go with the decision letter

       iii. Create Appeals Service Information Document (BHDDH)

- Include description of the Appeals process and timelines;
- Update flowchart;
- Clarify and describe the "Stay" during an appeal;
- Clearly identify what you can and cannot appeal;
- Include timelines and notifications.

       iv. Ensure Notice of Appeal Rights is included in all documents/stages of process

## 3. Enhance BHDDH Website to include all service options and advocate links

    a) Enhance the BHDDH website to include all service options considering 'no wrong door,' (i.e. Personal Choice, Rite @ Home, etc.).

    b) Define services and provide a comprehensive list of services by provider with drop downs to program description, provider agency contact information (including fiscal intermediaries), link to the agency website, and PDFs of brochures or other materials to print/download.

    c) Update transition section to BHDDH website.

## 4. Develop Information in Multiple Languages and Formats

    a) Ensure that all communications (letter, website, etc.) are fully ADA compliant for accessibility.

    b) Evaluate opportunities to increase translation services capacity.

    c) Develop information that is available in multiple languages and in a variety of formats.

    d) Ensure that all communication will be easily understood by adults with disabilities and their families and in their preferred language/method/format.

    e) Ensure bilingual support coordinators and/or interpreters/translators (trained and familiar with support needs and service delivery models) are made readily available for those who need them.

    f) Ensure access to trained/qualified independent facilitators who can help determine needs and develop budgets in a neutral manner, including facilitators that are bilingual.

    g) Ensure that appeal documentation/letters/information is presented in multiple formats/languages.

    h) Allow adults with I/DD, family members to submit materials and forms in preferred language with minimal delay for translation by BHDDH.

## 5. Provide SIS training to families and staff

    a) Provide training on the SIS process to families and staff to allow for more accurate reporting.

    b) Streamline communication about the SIS by:

       i. Add the link to https://www.aaidd.org/ SIS website to Advocates in Action, RIPIN and BHDDH websites for additional information; (add phone number).

       ii. Create universally designed language to allow information and process to be easily understood by individuals with I/DD and their families.

6. **Provide ongoing application assistance**

   a) Provide ongoing application assistance for all adults with disabilities to ensure timely and successful completion of renewal application through the LTSS redesign initiative.

   b) Ensure that the DD application is simply written so that it easily understood.

   c) Increase awareness of options to assist in the navigation process.

7. **Create or identify mechanisms to house all instructions, documents, and assessments**

   a) Disseminate in electronic form all instructions, documents, and assessments to all adults with disabilities.

8. **Develop information and assistance to implement and support individual budgets**

   a) Ensure development of a person-centered plan that informs development of the person-centered budget and address how the proposed budget is needed to meet the goals.

   b) Empower individuals to develop their own budgets based on their plan by providing support to those who may need assistance in developing and managing their budget.

      i. Define all options for services and allowable costs and activities. Options outside of the DD system include not only other State services, but the option to hire their own staff to provide a service (e.g. pay a neighbor mileage for transportation), or the option to do something with family, friends, co-workers, or on their own and prioritize their funding for something else.

      ii. Standardize allowable costs.

   c) Ensure that budget information is easily and readily accessible.

      i. Translate information into easily understandable terms and format, such as dollar amounts and a bank account type of presentation.

      ii. Make balances transparent and easily viewable by an individual at any given time.

      iii. Explore the use of technology, such as an app and more effective use of Therap to view their budget. This would put the power in the individual's hands to be able to access information in a way as simple as going into an online bank account.

      iv. Provide information in other languages, ASL, and video formats.

   d) Improve timelines and communicate a clear process for initial budget approval as well as for a change to a budget/emergency, with consistent and clear standards.

   e) Ensure whole life planning addresses everything the individual wants and needs, and everything available to the individual, not just DD services.

      i. Should include all other State services such as DHS (SLA, Self-Direction, SNAP, RI Works, cash assistance, childcare subsidies, etc.), DLT, ORS, Office of Healthy Aging, Housing Authorities, or other services.

## PROPOSED APPROACH TO ADDRESS CHANGES

1. Bring together a diverse working group of partners to develop a final implementation plan.

2. Develop ongoing resources needed for full implementation.

3. Develop purchasing timeline for those action items requiring procurement.

4. Prepare a fiscal impact analysis to quantify any long-term budget changes.

5. Engage internal and external stakeholders in the development of the final products and processes.

6. Develop and deliver education and training on process changes to agencies, staff, participants and families.

7. Coordinate with the three other implementation workgroups to determine consumer support needs rising out of their work and add items as needed to the implementation plan.

8. Full implementation will include system and process changes to integrate the overall goal into the ongoing work and structure of the Division.

## RESOURCE NEEDS

The full implementation plan will detail the specific resources needed to evaluate the recommendations and deliver the final products. Ongoing resource needs will be included to ensure the overall goal of improving accessibility for adults with I/DD, families, and stakeholders is integrated into the Division's overall operations rather than being a short-term initiative. The anticipated resource needs fall into the following categories.

1. **BHDDH staff:** BHDDH will assign staff the responsibilities to develop, review, and revise information and processes related to consumer support. All new initiatives will be evaluated for impact on consumers and families and include appropriate outreach and education. Liaisons to other agencies and community groups will be identified to ensure ongoing coordination of services and updated information.

2. **Contracts:** Any contracts related to consumer support will be identified, maintained, and actively managed.

3. **Budget:** Budget requirements to ensure accessible materials, mailings, translation services, and other identified needs will be developed.

4. **Stakeholders:** Ongoing advisory and input options from stakeholders will be identified and developed.

# PROPOSAL FOR IMPLEMENTING OPERATIONAL PROCESSES RECOMMENDATIONS

| 7/30/2021 | Consent Decree Workgroup Plan #4 |
| --- | --- |

This document is the proposed implementation approach to improve operational processes. The plan addresses the recommendations that came out of the five Fiscal and Administration Barrier workgroups that resulted from the July 31, 2020 Consent Decree Court Order. It details the specific goals, operational changes, stakeholder input, resources needed, and steps to be taken to fully develop, evaluate, and implement needed changes.

# BACKGROUND AND INTRODUCTION

On July 31, 2020 the State was ordered to develop workgroups to address 16 specific fiscal and administrative barriers that the Court Monitor and Judge had heard about from the DD Community. These barriers were grouped into 5 categories, with each category assigned to a workgroup. The five workgroups met to develop recommendations to address each concern and comply with the Court Order.

When all members of the five workgroups met to review the final recommendations, they identified the interrelatedness of the issues and recommendations, and pointed to the need for further coordination to address the implementation of changes. As a result, the recommendations from the former workgroups have been assigned to one of 4 new workgroups focused on implementation impact areas:

1. Annual Authorizations

2. Billing and Fiscal

3. Consumer Support

4. Operational Processes

This document focuses on Workgroup 4: Operational Processes. It provides a detailed overview of the relevant recommendations from the original workgroups that this new workgroup will address, then outlines the approach that will be used to develop the implementation plan and define the resource needs.

# OVERVIEW OF RECOMMENDATIONS

**Overall Goal: Increase access to and efficiencies of services for adults with I/DD**

The following recommendations came out of the 5 initial workgroups:

1. **Ensure that whole life planning encompasses all the individual wants/needs, and everything available to the individual, not just DD services**

   a) Should include all other State services such as DHS (SLA, Self-Direction, SNAP, RI Works, cash assistance, childcare subsidies, etc.), DLT, ORS, Office of Healthy Aging, Housing Authorities, or other services

   b) Consider impact of CFCM

   c) Develop process for determining individual budgets based on whole life plan

2. **Continue to develop Transition Planning Process Across the Life Cycle**

   a) Create and revise transition information to be more comprehensive and to ensure that procedures are identified for all types of transitions

   b) Update transition section on BHDDH website

   c) Increase awareness of stakeholders, such as Advocates in Action and RIPIN to assist in the navigation process

   d) Identify direct pathway for adults with disabilities and families considering self-direction to have timely and up-to-date information

3. **Add an assessment, in addition to the SIS, in order to determine the right level of care/funding**

   a) Choose or create a supplemental tool or narrative for determining the individual level of care/funding.

   b) Identify means for the additional assessment to be used in coordination with the SIS assessment for a more accurate determination of the need/funding.

   c) All assessments will be conducted by a conflict free entity to determine support needs, in accordance with the Consent Decree Section IV-7.

# PROPOSED APPROACH TO ADDRESS CHANGES

1. Bring together a diverse stakeholder workgroup to develop a final implementation plan

2. Participate and/or provide input into other workgroups addressing all topics to be implemented

3. Research products and processes developed and used by other States

4. Develop a budget analysis for implementation of all changes addressed in implementation plan

5. Continue to engage broad stakeholder participation throughout the implementation development process

6. Develop and deliver outreach, education and mentoring on all process changes

7. Coordinate with the other three workgroups to determine if any operational processes topics are identified in their work and add to the implementation plan

8. Identify any additional resources needed for full implementation

# RESOURCE NEEDS

The full implementation plan will detail the specific resources needed to evaluate the recommendations and deliver final products. Ongoing resource needs will be included to ensure the overall goal of improving accessibility for adults with I/DD, families, and stakeholders is integrated into the Division's overall operations rather than being a short-term initiative. The anticipated resources needs fall into the following categories.

1. **BHDDH staff:** BHDDH will assign staff the responsibilities to develop, review, and revise information and processes as it relates to operational processes. All new initiatives will be evaluated for impact on individuals with I/DD and families and include appropriate outreach and education. Liaisons to other agencies and community groups will be identified to ensure ongoing coordination of services and information.

2. **Contracts:** Any contracts related to operational supports will be identified, maintained and actively managed.

3. **Budget:** Budget requirements to ensure increased access/efficiencies of services will be developed.

4. **Stakeholders:** Ongoing advisory and input options from stakeholders will be identified and developed.

# Workplan for Reducing Fiscal and Administrative Burdens

| WORKGROUP | RECOMMENDATIONS | TASKS | TARGET DATE | COMPLETION DATE | Status Update |
|---|---|---|---|---|---|
| Billing and Fiscal Issues | Complete Implementation and Tracking Plan | | | | |
| | | Monthly reconciliation reports mailed to participants | 10/1/2021 | Ongoing | First mailing sent in October 2021 |
| | Bill Day Programs at Community Rates | | | | |
| | | Medicaid Outreach | 6/28/2021 | Ongoing | Vetted with Medicaid; needs additional follow up |
| | | Rate Methodology work | 9/14/2021 | Ongoing | RFP Posted; Vendor selection in progress |
| | Reduce Billing Ratios to two Categories(1-2/3-6) | | | | |
| | | Medicaid Outreach | 6/28/2021 | Ongoing | Vetted with Medicaid; needs additional follow up |
| | | Rate Methodology work | 9/14/2021 | Ongoing | RFP Posted; Vendor selection in progress |
| | Provide an Aggregate Amount for Funding | | | | |
| | | Medicaid Outreach | 6/28/2021 | Ongoing | Vetted with Medicaid; needs additional follow up |
| | | Rate Methodology work | 9/14/2021 | Ongoing | RFP Posted; Vendor selection in progress |
| | Make Viewable to all-Total Authorization and Spend | | | | |
| | | Determine IT-System change or develope report(Tharos) | 3/31/2022 | | |
| | | Communication – Participant Notice | 10/1/2021 | Completed | First mailing sent in October 2021 |
| | Individuals with Agency Services Able to Utilize Goods and Services | | | | |
| | | Develop policies for hybrid approach (agency and SD) | 3/31/2022 | | |
| | Create Individualized Budgets | | | | |
| | | Medicaid Outreach | 6/28/2021 | Ongoing | |
| | Align Additional IJ Request Dates with ISP Year Dates | | | | |
| | | Rate Methodology work | 9/14/2021 | Ongoing | RFP Posted; Vendor selection in progress |
| | | Started aligning additional funding over Tier with ISP dates | 6/1/2021 | Ongoing | Began aligning additional funding requests with ISP date. |
| | Develop/Definition Use of Service Coordination | | | | |
| | | Communication - Create and disseminate a Technical Bulletin | 1/1/2022 | | |
| | Build Additional Indirect Service Time into Existing Rates. | | | | |
| | | Medicaid Outreach | 6/28/2021 | Ongoing | Vetted with Medicaid; needs additional follow up |
| | | Rate Methodology work | 9/14/2021 | Ongoing | RFP Posted; Vendor selection in progress |
| | Maximize Access to All Funding Streams | | | | |
| | | Medicaid Outreach | 6/28/2021 | Ongoing | Vetted with Medicaid; needs additional follow up |
| | | Rate Methodology work | 9/14/2021 | Ongoing | RFP postod; Vendor selection in progress |
| | | Identify opportunities for braiding funding with other Non-DD funding sources | 3/31/2022 | | |
| Consumer Support | Ensure Access to all Available Supports | | | | |
| | | Medicaid/ ISS Engagement | 10/15/2021 | Ongoing | ISS Provider Presentation |
| | | Identify how to include other State services in whole life plans | 3/31/2022 | | |
| | Develop and Revise Guidance Documents | | | | |
| | | Develop guidance on how to obtain supports when new to system | 3/31/2021 | | |
| | | Transition Roadmap- Increase comprehensiveness | 11/30/2021 | | |
| | | Self-Direction Pathway Information | 8/30/2021 | Ongoing | Self-Directed Stakeholder group meeting monthly |
| | | Shortcut Plan Information | 10/30/2021 | Ongoing | Medicaid workgroup developing updated brochure |
| | | Update/simplify Appeal information and include at all relevant correspondence | 11/10/2021 | Ongoing | Appeals group recommend to finalize documents |
| | Provide information in Multiple Languages/Formats. | | | | |
| | | Ensure communications are accessible and easily understood | 10/30/2021 | Ongoing | Began with updating Eligibility Application |
| | | Evaluate opportunities to increase capacity of Bilignal Support Coordinators, Interpreters and Independent Facilitators | 3/31/2022 | | |
| | | Quick translation of documents submitted in other languages | 11/30/2021 | | |
| | Provide Education on the SS | | | | |
| | | Provide training on SS process to individuals, families, and providers | Ongoing | | Training to education in August |
| | | Create universally dovanged language on SS to ensure it is understood by all | 2/28/2022 | | |
| | | Provide link to American Association on Intellectual and Developmental Disabilities (AAIDD) website | 10/1/2021 | | |
| | Provide Application Assistance | | | | |
| | | Provide ongoing application assistance for renewals | Ongoing | | |
| | | Revise DD application to simplify | 9/15/2021 | Completed | |
| | | Provide stakeholders "Cheat Sheet" to assist with application process | 3/31/2022 | | |
| Operational Processes | Complete Authorization Letters | | | | |
| | | Revise quarterly statement for participant, more user friendly | 9/1/2021 | Completed | Letter developed; First mailing to participants in October |
| | Add Additional Assessment to better Determine Level of Care (LOC) | | | | |
| | | Identify tool(s) for capturing additional information not considered in the SS | 3/31/2022 | | |
| | | Identify means for using assessment w/ISS to capture Level of Need | 3/31/2022 | | |
| | Develop Implement Individual Budgets | | | | |
| | | Rate Methodology work | 9/14/2021 | Ongoing | RFP Posted; Vendor selection in progress |

| | | | | |
|---|---|---|---|---|
| | Medicaid Outreach | 6/28/2021 | Ongoing | Verified with Medicaid; needs additional follow up |
| | Rate Methodology work | 9/14/2021 | Ongoing | RFP Posted; Vendor selection in process |
| | Translate budget information into easily understood forms/format that is accessible to all | 2/1/2022 | | |
| | Communication - Participant Notification with budget dates | 10/1/2021 | Completed | First mailing sent in October |
| | Determine if: System change(s) or develop report (Therap) | 3/31/2022 | | |
| | Provide budget information that is accessible and easily understood | 3/31/2022 | | |
| | Improve timelines and communicate clear process for budget approval/changes | 8/31/2021 | Ongoing | |
| Enhance BHDDH Website | Include information on Service Options | 3/31/2022 | | |
| | Continuously update Transition information | 11/30/2021 | Ongoing | |
| | Ensure all policy documents are accessible | 3/31/2022 | Ongoing | |