**Monitor's Report**
**USA v Rhode Island**
**August 15, 2022**

"I go to bed every night worrying about the promises we've made.
I wake up every morning thinking we've not made enough promises"[1]
Dr. Paul Farmer, Partners in Health

This report will include the following sections:
- A review of transition activities and outcomes from both State agencies and local school districts (pages 3-11).
- A review of services and supports for adults (pages 12-20)– specific focus on (a) analysis of changes in administrative processes and removal of administrative barriers (pages 12-16); (b) compliance with Action Plan directives (pages 16-18); (c) innovations in organization and delivery of services – transformation projects (pages 18-20); (d) workforce trends (pages (pages 20-22); (e) employment and community participation data and trends (pages 22-28); and (f) interviews with a random sample of adults and families (pages 28-29).
- Summary statements for the critical areas of need identified in the Consent Decree, the Action Plan and prior Monitor Reports (pages 31-33).
- Summary statements re: progress towards substantial compliance with major sections of the Consent Decree (pages 34-35).
- Conclusion and Recommendations (pages 36-39).

Before beginning, I want to once again reinforce the **interconnectivity** between the various initiatives connected to the Consent Decree.  The diagram below illustrates that.

| **First, Systemic Change:**<br><br>Administrative Process<br>Funding System<br>Model for Providing Supports<br>Increased Capacity | **Then:**<br><br>Increased Employment<br>Increased Community Activity<br>Increased Combined Time<br>Personal Networks | **Then,**<br><br>**Individual Lives Change** |
| --- | --- | --- |

The November, 2020 Monitor's Report stated that substantial compliance with the Consent Decree requirements and benchmarks will only be achieved is there is major systemic reform; particularly in four areas – (1) removing administrative barriers and simplifying the system for individuals, families and providers; (2) reviewing and revising the methodology for funding and payment; (3) strengthening current models and developing and implementing new models for

---

[1] Dr. Paul Farmer, Global Health Advocate, quoted in the Boston Globe (February 21, 2022).

providing services and support to individuals; and (4) increasing the capacity of the entire system to provide the services and supports necessary for substantial compliance. These systemic efforts have been the primary focus of the past two years. In addition to continued efforts towards Consent Decree benchmarks, it is the Monitor's expectation that **all the systemic reforms and changes will be FULLY implemented by June 30, 2023**. As these systemic reforms begin to be implemented, the Monitor anticipates that more individuals will be employed, more individuals will be actively engaged in community activities of their choice, the combined time spent in employment and community activities will increase, and more individuals will develop personal networks of support. The ultimate criterion is the quality of individual lives – i.e., when the majority of individuals and families report that their lives are better and more employment and community focused than they were in previous years.

As has been indicated in previous Monitor's Reports, the **focus of monitoring will now change**. During the past two years the Monitor has assisted the State in identifying gaps and barriers to substantial compliance with the Consent Decree and in developing strategies to address those gaps and barriers. Recognizing that the pandemic has had a significant impact on progress, the State has had sufficient time to implement the systemic and procedural changes necessary to reach substantial compliance with the Consent Decree. The **focus will now be on outcomes** – e.g., are the benchmarks being met; are more individuals employed; are the number of direct support staff (specified in the May, 2022 court order) actually being recruited and hired; etc.

**Section 1 - Transition**

Since the transition population has not been a major focus of any prior Monitor's Reports, it is important to describe a conceptual framework for assessing the impact of transition activities. Section VII (Career Development Planning) and Section VIII of the Consent Decree (Transition Planning for Youth) describe the required actions to be implemented for youth in transition. The "spirit" of these requirements is to ensure that youth are prepared to achieve the outcomes detailed in Section IV (Outcomes) and Section VI (Integrated Community Services and Placements). Thus, it is important to determine what factors are most likely to contribute to those outcomes.

Several studies have documented the predictors of post school success. Mazzotti et al[2] reviewed 212 articles related to predictors of postschool success, 22 of these articles were "systematic research studies". They identified the following predictors of postschool success – (1) participation in career and technical education, (2) diploma status, (3) post school goal setting (including employment), (4) inclusion in general education, (5) independence in daily living skills, (6) **paid employment prior to exiting school**, (7) **family expectations**, (8) self-determination, self-advocacy and decision-making skills and (9) program of study. Carter et al[3] focused on employment predictors. **Having a paid, community-based job while still in high school** was strongly correlated with postschool employment success – "hands on work rather than preparatory experiences". Other predictive factors included (1) communication, (2) social skills, (3) self-advocacy, (4) **parental expectations**, (5) getting to places outside the home and (6) **spending 25% of the school day in community settings**. The National Secondary Transition Technical Assistance Center (NSTTAC) funded by the U.S. Department of Education conducted a systematic literature review and identified 17 predictors of postschool success.[4] These included (1) inclusion in general education, (2) diploma status, (3) **paid work experience**, (4) self-advocacy and self-determination, (5) **family involvement and support of student**, (6) social skills and other factors. Several other longitudinal studies support these basic themes. Wehman[5] found that **paid work experience** was the number one predictor of employment. Carter et al[6] found that students whose **parents expected them to be employed** were five times more likely to be employed than students whose parents did not expect them to be employed. Southward and Kzyar[7] found that **paid work experience while still in high school** more than doubles the likelihood of competitive employment after school exit and that students whose **parents expect** that they would be employed upon graduation from high are 58 times more likely to be employed two years after school exit.

[2] Mazzotti, Rowe, Kwiatek, Voggt, Chang, Fowler, Poppen, Sinclair, Test; Secondary Transition Predictors of Postschool Success: An Update to the Research Base. *Career Development and Transition for Exceptional Individuals,* SAGE Publications (2020).
[3] Carter, Austin, Trainor. Predictors of Postschool Employment Outcomes for Young Adults with Severe Disabilities. *Journal of Disability Policy Studies.* (2012)
[4] NSTTAC. *Predictors of In-School and Post-School Success.* (2011).
[5] Wehman, Taylor, Brooke, Avellone, Whittenburg, Ham, Carr. Towards Competitive Employment for Persons with Intellectual and Developmental Disabilities: What Progress Have We Made and Where Do We Need To Go. *Research and Practice for Persons with Severe Disabilities.* (2018)
[6] Carter, Austin, Trainor. Op. Cit. (2012)
[7] Southward & Kzyar. Predictors of Competitive Employment for Students with Intellectual and/or Developmental Disabilities. *Education and Training in Autism and Developmental Disabilities.* (2017)

Based on these (and multiple other) studies, the most significant predictors of employment are **paid work experience while still in high school** and **family expectations of employment**. Other predictors include (1) inclusion in the general curriculum, (2) self-determination/self-advocacy/decision-making, (3) social and communicative competence, (4) participation in career and technical education and (5) significant time in the community.  Developing and implementing strategies to address these factors should be the focus for transition activities for the remaining term of the Consent Decree.

The following review of Transition Services and Supports will focus on four areas:
1. State Agency (RIDE, ORS, BHDDH) activities;
2. Data Review;
3. Visits and Observations in 20 high schools;
4. Review of Career Development Plans.

**State Agency Activity:**

The Monitor commends the transition staff of the three state agencies.  The Monitor interviewed special education administrators in 2020 - they expressed a need for increased presence in high schools from BHDDH, ORS and provider organizations…and for greater integration and coordination of all transition-related activities.  The transition staff from the three state agencies have made significant efforts to address these requests.  These activities are detailed in the State's Quarterly Reports.  Specifically, the Monitor would highlight the following:
- Increased collaboration between RIDE, ORS, BHDDH and other partners and increased focus on the two years before school exit;
- Increase in the number of students (93%) participating in community-based work experiences[8];
- Collaboration between RIDE, the Regional Transition Centers and the Sherlock Center on providing training to LEA personnel re: Person-Centered Thinking;
- Collaboration between RIDE, Regional Transition Centers and Griffin-Hammis Associates on a School to Work Customized Employment Pilot – the Monitor is strongly encouraged by this pilot and interested in plans to see this go to scale in all districts;
- ORS continues to provide Pre-ETS to a large number of students – 1290 as of April, 2022[9]

**Visits and Observations to 20 High Schools:**

The Monitor has committed to visit every high school in Rhode Island during calendar year 2022.  The Monitor visited 20 during Spring, 2022 – the remainder will be visited in Fall, 2022. The intent of these visits is (a) to understand first-hand how each high school and each school district approaches transition, (b) to "brainstorm" with each district how to improve transition outcomes and discuss what they collectively need to do that, (c) to determine if families (and students) feel prepared and have the information and resources they need to make decisions

---

[8] State Quarterly Consent Decree Report, April, 2022.
[9] State Quarterly Consent Decree Report; April, 2022.

about adult services and supports, and (d) to review career development plans to determine if they effectively develop real career paths for students.  The monitor observed and talked with approximately 200 students, interviewed approximately 40 parents and teachers/transition staff and administrators (special education administrators, principals, several superintendents) from every school.  The monitor enjoyed these visits and found the discussions to be very productive. **All the LEAs should be commended for the increased focus on employment and their efforts to increase the employment and community outcomes for young adults with IDD.**

Primary observations and themes from the visits:

- Administrators from **every** district commented that the Consent Decree has been a positive influence in their districts and has significantly increased focus on transition services and postschool outcomes (specifically, employment experiences) for youth with intellectual and developmental disabilities.

- Program structures in most high schools differentiated between "high school" and "transition".  There were several discussions about diploma status – most of the high schools awarded regular diplomas to students with IDD.  There were also lengthy discussions about curriculum and inclusion in general education.  A small number of districts had developed curriculum sequences that blended general education courses with modified courses that met graduation credits.  Some were traditional self-contained classrooms.  Clarifying curriculum requirements would be a useful activity in every high school.

- Every student observed spent a portion of their school week in community employment settings.  There was, however, huge variance in the intensity and breadth of these experiences.  In some districts students spent more than 50% of their time in work settings….in othe districts students spent 2-3 hours on one day only.

- Some districts worked intensely at developing relationships with community employers and documented work experiences in more than 25 community settings….other districts did not have staff assigned to developing partnerships with employers and used a very small number of employers for student work experiences.

- Families were asked what their expectations were for their daughter/son post school exit and if they had the information and resources they needed to make decisions about adult services and supports.  All families made positive (sometimes, VERY positive) statements about school personnel and the transition supports and services provided by the districts.  Family expectations were varied.  A few families had very clear (and positive) expectations.  Others had limited understanding of the process and, thus, limited expectations.  One mother simply wanted to know what type of bus would pick up her family member after exiting school.  Few expressed that they had the information and resources they needed to make decisions about adult life.

- Despite the efforts of the State agencies, few families had a real plan for adult services and supports.  Most of the administrators and transition personnel felt there was still a disconnect between school and adult services.  The exceptions to this disconnect occurred when an adult provider was directly connected to the school district and when there had been collaborative efforts to connect the two service systems.

- About a quarter of the students interviewed had employment (or other) goals for post school exit.  The majority of students simply described their current work trial, as is often

typical of these students.  There were indicators that specific instruction in self-determination was occurring in some (but not all) schools.

**Review of Career Development Plans**

100% of transition-aged students have Career Development Plans.  The Monitor reviewed 67 of those plans.  Each plan was reviewed for three things – (1) Did the CDP substantially include the information listed in the Consent Decree; (2) Did the CDP identify one or more specific career goals for the student; (3) Did the CDP include a specific set of action steps targeted to assisting the student to achieve the stated career goal(s)?

100% of the CDPs included significant detail that aligns with Section VII (2,4,5) of the Consent Decree.  All of the CDPs (with a few minor exceptions) included detail about the assessments given, the student's interests and preferences, employment strengths, employment barriers, supports needed (these tended to be general, rather than specific to a job or work trial) and team recommendations.  The CDPs (and IEPs) included multiple types of assessments, including some that were picture-based.  There were examples of MAPs.  One LEA did the CDP in both pictures and words.

Every student (as listed in the CDP) had some combination of community-based work experiences and/or integrated work trials.  The average number of experiences was between 4 and 5, although a number of CDPs documented more than 10 experiences.  Many of the students in the same LEA had similar experiences in similar settings.  Despite those experiences, several administrators commented that **"few placements resulted in jobs"**.

4% of the CDPs contained the student information referenced above, but no reference to any type of career goal.

25% of the CDPs described general student interests or preferences as goals – examples:
- Continue working at my vocational sites at school to gain more confidence
- Continue to gain skills
- A job that keeps me active, have opportunities to work outside and require me to use my hands
- Work where I can be social and organize things
- Integrated part time work in my community
- Demonstrate appropriate work habits and behaviors at my work sites
- Researching and exploring a variety of vocations
- Dress up and work with a few people.

51% of the CDPs identified general types of work as Goals – examples:
- Employment in the area of art
- Work as a stock clerk in a retail store
- A job in a library or office type setting
- My employment areas of interests include one of the trades (construction, mason, painting), food service (cook, service counter), working as a mail man or in a mail room
- My employment interests include dishwashing, mail room, computers

- A job that involves organizing (cashier, filing, sorting, following a plan)
- Work with animals
- Work with children or in a clothing store
- Helper, Production worker, Non-Farm Animal Caretaker, Woodworker.

20% of the CDPs had targeted career goals….and about half of those had work trials, training or other activities aligned with the goal – examples:
- I want to be a child care worker – work trials were in childcare centers
- I would like the training to become a chef – enrolled in a CTE culinary program, work trials in restaurants
- I would like to work in the field of automotive – applying for a CTE automotive program
- I am interested in working in family business painting houses – corresponding work experiences
- I would like to work as a stock clerk at Dick's Sporting Goods – lengthy work trial there.

Given that the research identifies paid work while still in school as primary predictor of post school employment….and given that LEAs reported that **few placements resulted in jobs**….and building on some of the current practices and strengths of the LEAs; the Monitor believes that the approach to employment and the focus of CDPs needs to be refined to focus on developing longitudinal individualized career paths. The CDP can be used as a longitudinal tool to guide each student's career development from work exploration to actual employment. Essentially, the monitor sees three phases.
1. Discovery. LEA personnel universally acknowledged that most students with IDD have limited understanding of work and work options. The point of "Community-Based Work Experiences" is to provide each student with a range of experiences to build and expand student's breadth of interests….**beyond** what they might currently identify as interests. The majority of the LEAs observed did a quality job of providing these community-based work experiences. However, many LEAs were hampered by limited access to employers. One LEA had an "exploration" course in which enrolled students spent time in every trade taught in their vocational school – the Monitor endorses the concept behind that.
2. Targeted Integrated Work Trials. The end point of the discovery is to identify a small number of jobs and/or career tracks in which the student has particular interest and/or particular skill. With assistance and funding from ORS and BHDDH, the student should have one or two paid work trials in each targeted area. Similarly, if a certificate or other credential or training is required, the LEA/ORS/BHDDH team should assist the student in applying and completing the requirements.
3. Job Development. Again, with the support of ORS, BHDDH and potentially adult service providers, the student should apply for an actual job….with the **goal that each student have a paid job before exiting school that will continue post school**.

Using this model, the CDP would become a longitudinal planning tool from age 14 through age 23/24. The CDP would have four parts:
1. The information regarding assessments, interests, preferences, strengths, barriers, supports needed, etc. that is currently in the CDP.
2. Discovery – the listing of community-based work experiences that are intended to develop and broaden interests…and identification of the two or three most likely to be a

career path for that student.  This would most likely be the focus for students aged 14-18.  Again, this exists in most CDPs reviewed.

3. Paid work experience (i.e., integrated work trials) in the identified target areas.  This would most likely be a focus for students aged 19-20.  CDP should include specific action steps to ensure that any required training is provided, accommodation and supports provided, barriers removed, etc.

4. Actual job development during the last year prior to school exit.  Again,  CDP should include specific action steps to ensure that any required training is provided, accommodation and supports provided, barriers removed, etc.  The CDP should continue and become the employment section of the ISP implemented by a provider organization or through self-direction.

The monitor recommends that the CDP form (and guidance) be revised to reflect this focus on paid work experience while still in school and an actual job before exiting school.  The monitor recognizes that ORS/BHDDH/RIDE will need to provide training and technical assistance on the implementation…..and that additional resources will need to be provided from BHDDH and ORS.

**Outcome Data**

There are three data sets that document post school employment trends of the "youth exit" population identified in the Consent Decree.

(a) State Quarterly Consent Decree Reports[10] - This reports charts cumulative placements. There are 582 individuals in the Youth Exit population.  The benchmark is 432 placements. Currently the State reports 288 placements - **67% of the benchmark number**.

| March 31, 2019 | March 31, 2020 | March 31, 2021 | March 31, 2022 | July 31, 2022 |
|---|---|---|---|---|
| 257 | 277 | 284 | 288 | 288 |

The State further reports[11] that **106 individuals (18.2%)** in the Youth Exit population are currently employed in integrated settings.

(b) Sherlock Employment and Day Activity Survey[12] - The Sherlock Survey is a point in time survey collected semi-annually.  The data reported in the table below was collected during Fall of each prior year and in April, 2022. The numbers reported are the numbers of individuals in the Youth Exit population actually employed during the data collection period.

| | 10/2019 | 5/2021 | 10/2021 | 4/2022 |
|---|---|---|---|---|
| Total Respondents | 300 | 291 | 275 | 258 |
| # Employer Paid Jobs | 84 | 78 | 79 | 73 (28%) |
| Average Weekly Hours | 10.5 | 10.66 | 11.41 | 11.28 |
| Average Hourly Wage | $11.70 | $12.15 | $12.30 | $13.37 |

[10] Quarterly Consent Decree Reports (April, 2019; April. 202;, April, 2021,;April, 2022; July, 2022)
[11] Quarterly Consent Decree Reports (April, 2022)
[12] Sherlock Employment and Day Activity Surveys (June, 2019; June, 2020; June, 2021; July, 2023)

| # Self Employed | 2 | 2 | 2 | 1 |
| # Provider Paid | 1 | 0 | 2 | 2 |

(c) Department of Education Annual Performance Report – Post School Follow-up[13].
The response rate to this annual follow-up tends to be low.  However, the responses from individuals with individuals who have intellectual disabilities indicates some progress.

| | Individuals Exiting in 2016-2017 | Individuals Exiting in 2020-2021 |
|---|---|---|
| Participating in Employment | 18.6% | 22.06% |

Collectively, these three sources document that between 18% and 28% of the Youth Exit population are currently employed.  This strongly indicates a need to refocus employment related activities during transition years.

**LEA Suggestions re: What is Needed to Further Improve Transition Services and Transition Outcomes**

During every visit the Monitor asked everyone (administrators, staff, families. Students) what would make transition "better" and what was needed to achieve that.  The requests and suggestions were similar across all schools.  The primary requests were:

- Additional resources to supplement school funding; e.g., funding from DDD to support planning and community exploration, ORS funding targeted to providing paid employment experiences for each individual, others:
- More supports to families.  There was a general sense that the information provided was overwhelming.  The research on transition-aged families strongly suggests that what families need/want is a consistent person to "talk to" who can guide them through the process.
- Increased access to employers.  A few LEAs assigned this responsibility to a transition coordinator.  Most LEAs had limited access to employers.
- Every student had community placements.  As indicated above, few of those placements resulted in paid employment and/or a post school job.  There was significant discussion about a different approach - see discussion of CDPs above and recommendation 1 below.
- Strategies and resources for developing community connections and personal support and social networks – see recommendation 2 below..
- Increased transportation resources – e.g., increased support from RIPTA (especially in the rural districts), increased focus on mobility training, assistance in acquiring vehicles.
- Redesigning the CDP to focus more on actual career and job development.  Using the same CDP form for the last two years before school and the first two years of adult support.  Including providers on the transition planning team.  (The Monitor is aware that this already occurs in some settings – the practice should be taken to scale.)
- Increased access to and use of Career and Technical Education both for discovery and developing career paths.
- Earlier access to provider organizations and individuals/families who self-direct….to serve as guides and facilitate seamless transition.

---

[13] RI Department of Education Annual Performance Report, Indicator 14 data.

- Training and technical assistance in integrating employment, life skills and academics into a cohesive curriculum.
- Consistent caseworkers from BHDDH.

**Recommendations:**

Based on the Monitor's observations and interviews, Rhode Island transition services are essentially in compliance with the requirements of the Consent Decree. The Monitor observed nothing negative. However, services and supports can be improved with the intent of increasing post school employment and community outcomes.

Recommendation 1 – Given that paid employment while still in school is the most significant predictor of post school employment, services and supports should focus on creating pathways for individuals that provide paid employment during the last year(s) of school. Similarly, the **expectation should be that every student has a continuing job in an integrated setting at the time of school exit**. The Monitor had multiple discussions with transition personnel re: applying the core ideas of Project Search to generic community settings – i.e., developing relationships with a breadth of community employers, using those employers to provide discovery across a variety of job types, using meaningful data to select one or two that match the student's interests, providing paid employment in those targeted areas and ultimately matching the student with an employer. Every district had a few examples of students who had paid employment while in school that resulted in a job post school. With paid employment in school and a job at school exit as the goals, the State needs to provide targeted technical assistance and additional resources to individuals, families and schools towards that end.

Recommendation 2 – The same paradigm should be applied to other community activities (note that reference cited earlier that students should spend 25% of their school day in the community). **The expectation should be that every student exits school with a number of established relationships with community organizations and activities**. Again, there is evidence in the literature that membership and active participation in community organizations is a foundation strategy for developing relationships, building community networks and expanding personal interests. Currently schools do not have the resources to do this. The State needs to develop a strategy for providing braided funding to districts for that purpose.

Recommendation 3 – Additional Resources. As the Monitor has discussed with the State team, there needs to be **additional resources provided to individual students to supplement school funding**; specifically for planning and for developing employment and community connections and networks. The Monitor understands that individuals cannot participate in Children's waiver services and the Adult waiver simultaneously; however, Consent Decree activities (specifically the requirements in sections V, VI, VII, VIII) are not limited to one funding source. The Monitor recommends that the State develop a funding stream for all youth found eligible for DD services (through the eligibility by 17 process) for the purpose stated above to be included in the 2024 budget cycle. Specifically, the Monitor recommends that ORS and BHDDH provide funding for each/every student for job development and job coaching during the last two years before exiting. The Monitor recommends that BHDDH provide funding for each/every eligible student for community planning and for developing community relationships.

Recommendation 4 – As indicated in the observations, most school personnel and families continue to experience a disconnect between school and adult services. The State agencies have implemented several quality practices to address this issue.  The Monitor encourages the State to take these practices to scale.  Other suggestions from school personnel include (a) connecting providers (and/or other individuals/families who self-direct) to students and families earlier in the transition process and (b) melding the IEP/ISP/CDP processes so that there is ONE plan from 19 through the first year of adult supports.  The Monitor also recommends that BHDDH **incentivize adult service providers to become involved with transition planning at least two years prior to school exit.**

Recommendation 5 – The review of CDPs above documents a number of issues.  To align with the prior four recommendations, the Monitor recommends that the State **redesign the CDP** to focus less on descriptive baseline and more on developing and targeting a specific career path for each student through the three phases of (a) discovery (breadth of experience), (b) paid employment experiences in one or two targeted areas and (c) actual job creation and development.

Recommendation 6 – The Monitor recommends that the State develop a strategy for **providing every family with a consistent person to talk to and to serve as a guide through the process**.  Many schools highlighted a DD caseworker or an ORS counselor who served that role for a specific family.  However, for others that did not occur.  Given that family expectations are the other significant predictor of post school employment, reaching families earlier and more consistently is a key factor in increasing employment outcomes.

Recommendation 7 – The Monitor was impressed with the quality of Career Technical Education programs.  However, few students with IDD participated in these programs.  The Monitor recommends that the State develop a strategy for **increasing access to CTE both as strategy for discovery and as a path to an actual job**.  The State should track and report the number of students with IDD who participate in CTE.

Recommendation 8 – **Transportation** (i.e., access to the community) was an issue raised in several schools.  In the rural areas the question was lack of public transportation.  In the suburban and urban areas the issue was a need for more mobility training.  The Monitor recommends that the State meet with each district to identify transportation issues and develop solutions.

Summary – All LEAs provide transition services that align with the Consent Decree.  And, again, I commend the State Transition Team and the LEAs for their efforts to increase the efficacy of transition.  The research is clear about what factors most significantly increase the likelihood of post school employment and integrated community activity.  Recommendations 1, 2 and 6 are intended to increase focus on those strategies.  Recommendation 3 addresses the issue of additional resources.  Recommendations 4, 5, 7, 8 are strategy issues that will contribute to the ultimate goals of employment and integrated community activity.  There are high quality transition services throughout the state – **the question is scale**, how do we reach more/most transition-aged youth.

**Section 2 – Services and Supports for Adults**

Again, to reinforce the interconnectivity between the various initiatives, the following simple logic model provides a wholistic view of the effort(s) needed to achieve substantial compliance with the Consent Decree.  **If** the State complies with the systemic changes ordered by the Court; **then**, there should be a positive impact on the workforce capacity and a beginning transformation of services and supports.  **Then**, the State should move closer to achieving the outcomes required by the Consent Decree…**and**, finally and most importantly, **individual lives should be better**.  This section of the report will provide detail on the items identified in this logic model.

| Input | Output | Outcomes | Outcomes |
|---|---|---|---|
| State Systemic Changes  Compliance with Action Plan and May 5, 2022 Court Order | Changes in Support Systems Transformation Funds  Workforce Trends | #Employed #Receiving Supported Employment Services #Participating in Community Activity Combined Community Hours | Changes in Individual Lives - Interviews with a Randomly Selected Sample of Individuals |

**Input - Systems Change**

The Monitor's Reports (November, 2022 and November, 2021) identified three primary areas of systems change needed to achieve substantial compliance with the Consent Decree.  Several Court Orders (January 6, 2021; March 16, 2021) and the Action Plan (October 19, 2021) ordered by the Court also addressed these issues:

- Administrative Barriers and Procedures
- Funding and Payment Systems
- Increased Capacity and Transformation of Models for Providing Services and Supports.

**Administrative Barriers and Procedures**

The July 30, 2020 Court Order identified 16 fiscal issues and administrative barriers and ordered the State to "review and address each of these issues and develop a strategy for resolving each of the issues".  The State formed five workgroups to develop solutions and strategies.  The Action Plan specified that the "administrative work groups efforts will be completed by March 31, 2022".  A summary of the State's actions and supporting documents was filed with the Court on that date.  That summary is attached to this report as Appendix A.

The Monitor interviewed several families and service providers to assess the impact of the administrative barriers efforts.  At a high level families expressed the following:

- Appreciation for the resources that currently exist and the impact those resources have had on their family members' lives;
- Families report that proposed strategies to address administrative barriers have had minimal impact on their family members' daily lives;
- The primary reasons for the limited impact are (1) implementation issues (i.e., policies not being effectively translated into practice) and (2) families being generally unaware of changes and, specifically, how to access those changes;
- Families expressed a strong need for increased outreach and communication to families. If caseworkers are the primary means for family outreach, then caseworkers need (a) to be comprehensively trained re: implementation of the revised policies, (b) assigned in a manner that allows for consistency of support over time and (c) be consistent in the information being delivered.

The following table lists the 16 issues and barriers, selective comments from families or providers and the Monitor's expectations.

| Barriers | Perceptions/Issues Raised by Families/Providers | Monitor's Expectations |
|---|---|---|
| The process for determining the support needs of each individual found eligible for services through the RI Division of Developmental Disabilities. | Some families continue to report issues with the accuracy of SIS scores and SIS interviews.<br><br>Very few have seen the "additional needs questionnaire" cited in the State's summary or understand its use or impact. | The State needs to do a comprehensive review of the use of the SIS and the methodology for determining level of support needs.  The needs questionnaire needs to be further revised to allow families to identify unique needs and strategies for addressing those needs.<br><br>Caseworkers need intensive training in using and interpreting the questionnaire. |
| The process and timeline for developing annual individual budgets. | This is one of the most critical aspects of the transition to high quality person-centered practice. | The connection between accurate assessment of needs and opportunities, independent plan facilitation and development of individualized budgets is not well understood. The Monitor is aware of the State's activity….and recommends that the **process be finalized by October 31, 2022** and that **statewide rollout (by ISP dates) begin no later than January 1, 2023.** |
| The need to consolidate the application (by individuals) for all pertinent RI services into one process.  This includes outreach and communication to families, | Many of the families (both families in transition and those already in the adult system) continue to report being overwhelmed by the application | One of the recommendations discussed during the review was to develop the equivalent of one application that includes all information needed by any/all |

| | | |
|---|---|---|
| simplifying language on all forms and directions, shortening timelines for the various stages of application and eligibility, and melding the various eligibility processes (e.g., Medicaid eligibility and developmental disability eligibility) into one process. | process and by the multitude of applications. | sources.  The Monitor recommends that such an application be **developed by March 1, 2023 and fully implemented by July 1, 2023.**<br><br>Again, the efficiency of the application process is largely dependent on the caseworker.  Thus, comprehensive training needs to occur to ensure consistent implementation. |
| The need for eligible individuals to re-determine eligibility more than once. | | Information re: the policies and practices in the State's report need to be communicated in plain language to ALL individuals and families. |
| The appeals process for individuals as it relates to eligibility, level of need or funding level. | Most families were unaware of the administrative review process. | Again, information re: proposed changes in any appeals process needs to be effectively communicated in plain language to ALL individuals and families. |
| Quarterly authorizations | Families are aware of the transition to annual authorizations, but most do not understand its impact. | Again, information needs to be effectively communicated in plain language to ALL individuals and families. The State has proposed to send quarterly statements.  Monitor is unaware if this has universally occurred.  The **process for distributing quarterly statements should be fully implemented by October 1, 2022.** |
| Ratios | Providers continue to be concerned about the overlay of ratios and 15 minute billing units. | The workgroup recommendations included replacing ratios with two basic rates (1-1or2 and 1-3) and replacing 15 minute billing units with 3 or 4 hour units.<br><br>The Monitor understands that this is part of rate review process, but expects that something similar to the workgroup recommendations will be implemented. |
| 15 minute billing units | | See above |

| | | |
|---|---|---|
| The need to develop a clearly defined list of functions and activities for which funding is allowable.  Definitions for each function or activity approved for funding and the rates connected to each. | | The Monitor understands that this is part of the Rate Review process. |
| The need to provide a range of funding levels for each function or activity that are responsive to individual support needs. | | The Monitor understands that this is part of the Rate Review process. |
| The need for guidance re: flexibility permitted within each function or activity. | The State's report cites revised policies and practices.  Families are generally unaware of most of these. | Information re: the policies and practices in the State's report need to be communicated in plain language to ALL individuals and families. |
| The need for guidance re: the combining of individual budgets, at the request of individuals | The State's report cites revised policies and practices.  Families are generally unaware of most of these. | Information re: the policies and practices in the State's report need to be communicated in plain language to ALL individuals and families. |
| The L9 process for requesting additional funding | Most families were unaware of the administrative review process. | Information re: the policies and practices in the State's report need to be communicated in plain language to ALL individuals and families. |
| The S109 process for appealing funding decisions | Most families were unaware of the administrative review process. | Information re: the policies and practices in the State's report need to be communicated in plain language to ALL individuals and families. |
| The process and timeline by which individuals contract with provider organizations | | Information re: the policies and practices in the State's report need to be communicated in plain language to ALL individuals and families. |
| Provider contractual and billing procedures | | The Monitor understands that this is part of the Rate Review process. |

Although the administrative work groups spent significant amount of time reviewing the issues and developing recommendations, both families and providers report **that implementation has been limited**.  As indicated above, the Monitor's recommendations are essentially intended to expedite implementation of the administrative changes.  Specifically:

- As ordered in the Action Plan, fully implement the recommendations arising from the Rate Review by July 1, 2023.

- By the end of the Consent Decree, explore an alternative to the SIS as the primary methodology for identifying and allocating support needs.
- Further refine the "additional needs questionnaire" by October 31, 2022.
- Finalize the process for needs assessment, independent facilitation (i.e., conflict free case management) and development of individual budgets by October 31, 2022 and begin statewide rollout (by ISP dates) begin no later than January 1, 2023.
- Continue to simplify the application process. Develop a common application and data set by April 1, 2023 and fully implement the revised application process by July 1, 2023.
- Implement the process for distributing quarterly statements by October 1, 2022.
- Develop a comprehensive communication plan to ensure that individuals and families understand the new administrative processes by December 31, 2022..
- Develop a professional development curriculum for caseworkers and others to ensure consistent understanding, messaging and implementation of the new administrative processes by December 31, 2022.

**Input - Compliance with the Action Plan – Funding and System Transformation**

In May, 2021 the Monitor found the State out of compliance with four sections of the Consent Decree – Section IV - Outcomes, Section V(K) – Employment in Integrated Settings, Section VI(B) – Time in Integrated Day (i.e., Community) settings, Section IX(3) – Workforce Preparation and Section XI – Capacity. The State was in "partial" compliance with Section XIV – Sufficient Funding. The State was also found to not be in full compliance with the January 6, 2021; March 16, 2021 and April 28, 2021 court orders. A Show Cause Order was issued on July 12, 2021 to determine if the State should not be held in contempt for violating the court orders and the Consent Decree. A hearing was scheduled for October, 2021. The "Action Plan" stated the specific actions the State would implement to avoid a contempt finding.

The Action Plan focused on three primary areas:
- System Overhaul and Longitudinal Stability,
- Wages and Stability of the Workforce,
- Creation of a Transformation Fund both to increase capacity and stimulate new and revised models for providing services and supports.

**Input - Compliance with Specific Items in the Action Plan:**

**Rate Revision** – The Action Plan specifically states that the contract for rate review will be awarded by November 1, 2021 and work will begin by December 1, 2021. The contract was awarded to Health Management Associates in February, 2022. HMA is aware that their work is to be completed in time for the Caseload Estimating and Revenue Estimating Conferences in November, 2022. The State is aware of the Court's expectation that funding to implement the recommendations will be included in the Governor's January, 2023 budget request and fully implemented by July 1, 2023. The Action Plan also specifically states that nothing in the Action Plan "abrogates the Monitor's or the United States' ability to contest the State's determination of reasonableness". The State is also aware that the Court's expectation is for **this review to include both Medicaid rates and all other rates and funding structures which impact Consent Decree requirements**. Thus, although the rate revision process is underway, any final

decision about the reasonableness of the State's recommendations and actions cannot be made until the Monitor and the United States have reviewed the completeness of the recommendations, the January, 2023 budget request and the plans for full implementation by July, 2023.

**Administrative Process Changes** – the Action Plan stated that the administrative work groups efforts would be complete by March 31, 2022.  Although this has technically occurred, as indicated above, several of the recommendations of the work groups to address the administrative barriers identified in the July 30, 2020 court order have not been implemented.  Thus, the State has only **partially complied** with this requirement.  The court expects ALL of the work group recommendations to be fully implemented by December 31, 2022.

**Caseload Estimating** – The DD population has been included in caseload estimating since November, 2021.  Thus, the State has sufficiently complied with this requirement.

**Wages –** In compliance with the Action Plan, the Medicaid reimbursable rate for support staff was increased to $18 beginning July 1, 2022.  A proportional increase in has been implemented for overnight staff and supervisors.  The Action Plan orders the rate to be increased to $20 beginning July 1, 2023.

**Statewide Infrastructure and Recruitment –** The Action Plan ordered the State to submit a plan "to address statewide infrastructure and recruitment by November 15, 2021".  The Action Plan further states that "the plan will include a contract with a private organization to coordinate and **implement an intensive statewide recruitment initiative**".  After six months without selecting a private vendor, the Court issued an order on May 3, 2022 detailing the core tasks and benchmarks to be achieved by the State and vendor.  Eight months after the date defined in the Action Plan the State issued an RFP to select a private vendor – that RFP did not specify the need for intensive statewide recruitment.  The State, in the Monitor's judgement, has failed to realize the urgency and scope of effort needed to address the 1081 direct support staff gap identified by the Approach Group[14].  The workforce gap and the resulting limited provider capacity is one of the primary barriers to substantial compliance with Consent Decree benchmarks.  In recent weeks the State has begun to implement several activities related to the required plan; however, as of August 15, 2022 the Court has not received a comprehensive plan that addresses all the required components. The intent of the Action Plan and the May 3 Court Order is for the private vendor (or vendors), through an intense comprehensive statewide recruitment effort, to supplement provider efforts and to recruit and prepare a benchmark number (item 9 in the May 3 court order) of potential candidates and paid interns and to assist providers with training, onboarding, hiring and retaining the defined number of new candidates for direct support positions.  **The State has NOT met the expectations of the Court as detailed in the Action Plan and the May 3 Court Order..**

**Transformation Fund Round 1 –** The application period for the first round of transformation funds closed on December 17, 2021.  Round 1 projects focused on innovative approaches to developing a community-based workforce.  There were 29 applicants.  $4,000,000 in funds was awarded on December 31.  The strategies in these projects will be summarized later in this report.

---

[14] Court Support Analysis; Approach Group (April 26, 2021).

**Transformation Fund Round 2 –** The application period for the second of transformation funds closed on April 15, 2022.  Round 2 projects focused on developing and/or expanding new innovative models for providing community-based supports that increase individual outcomes of employment and integrated community activity.  $6,000,000 was awarded to 30 applicants – 24 current providers and 6 new applicants. The strategies in these projects will be summarized later in this report.

**Transformation Fund Enhancing the Capacity of Individuals/Families who Self-Direct –** Based on information gathered from individuals/families who self-direct, the State has developed two RFPs.  The first ($1.3 million) will identify one or more entities to provide service advisement across a variety of domains.  The second ($700,000) will create a staffing pool and registry to assist individuals/families who self-direct to address staffing issues.  Both RFPs will be posted by August 29, 2022.  Awards are anticipated by end of September.

**Technology Fund –** Given that technology has been demonstrated to be an effective support for individuals with IDD[15], the Action Plan mandated creation of a $2 million Technology Fund. The State in collaboration with an array of community stakeholders has provided informational materials and assistance to individuals, families and providers re: use of technology as support. The State solicits and accepts requests for technology funds.  In the first quarter 265 requests were made for approximately $205,000.  Funds will be distributed (and technology purchased) through the provider organizations and/or fiscal intermediaries.  Providers and FIs will receive lists of the individuals requesting funds and the technology requested by the end of August.  The next quarter's requests are due September 30….and then quarterly thereafter.

The State has substantially met the expectations and requirements of the Action Plan for the transformation and technology funds; however, the **administrative process** for distributing funds (particularly the technology funds) **needs to be quicker and more efficien**t.  The State has not substantially met the Court's expectations for the Statewide Workforce and Recruitment Initiative.

## Output – Systems Transformation – Transformation Funds

The Round I Transformation Fund projects focused on developing and expanding a community-based workforce.  The practices embedded in those projects included the following:
- Strengthening organizations' data collection capacity;
- Earn-and-learn models; partnering with K-12 and higher education entities;
- Advancing DSPs understanding of self-determination and person-driven practices;
- Engaging individuals and families in the transformation process;
- Using community navigation to make individualized relationships and membership;
- Maximizing online recruitment strategies;
- Collaboration with community organizations to establish new pipelines into the field;
- Offering student loan relief; supervisor training as a retention strategy;

---

[15] Addendum to Monitor's Report (December 15, 2021).

- Using the NADSP E-Badge Academy;
- Technology and digital literacy training for DSPs and individuals served;
- Redefining the DSP position;
- Viewing the workforce through a social-justice lens;
- Hiring individuals with lived experience of disability;
- Advancing customized employment supports.

The Round 2 Transformation Fund applications focused on developing and implementing innovative models for providing community-based services and supports. The Monitor was impressed with the innovation inherent in the applications. The applications included the following practices:

- More than half applications focused on developing a model similar to the hybrid model described in the Monitor's November, 2021 report. These application focused on using an advisor/facilitator/community navigator (multiple titles were used) to support a targeted group of individuals in developing person-centered/person-driven whole life plans….and identifying a network of individualized supports. Each of these applications targeted a select group of individuals, typically 12-20. During the next 6-12 months these projects are anticipated to define (a) the factors connected to efficacy and (b) the cost of implementing effective models to a greater scale. When the rate review recommendations are put out for public comments, the Monitor will ask the Round 2 applicants if the rates provide sufficient resources and flexibility to expand implementation.
- One of the applications focused on whole life support brokerage with a focus on diverse populations and ensuring interpretation services. Another focused on the support needs (highlighted in Section 3 of this report) expressed by individuals/families who self-direct.
- Several of the applications focused on developing team models that melded community navigators, employment navigators and plan facilitators. As cited in the Monitor's November, 2021 report there is growing evidence that the integration of supports is most likely to increase individual outcomes.
- Several applications proposed new staffing patterns and more intense approaches to employer outreach and job development.
- Most of the applicants focused on increasing self-determination and on whole life planning. One particular application focused on developing "a sense of agency", i.e. increasing individual responsibility.
- Several applications focused on redefining the role of direct support to include competency in community navigation, self-determination, person-centered thinking.
- A few of the applications focused on facilitating school-adult service planning and transition.
- One application proposed a model for stabilizing "system fluidity" as individuals moved from traditional agency supports to shared living.
- A few focused on using housing as the core for life planning.
- One applicant proposed a structure for integrating several initiatives and facilitating quarterly "sharing" of information and practices of all funded projects.

Collectively, the Transformation Fund projects include the elements for "transforming" how services and supports are provided….and represent the next evolution of the Development Disabilities movement. **The current and new providers who developed and are implementing these models should be commended.**
**The Court will review the rate review recommendations and the proposed FY2024 budget to ensure that there is sufficient support to continue to expand these models.**

## Output - Workforce Trends

Workforce issues have been the dominant barrier to substantial compliance identified by providers and other stakeholders.  The October, 2021 Action Plan (cited above) focused on three strategies to address the workforce crisis – (a) court ordered increases in direct support staff and supervisor hourly wage; (b) comprehensive rate review including a mechanism for annual indexing of wages/rate to cost of living or other appropriate measure; and (c) an intensive statewide workforce recruitment and infrastructure initiative.  The impact of these strategies is assessed through (a) semi-annual Staff Stability Survey[16] and (b) an annual survey of individuals who self-direct.

The following table tracks the workforce interventions mandated in the Action Plan and trends in key workforce variables.  This table will be used to track workforce variables longitudinally through the end of 2023.  Note that Staff Stability Survey data (as collected from provider organizations) is for a specific six month time period.  The baseline numbers reported below are from a limited data collection done by the monitor in April, 2021.  It should also be noted that a report filed with the Court in April, 2021[17] reported that to provide the services allocated an additional 1081 direct support staff would be needed.  In essence, at that point the RI DD System was functioning at 62% capacity.

| | Baseline 4/2021*** | 7-12/2021 | 1-6/2022* (to be collected 9/2022) | 7-12/2022* (to be collected 2/2023) | 1-6/2023* (to be collected 9/2023) | 7-12/2023* (to be collected 2/2024) |
|---|---|---|---|---|---|---|
| **Intervention** | | $15.75 | Transformation Funds Statewide Workforce Initiative | $18.00 Rate Review Recommendations implemented SWI Continues | SWI continues | $20.00 |
| **# Agencies Responding** | *20* | 32 | | | | |
| **# DSPs end of period** | *2194* | 2720 | | | | |
| **DSP change during period** | | +131 | | | | |
| **Average starting salary** | *$13.18* | $16.04 | | | | |

---

[16] National Core Indicators Staff Stability Survey – RI version; Human Services Research Institute (2022)
[17] Court Support Analysis; Approach Group (April 26, 2021)

| | | | | | | |
|---|---|---|---|---|---|---|
| **Average salary** | | $16.60 | | | | |
| **Full time vacancies** | | 390 | | | | |
| **Part time vacancies** | | 228 | | | | |
| **Total vacancies** | *447* | 618 | | | | |
| **Vacancy rate** | *20.3%* | 19.3% | | | | |
| **# separations** | | 494 | | | | |
| **Turnover rate** | *29%* | 18.2%** | | | | |
| **# Frontline Supervisors** | | 350 | | | | |
| **# Supervisors Who Worked Overtime** | | 160 | | | | |

*\*Future collection periods and interventions*
*\*\*separations/number of staff at end of year (formula used by HSRI)*
**\*\*The numbers in the baseline column are based on 20 agency responses (i.e., about 2/3 of the total agencies).  Thus, any direct comparison of baseline numbers and Staff Stability Survey numbers would be inaccurate.  However, they do allow for a base understanding of select variables before the court-ordered interventions began.**

To assess workforce trends for individuals/families who self-direct, a shorter survey was distributed through the Fiscal Intermediaries.  These are the results:
- There were 178 responses, a response rate of approximately 18%.
- Collectively the respondents report currently having 416 support staff, 87 (20.9%) are parents of the individual supported.
- They report 213 staff vacancies – if the total positions are 619 (416 staff + 213 vacancies), the vacancy rate is 33.8%.
- 43 support staff have separated in the past six months.
- The average wage is $19.94.
- Only 3% report providing any medical or dental insurance – this is a significant issue consistently raised by individuals/families who self-direct in recruiting and retaining support staff.
- Only 67 support staff (37.6%) participated in professional development during the past six months.  The lack of access (and time) to participate in professional development is another concern consistently raised by individuals/families who self-direct.

That there were 131 more support staff in provider agencies in December, 2021 than in July, 2021 is a positive sign.  Support Staff and Supervisor wages have increased.  However, there

were 618 vacancies (vacancy rate of 19.3%) and 494 separations during the six-month period (turnover rate of 18.2%). 46% of supervisors worked overtime providing direct support to compensate for staffing gaps. For individuals and families who self-direct the situation is worse. The respondents to the Monitor's survey reported 213 vacant positions (a vacancy rate of 33.8%). Given that the respondents represented 18% of the total self-direct population, one could project that the vacancies in the self-direct realm might be approaching 1000. One of the issues most frequently raised is that staff do not have the same access to professional development than agency staff do. Survey respondents reported that only 37% of their staff participated in any professional development during the past year.

Short summary – **The workforce crisis continues.** The wage increments and transformation funds ordered in the Action Plan have begun to move some of the factors; however, the staffing gaps will not be adequately addressed until the Statewide Workforce Initiative (ordered in the Action Plan and the May 3 court order) is fully implemented and not until there is an **intensive comprehensive statewide recruitment campaign** that supplements what individuals/families/providers already do and that meets the benchmarks in the court order.

**Outcome – Are Consent Decree Populations Receiving the Services and Supports Needed for Substantial Compliance with the Consent Decree?**

The benchmarks/outcomes specified in the Consent Decree include – Supported Employment Placements (Section IV 8,9,10); Average of 20 hours of work in integrated settings (Section V K); Integrated Community Services and Placements for All Hours Not Working (Section VI B). The two primary data sources for these benchmarks/outcomes are (a) the State's Quarterly Consent Decree Report and (b) the Semi-Annual Sherlock Employment and Day Activity Survey. The following tables are from those two sources.

**Topic 1 - Cumulative Supported Employment Placements**[18]

|  | 9/2019 | 6/2020 | 6/2021 | 9/2021 | 12/2021 | 3/2022 | 6/2022 | 1/2022 Benchmark |
|---|---|---|---|---|---|---|---|---|
| **Youth Exit** | 269 | 277 | 284 | 284 | 286 | 288 | 288 | 432 |
| **Sheltered Workshop** | 230 | 243 | 261 | 261 | 261 | 263 | 267 | 500 |
| **Day Program** | 381 | 392 | 419 | 421 | 421 | 422 | 426 | 525 |
| **Total** | 880 | 912 | 964 | 966 | 968 | 973 | 981 | 1457 |

As of July 30, 2022 State data indicates that Youth Exit placements are at 67% of the January 1, 2022 benchmark, Sheltered Workshop placements are at 53% of the benchmark and Day/Community placements are at 81% of the benchmark. Overall, **the State is at 67% of the 2022 benchmark**. Observations:
- These are cumulative placements, not number of individuals employed.
- The placement numbers have been flat throughout 2021 and 2022. The monitor believes this is an indicator of increased level of support needs of the remaining Consent Decree population and documents the importance of customized employment and other individualized employment strategies.

---

[18] State Quarterly Consent Decree Reports (2019-2022)

- The annual Consent Decree benchmarks increase in intensity beginning in 2021 – the placement numbers do not maintain that pace.

## Topic 2 - Current Employment and Related Factors

### (a) Employer Paid Individual Jobs[19]

|  | 10/2019 | 5/2021 | 10/2021 | 4/2022 |
|---|---|---|---|---|
| Total Respondents | 2391 | 2246 | 2215 | 2052 |
| Youth Exit | 84 | 78 | 79 | 73 (33%)* |
| Sheltered Workshop | 62 | 55 | 71 | 55 (13%)* |
| Day Program | 125 | 118 | 123 | 126 (14%)* |
| Totals | 271 | 251 | 273 | 254 (17%)* |

*The percentages in these columns are the number of individuals in each target population (minus those in provider paid employment) divided by the number of individuals receiving services.*

### (b) Self- Employment[20]

|  | 10/2019 | 5/2021 | 10/2021 | 4/2022 |
|---|---|---|---|---|
| Total Respondents | 2391 | 2246 | 2215 | 2052 |
| Youth Exit | 2 | 2 | 2 | 1 |
| Sheltered Workshop | 2 | 3 | 2 | 2 |
| Day Program | 2 | 9 | 13 | 6 |
| Totals | 6 | 14 | 17 | 9 |

### (c) Provider Paid Individual Jobs[21]

|  | 10/2019 | 10/2020 | 11/2021 | 4/2022 |
|---|---|---|---|---|
| Total Respondents | 2391 | 2246 | 2215 | 2052 |
| Youth Exit | 1 | 0 | 2 | 2 |
| Sheltered Workshop | 14 | 14 | 9 | 14 |
| Day Program | 25 | 30 | 21 | 28 |
| Totals | 40 | 44 | 32 | 44 |

### (d) Number of New Jobs During Past Year[22]

|  | Youth Exit | Sheltered Workshop | Day | Totals |
|---|---|---|---|---|
| State Report |  |  |  |  |
| Sherlock Survey | 23 | 9 | 26 | 58 |

### (e) Current Employment

|  | Youth Exit | Sheltered Workshop | Day | Totals |
|---|---|---|---|---|
| Sherlock Survey Consent Decree Population | 76 | 71 | 160 | 307 (17%) |
| Sherlock Survey – Complete DD Population |  |  |  | 514 (25%) |

---

[19] Sherlock Employment and Day Activity Survey – Consent Decree Reports (August 1, 2022) (2018-2021 Reports)
[20] Sherlock Survey, Op Cit.
[21] Sherlock Survey, Op Cit.
[22] Sherlock Survey, Op Cit.

| State Report – Total DD Population | 90 | 173 | 296 | 559 (23.8%) |

*\*\*Includes employer paid individual job, provider paid individual jobs, self-employed.*

**(f) Common Job Types –** Employer Paid and Provider Paid Individual Jobs[23]

| | |
|---|---|
| Retail Trade | 39.1% |
| Accommodation and Food Services | 17.7% |
| Health Care and Social Assistance | 16.4% |
| Waste Management and Remediation<br>Educational Services<br>Other Services | 4.3% |

Given that the total benchmark supported employment placements through 2024 total 2,135 (i.e., 91% of the current Consent Decree Youth Exit, Sheltered Workshop and Day populations); the expectation is that eight years into the Consent Decree the percent of individuals employed in integrated settings would be higher than the data indicates.  Observations:

- There is significant variance in the numbers reported in the various data sets.  The Sherlock Survey (data collected in April, 2022) indicates an employment rate of 17%; the State Quarterly Report for June 30, 2022 reports an employment rate of 23.8%.  The most recent National Core Indicators for RI (based on a sample of 350 interviews) indicates that 33% of the interviewees report having a community job.  The Sherlock Survey for the entire DD population in RI (not just the Consent Decree population) reports an employment rate of 25%.  During the next quarter the Monitor will do a data audit to come closer to an accurate number. Nonetheless, **none of the current employment numbers approximate the expected employment rates.**
- The difference between the rate of "supported employment placements" and actual employment is interesting.  This reinforces the issue raised earlier re: transition-aged students.  **Few placements result in jobs.**  This again indicates the need for a more systematic approach to guiding individuals from discovery to targeting a few focus areas of employment and ultimately to an actual job.
- Both the data and anecdotal observations strongly indicate that many of those individuals not employed have more significant support needs….thus, customized approaches need to be a priority.
- The Sherlock Survey queries the reason some individuals are not available for services.  227 (11%) cite pandemic related reasons or system capacity issues.  Thus, the effect of COVID still lingers….and the impact of the capacity gap is once again reinforced.
- Self-employment continues to be an option for a small percentage of the Consent Decree population.  There are national reports that indicate that self-employment was the most rapidly growing type of employment for people with IDD during the pandemic.
- The types of jobs attained by individuals with IDD remains consistent.  The Monitor strongly believes that discovery experiences need to be more diverse.

**Average Hours Worked, Average Hourly Wages, Average Weekly Earnings – Employer Paid and Provider Paid Individual Jobs[24]**

---

[23] Sherlock Survey, OP Cit.
[24] Sherlock Survey, Op Cit

| | Youth Exit Hours | Youth Exit Hourly Rate | Sheltered Workshop Hours | Sheltered Workshop Hourly Rate | Day Hours | Day Hourly Rate |
|---|---|---|---|---|---|---|
| Employer Paid | 11.28 | $13.37 | 11 | $13.19 | 8.22 | $13.17 |
| Provider Paid | 10.25 | $12.25 | 6.37 | $13.02 | 5.97 | $13.48 |
| State Report | 12 | $12.61 | 13.4 | $12.29 | 10.1 | $12.53 |

Observations:

- The average hours worked continues to be **less than the benchmark of a 20-hour week average**.
- The average weekly hours for employer paid jobs has increased by about one hour per week since the end of 2019.
- The average hourly wage has increased by about $1.25 since the end of 2019.

**(g) Other Supported Employment Services[25]**
In addition to supports to individuals in employment, other supported employment services are provided.

| | 11/2021 | 4/2022 |
|---|---|---|
| Employed + Receiving Other Supported Employment Services | 228 | 197 |
| Not Employed + Receiving Other Supported Employment Services | 170 | 162 |

| Other Supported Employment Services 4/2022 | Number Participating | Mean Weekly Hours |
|---|---|---|
| Career Planning | 86 | 1.07 |
| Short Term Vocational Experience | 8 | 2.41 |
| Long Term Vocational Experience | 6 | 2.71 |
| Post Secondary Education and Training | 23 | 2.70 |
| Job Search with Individual | 36 | 1.16 |
| Job Search on Behalf of Individual | 33 | 1.07 |
| Coaching - Retention | 207 | 6.34 |
| Totals | 359 | 5.22 |

Observations:

- The combined total of individuals who are employed and individuals not employed who report receiving other supported employment services is 416 – that is **20% of all the respondents to the 4/2022 Sherlock Survey**. As with other employment related factors, that number has been relatively flat for a number of years and is below expectations eight years into the Consent Decree.
- There continues to be minimal use of post-secondary technical training.
- 69 individuals report job search activities for slightly more than one hour per week – again below expectations for eight years into the Consent Decree.

**(h) Number of Businesses Contacted on Behalf of Individuals[26]**

---

[25] Sherlock Survey, Op Cit.
[26] Sherlock Survey; August, 2022 Report.

The Monitor (and others) have identified the need to significantly increase employer outreach as one factor towards increasing employment outcomes.  To that end, a new question was added to the most recent Sherlock Survey.  The table below documents that (during the three month reporting period) business were contacted on behalf of **only 67 individuals** (3% of respondents).

|  | Youth Exit | Sheltered Workshop | Day | Total |
|---|---|---|---|---|
| **Number of Individuals** | 19 | 16 | 32 | 67 |
| **Mean Number of Businesses Contacted** | 3.89 | 2.69 | 2.66 | 3.01 |

## Topic 3 - Integrated Community Activity

### (a) Number Participating[27]

|  | 10/2019 | 10/2020 | 11/2021 | 4/2022 |
|---|---|---|---|---|
| **Youth Exit** | 286 | 222 | 254 | 147 |
| **Sheltered Workshop** | 296 | 363 | 412 | 366 |
| **Day Program** | 750 | 853 | 965 | 815 |
| **Total** | 1332 | 1438 | 1631 (73.6%) | 1328 (64.7%)* |

*Percent of Total Respondents

### (b) Average Weekly Hours[28]

|  | 10/2019 | 10/2020 | 11/2021 | 4/2022 |
|---|---|---|---|---|
| **All** | 9.48 | 11.89 | 12.26 | 13.60 |

Observations:
- Integrated Community Activity is an **area of positive growth**.  Despite an unexplained dip during Spring, 2022, there has been a steady increase in the number of individuals participating in integrated community activities and the average number of weekly hours. There is, however, room for additional improvement.
- As cited earlier, several respondents (11%) identified pandemic and/or provider and staff capacity issues as barriers to participation.

### (c) Categories of Community Activity[29]

|  | 10/2019 Participants | 10/2019 Mean Hours | 4/2022 Participants | 4/2022 Mean Hours |
|---|---|---|---|---|
| **Arts and Leisure** | 397 | 7.13 | 1269 | 6.87 |
| **Health and Fitness** | 601 | 3.74 | 802 | 3.20 |
| **Adult Education Training** | 56 | 1.86 | 161 | 2.93 |
| **Daily Living** | 974 | 1.75 | 808 | 5.12 |
| **Volunteer** | 84 | 2.45 | 176 | 3.04 |
| **All** |  | 9.48 |  | 13.60 |

Observations:

---

[27] Sherlock Survey, Op Cit
[28] Sherlock Survey, Op Cit
[29] Sherlock Survey, August, 2022 Report.

- This table compares the last data collection in 2019 before the pandemic with the most recent data collection in 2022.
- As indicated earlier, there has been increase in the average number of weekly hours.
- Most notably is the increase in adult education and in volunteer time.  Both increase community presence and represent pathways to potential employment.

**(d) Settings Where Community Activity Occurs[30]**

| Setting | Percent |
|---|---|
| Virtual | 3% |
| Public Venue | 71% |
| School and/or Training Facility | <1% |
| Senior Center or Facility | 2% |
| Member Based Organization | 10% |
| Business or Employer | 14% |

**(e) Number of Other People Participating in Community Activities[31]**

| | 11/2021 | 4/2022 |
|---|---|---|
| Mostly On My Own | 37% | 37% |
| Mostly with 1 or 2 People | 52% | 50% |
| Mostly with 3 or More People | 11% | 13% |

This is a new question added to the Sherlock Survey in 2021.  It documents that small group continues to be the most common structure for community activity.

**(f)  Combined Weekly Individual Jobs and Community Hours[32]**

| | Number Reporting | Mean Combined Weekly Hours | Number Reporting >10 hours | Number Reporting >20 hours |
|---|---|---|---|---|
| Youth Exit | 73 | 19.99 | 61 (84%) | 32 (44%) |
| Sheltered Workshop | 55 | 18.35 | 45 (82%) | 22 (40%) |
| Day | 126 | 17.48 | 106 (84%) | 51 (40%) |
| All | 254 | 18.39 | 212 (83%) | 105 (41%) |

Observations:
- If the Consent Decree is taken literally, the expectation is that the average individual would spend 40 hours in the community (Sections IV, V-K, VI-B) – up to 20 hours in an integrated employment setting and the remaining time in other community activities.
- As indicated earlier, there is a progressive increase in the hours spent in community activity.  The number of individuals employed, however, has been relatively the same for several years.
- As a metric, the Monitor asked the Conversion Institute (based on the Sherlock Survey) to compute the combined weekly hours for individuals report employer paid jobs AND community activity.

---

[30] Sherlock Survey; August, 2022 Report.
[31] Sherlock Survey; August, 2022 Report.
[32] Sherlock Survey, Op Cit.

- As stated earlier, the number of respondents with individual jobs was 254.  212 of them report more than 10 combined weekly hours.  Only **105 report 20 combined hours.  105 is 5% of the total respondents** – below expectations defined by the Consent Decree.

## Outcome – Are Individual Lives Changing?

As specified in the Action Plan, a random sample of 30 individuals was selected for interviews.  The sample was stratified by age.  21 individuals/families agreed to the interview.  14 (67%) are supported by an agency; 6 (29%) self-direct; 1 reported doing both.  The interviews were conducted by individuals who have family members with IDD.  Questions and responses are summarized below.

| Is life better than it was one year ago? | 13 (62%) said yes; 8 (38%) said no. |
|---|---|
| Are you employed? | 7 (33%) said yes; 13 (62%) said no; 1 is retired. |
| If employed, how many hours? | The 7 who are employed worked an average of 17 hours per week.  Most common response was 10 hours per week. |
| Are you engaged in community activities? | 18 (86%) said yes; 3 (14%) said no. |
| What types of community activity? | The primary activities (reported by half the respondents) were (a) recreation - exercise, bowling, other sports; (b) going to lunch or dinner; (c) shopping.  There were a few references to other activities – 3 went to the library, 3 went on trips, 2 volunteered. |
| With whom do you go into the community? | Staff were the primary companions and/or support (81%).  61% reported family accompanied them on some trips.  Only 7 (33%) reported being accompanied by friends. |
| How many hours per week do you spend in the community? | Slightly more than half reported 15-20 hours of community activity; a third reported less than 5 hours of community activity. |
| What were your achievements during the past year? | 30% reported "nothing".  3 reported going back to work or getting a new job, 3 went on a trip, 2 reported increased social life including a "new boyfriend", 1 started taking classes at CCRI. |
| Any really big stuff happen in the past year? | Again, 30% reported "nothing".  Other responses mirrored achievements – employment, a trip, social life. |
| What were your biggest challenges during the past year> | Challenges were very personal – illness and death in the family, losing support staff, frustration with a specific aspect of their life. |
| Anything else you'd like to talk about? | The most common responses were about loss of staff. And a decrease in service hours.  Some couldn't see people because of COVID.  Two commented how difficult it was to figure out the adult system – reported the best information was from other families. |

In many aspects these interviews documented trends similar to those in the large data sets. Although two thirds of the respondents reported that life was better than a year ago (Remember, last year was a COVID year); there was not real depth or breadth in most of their lives.  The staffing crisis continues to have a significant effect on almost every person.  These interviews also reinforce that, although there is a system, **each life is different**.  These interviews made me reflect on the quote from Dr. Paul Farmer that I used as an introduction to this report.  For more than five decades society has made promises to individuals with IDD – for many people those promises have not yet been kept.  And, reflecting on the promises made – they have not been deep enough or broad enough to effect real change in most individual lives.

**Summary - Services and Supports for Adults**

Returning to the logic model on page, the following table offers a high level summary.  All of the Monitor's prior reports have emphasized that outcomes/benchmarks will most likely not be achieved until the systemic changes (Input and Output) are fully implemented.

| Input | Output | Outcomes | Outcomes |
|---|---|---|---|
| State Systemic Changes<br><br>Compliance with Action Plan and May 5, 2022 Court Order | Changes in Support Systems<br>Transformation Funds<br><br>Workforce Trends | #Employed<br>#Receiving Supported Employment Services<br>#Participating in Community Activity<br>Combined Community Hours | Changes in Individual Lives - Interviews with a Randomly Selected Sample of Individuals |
| **Status** | **Status** | **Status** | **Status** |
| Although significant time and effort has been spent on the administrative barriers, implementation has been limited.  Families report limited impact on the daily lives of their family member and a general lack of awareness.<br><br>Caseload Estimating has been implemented.<br><br>The Rate Review is in process. | The Transformation Funds applications include several innovative strategies for developing a community-based workforce and innovative models for providing community supports.  These projects are pilots.  Funding to implement them to scale needs to result from the Rate Review.<br><br>Although beginning to trend in a positive direction, workforce | Employment related data has been flat for several years.<br><br>Placement data is at 67% of Consent Decree benchmark.<br><br>Depending on data source, percent currently employed is between 17-23%.  Job search activities and outreach to potential employers is limited.<br><br>Community activity is increasing.  64% of | Although there are some positive trends (particularly in the area of community activity), individuals and families are not reporting significant impact on their daily lives. |

| | | | |
|---|---|---|---|
| The Wage Increase, Transformation and Technology sections of the Action Plan have been implemented.<br><br>The State is not in compliance with the intent of the Statewide Workforce Initiative or the May 3, 2022 Court Order. | continues to be an issue.  Providers report 618 vacancies (19.2% vacancy rate) and 494 separations (18.2% turnover rate). Individuals and families who self-direct report a 33.8% vacancy rate. | people are involved in community activities for an average of 13.6 hours per week. Participation in post-secondary training and volunteer experiences are increasing.<br><br>Only 5% of survey respondents have combined employment and community activities totaling more than 20 hours per week. | |
| **Primary Needs**<br><br>**Full Implementation** and Funding of Administrative Barriers Work Group recommendations.<br><br>**Full implementation** and funding of Rate Review recommendations.<br><br>**Full Implementation** of the Workforce Initiative and compliance with May 3, 2022 court order. | **Primary Needs**<br><br>**Funding to Implement** transformation projects at scale.<br><br>**Full Implementation** of the Workforce Initiative and compliance with May 3, 2022 court order.<br><br>**Intense Statewide Recruitment** to resolve the documented workforce gap. | **Primary Needs**<br><br>Increased focus on:<br>(a) Job search<br>(b) Employer Outreach<br>(c) Braiding funds and resources to increase outcomes<br>(d) Customized Employment<br>(e) Community mapping<br>(f) Developing community connections.<br><br>**Targeted Employment Funding** | **Primary Needs**<br><br>Individuals/Families continue to stress the need for **individualization** of<br>(a) Needs assessment<br>(b) Planning<br>(c) Budgeting<br>(d) Supports. |

**Summary I: Critical Areas of Need Identified in the Consent Decree, the Action Plan and prior Monitor Reports.**

In the documents referenced above, five areas of critical need have been identified and stressed.

- Sufficient Capacity
- Timely Funding
- Stable and Competitive Workforce
- Increased Individual Employment
- Increased Community Activity.

**Topic 1 - Sufficient Capacity**

The Monitor's November, 2021 Report defined capacity in three ways:

- Stabilizing and strengthening the network of provider organizations and the array of services they provide;
- Stabilizing and strengthening the system of supports for individuals and families who choose to self-direct;
- Developing a hybrid model that provides more guidance than self-direction, but relies on the development of personal networks and a broader array of individualized community supports.

Thus, **capacity to efficiently implement all three of these models** is essential to achieving the goals and benchmarks of the Consent Decree.  Thus, the requirement "to support and maintain a sufficient capacity to deliver Supported Employment and Integrated Day Services to individuals" as described in Section XI of the Consent Decree needs to **include an array of options aligned with individual choices and preferences**.

**Self-Direction** continues to be a rapidly growing service option.  The number of individuals self-directing increased from 489 in FY2017 to 976+ in FY2022.[33]  More than half of the families interviewed during the school visits stated that they intend to self-direct.  At two recent family meetings (which included several individuals/families who self-direct) families described their fear of imminent crisis if one or two of their primary staff depart. The Action Plan ordered two million dollars in transformation funds to address two of the issues most frequently raised by people who self-direct – service advisement and a staffing pool.  RFPs will go out shortly.  These should at least partially address the issues/concerns raised by individuals/families.

Individuals/families advocate for the following to further strengthen and stabilize the self-direct system:

- Many continue to express concerns about the implementation of the SIS and how accurate it is in identifying unique needs; thus, families want an alternate strategy for identifying needs and allocating supports;
- Concern about the lack of health care benefits, paid sick time, other benefits for the staff who support people who self-direct – thus, they recommend the development of a statewide mechanism for providing those benefits;

---

[33] DD Census number; February, 2022.

- An increase in professional services, particularly for individuals who have co-occurring behavioral health issues and individuals who are non-speaking and/or have significant communication needs;
- Creation of a resource bank of technically-knowledgeable professionals who can provide information on an array of topics;
- More consistent case managers who have knowledge of both the individual and resources;
- Add an administrative fee to self-direct contracts to address the time families spend on administrative tasks;
- Defined supports to address health (and other) emergencies.

Fiscal intermediaries have expressed similar concerns about the strength and stability of the self-direct system. The responsibilities of fiscal intermediaries have increased significantly since the inception of the model thirty years. The FIs request (a) an increase in their administrative fees, (b) clear policies from the State re: what can/cannot be included in a self-direct plan and (c) increased individual and family access to professional services and family advisement.

**Provider Capacity**, stated simply, is the composite of (a) a sufficient high-quality workforce, (b) sufficient funding and (c) capacity and space for innovation. Since the Action Plan (October, 2021) steps have been taken to **begin** to address these three issues. At this point in time, these initiatives are in process. In the Monitor's opinion, provider capacity continues to be limited. The next six-nine months are critical to building and maintaining capacity. **If** the rate review process produces a system redesign and competitive rates, **then** capacity will be increased. **If** the Statewide Workforce Initiative is implemented with the scope and intensity intended in the Action Plan and May 3 Court Order, **then** capacity will be increased. **If** the transformation projects produce an increase in community-based services and innovative models of support AND if they are adequately funded to allow implementation to scale, **then** capacity will increase. If these initiatives are not implemented with the urgency and comprehensiveness expected by the Court, then capacity will continue to be limited and the State will be in jeopardy of not meeting the final benchmarks of the Consent Decree.

**Capacity Summary –** The capacity of the State to fully implement the requirements of the Consent Decree continues to be limited. As stated above, initiatives are in process which are intended to increase capacity. The expectation is that all of these initiatives will be fully implemented by July 1, 2023. If that happens, the measures of capacity should improve.

**Topic 2 – Timely Funding**
The FY2023 budget recently approved by the RI legislature funds all the requirements of the Action Plan. Inclusion of DD in Caseload Estimating began in November, 2021. The rate review is in process. The State is also aware that the Court's expectation is for this review to include both Medicaid rates and all other rates and funding structures which impact Consent Decree requirements. Thus, decisions about adequacy and timeliness of funding cannot be made until the rate review and the FY2024 budget request are complete.

**Topic 3 – Stable and Competitive Workforce** (from the Workforce Trends section of this report)

That there were 131 more support staff in provider agencies in December, 2021 than in July, 2021 is a positive sign.  Support Staff and Supervisor wages have increased.  However, there were 618 vacancies (vacancy rate of 19.3%) and 494 separations during the six month period (turnover rate of 18.2%).  46% of supervisors worked overtime providing direct support to compensate for staffing gaps.  For individuals and families who self-direct the situation is worse.  The respondents to the Monitor's survey reported 213 vacant positions (a vacancy rate of 33.8%).  Given that the respondents represented 18% of the total self-direct population, one could project that the vacancies in the self-direct realm might be approaching 1000.  One of the issues most frequently raised is that staff do not have the same access to professional development than agency staff do.  Survey respondents reported that only 37% of their staff participated in any professional development during the past year.  Short summary – **The workforce crisis continues.**  The wage increments and transformation funds ordered in the Action Plan have begun to move some of the factors; however, the staffing gaps will not be adequately addressed until the Statewide Workforce Initiative (ordered in the Action Plan and the May 3 court order) is fully implemented and not until there is an **intensive comprehensive statewide recruitment campaign** that supplements what individuals/families/providers already do and that meets the benchmarks in the court order.

**Topic 4 – Increased Individual Employment**

All of the employment metrics continue to be essentially flat.  The State is at 67% of the 2022 Consent Decree benchmark for supported employment placements.  The percent of individuals currently employed is between 17% and 23% (depending on the data source).  The average weekly hours worked is increasing slightly, but is below the 20 hour average defined in the Consent Decree.  Again, the employment metrics are expected to change if adequate funding is in place, if the workforce crisis is resolved and if innovative employment and community support models go to scale.  Additionally, there needs to be (a) an increased focus on discovery and career development for individuals currently not employed and (b) an increase in employer outreach and development of potential job sites.

**Topic 5 – Increased Community Activity**

This is an area of positive growth.  The number of individuals participating in community activities has increased as the pandemic fades.  Currently two-thirds of the population spends 13.6 hours weekly in community activity.  (Note – one third reports not being involved in community activity.)  Participation in post-secondary education and/or training has increased and volunteering has increased.  As state many times before, community involvement will increase if adequate funding is in place, if the workforce crisis is resolved and if innovative employment and community support models go to scale.  Additionally, training and support for true person-centered and person-directed models of support needs to continue to ensure that these models become not just a "best practice", but the actual norm.

**Summary II – Compliance with the Sections of the Consent Decree**

| Section IV - Outcomes | The State has essentially met the requirements of items 1 through 8.<br><br>The State has achieved 67% of the 2022 placement benchmarks.  Current employment numbers range between 17% and 23%, not the percent implied in the benchmarks. |
|---|---|
| Section V – Supported Employment Services and Placements | All Supported Employment Services appear to conform with the requirements specified in items A through I.<br><br>Item J requires an average of 20 weekly hours of employment – currently none of the populations approximate that number.<br><br>The numbers/percentage of individuals receiving other supported employment services is low.  As is the percentage of people actively engaged in job search and the number of individuals for whom employer outreach has occurred.<br><br>The variance process is in place, although not extensively used. |
| Section VI – Integrated Community Services and Placements | There has been consistent progress in this area (particularly given the continuing impact of COVID).  65% of the Consent Decree population participates in community activities for an average of 13.6 hours per week.  Participation in post-secondary education and/or training and volunteering has increased.  Small group participation remains the norm for community activity.  Community activities conform to the descriptors in item B 1-10..<br><br>Item B sets an expectation of 40 weekly hours of combined employment and community activity.  Currently, only 5% of the Consent Decree population reports combined activity of more than 20 hours. |
| Section VII – Career Development Planning | The State approaches 100% compliance for Career Development Plans.  Plans essentially meet the requirements defined in items 1-7.<br><br>The Monitor has reviewed 67 career development plans for youth in transition.  Although the required elements were present, there is a need to change the focus from placements to developing career pathways.  During the next four months the Monitor will continue to review Youth Transition plan and will also review a comparable number of adult career development plans. |

| Section VIII – Transition Planning for Youth | The State is in substantial compliance with this section of the Consent Decree.  Every youth observed has a career development plan and a variety of employment and community placements. The Monitor has made several recommendations for increasing the focus on actual job placement and on developing community connections prior to exiting school. |
|---|---|
| Section IX - Training | Through the efforts of the state agencies and the Conversion Institute, the State is in substantial compliance with the required training components defined in Items 1-4.  The Monitor has made several recommendations re: focusing training on the changing role of support staff, customized employment and community navigation. |
| Section X – Outreach, Education, Support | Although there are several initiatives for community outreach that are in process, communication with individuals and families continues to be an area needing increased focus.  The Monitor has made recommendations both for families in transition and families of adults.<br><br>The Employment First Task Force has disbanded.  The Monitor is waiting for the State's proposal for reconstituting the task force. |
| Section XI – Provider Capacity | Although initial efforts are in process, the State continues to be out of compliance with the requirement to ensure sufficient provider capacity.  This continues to be the major barrier to meeting the benchmarks of the Consent Decree.  The State has not adequately complied with the Statewide Workforce and Recruitment Initiative. |
| Section XIV - Funding | The FY2023 budget funds all the items in the Action Plan.  Any decision about individual allocations, overall Consent Decree funding cannot be made until rate review is complete and the State's FY2024 budget request is review.  The Monitor has made recommendations re: increasing resources to the transition populations and for providing guidance re: braiding and blending funding from any/all public or private sources. |

**Conclusion and Recommendations**

The Rhode Island Developmental Disability System is definitely in what Michael Smull describes as "the messy middle" – the elements of the desired future system have been defined and there is beginning movement (at least for some individuals) towards that future, yet most are still in the current system which needs to be funded and maintained while the future is being built.  During the past two years the Court has focused on identifying the systemic gaps that are barriers to substantial compliance with Consent Decree benchmarks and requirements and, through several Monitor Reports and Court Orders, has recommended strategies for addressing those gaps.  **Given that the Consent Decree is scheduled to terminate in April, 2024, all of these needs to be fully implemented with urgency.**  The table at the end of this section highlights the Court's expected completion dates.  The Court will monitor these dates closely,

This report (and others) has illustrated the connection between the systemic initiatives pertinent to administrative process, funding, capacity and program transformation and substantial compliance with the benchmarks of the Consent Decree.  Given that it is August, 2022…. the Monitor stresses **Implementation** and **Urgency**.

Recommendations were made throughout this report but are repeated here for focus and clarity.

**Transition Recommendations:**
Recommendation 1 – Given that paid employment while still in school is the most significant predictor of post school employment, services and supports should focus on creating pathways for individuals that provide paid employment during the last year(s) of school.  Similarly, the expectation should be that every student has a continuing job in an integrated setting at the time of school exit.

Recommendation 2 – The same paradigm should be applied to other community activities.  The expectation should be that every student exits school with a number of established relationships with community organizations and activities.  The State needs to develop a strategy for providing braided funding to LEAs for that purpose.

Recommendation 3 –There needs to be additional resources provided to individual students to supplement school funding; specifically for planning and for developing employment and community connections and networks.  The Monitor understands that individuals cannot participate in Children's waiver services and the Adult waiver simultaneously; however, Consent Decree activities (specifically the requirements in sections V, VI, VII, VIII) are not limited to one funding source.  The Monitor recommends that the State develop a funding stream for all youth found eligible for DD services (through the eligibility by 17 process) for the purpose stated above to be included in the 2024 budget cycle.  Specifically, the Monitor recommends that ORS and BHDDH provide funding for each/every student job development and job coaching during the last two years before exiting.  The Monitor recommends that BHDDH provide funding for each/every eligible student for community planning and developing community relationships.

Recommendation 4 – As indicated in the observations, most school personnel and families continue to experience a disconnect between school and adult services. The State agencies have implemented several quality practices to address this issue.  The Monitor encourages the State to take these practices to scale.  Other suggestions from school personnel include (a) connecting providers (and/or other individuals/families who self-direct) to students and families earlier in the transition process and (b) melding the IEP/ISP/CDP processes so that there is ONE plan from 19 through the first year of adult supports.  The Monitor also recommends that BHDDH incentivize adult service providers to become involved with transition planning at least two years prior to school exit.

Recommendation 5 – The review of CDPs above documents a number of issues.  To align with the prior four recommendations, the Monitor recommends that the State redesign the CDP to focus less on descriptive baseline and more on developing and targeting a specific career path for each student through the three phases of (a) discovery (breadth of experience), (b) paid employment experiences in one or two targeted areas and (c) actual job creation and development.

Recommendation 6 – The Monitor recommends that the State develop a strategy for providing every family with a consistent person to talk to and to serve as a guide through the process. Many schools highlighted a DD caseworker or an ORS counselor who served that role for a specific family.  However, for others that did not occur.  Given that family expectations are the other significant predictor of post school employment, reaching families earlier and more consistently is a key factor in increasing employment outcomes.

Recommendation 7 – The Monitor was impressed with the quality of Career Technical Education programs.  However, few students with IDD participated in these programs.  The Monitor recommends that the State develop a strategy for increasing access to CTE both as strategy for discovery and as a path to an actual job.  The State should track and report the number of students with IDD who participate in CTE.

Recommendation 8 – Transportation (i.e., access to the community) was an issue raised in several schools.  In the rural areas the question was lack of public transportation.  In the suburban and urban areas the issue was a need for more mobility training.  The Monitor recommends that the State meet with each district to identify transportation issues and develop solutions.

**Administrative Process Recommendations:**
- As ordered in the Action Plan, fully implement the recommendations arising from the Rate Review by July 1, 2023.
- By the end of the Consent Decree, explore an alternative to the SIS as the primary methodology for identifying and allocating support needs.
- Further refine the "additional needs questionnaire" by October 31, 2022.
- Finalize the process for needs assessment, independent facilitation (i.e., conflict free case management) and development of individual budgets by October 31, 2022 and begin statewide rollout (by ISP dates) begin no later than January 1, 2023.

- Continue to simplify the application process.  Develop a common application and data set by March 31, 2023 and fully implement the revised application process by July 1, 2023.
- Implement the process for distributing quarterly statements by October 1, 2022.
- Develop a comprehensive communication plan to ensure that individuals and families understand the new administrative processes by December 31, 2022..
- Develop a professional development curriculum for caseworkers and others to ensure consistent understanding, messaging and implementation of the new administrative processes by December 31, 2022.

**Adult System Recommendations:**
- Full Implementation and Funding of Administrative Barriers Work Group recommendations.
- Full implementation and funding of Rate Review recommendations.
- Full Implementation of the Workforce Initiative and compliance with May 3, 2022 court order.
- Explore the possibility of developing a statewide mechanism for providing health benefits to self-direct support staff;
- Address the issues raised by individuals/families who self-direct and by fiscal intermediaries (pages 31-32) – report to Monitor by December 31, 2022;
- Technical Assistance to provider organizations to increase employer outreach and access.
- Continued technical assistance and funding to promote customized employment.
- Continue funding targeted to increasing employment outcomes.
- By January 1, 2023 develop a guide that provide guidance re: braiding and blending of funding from ORS, BHDDH, DLT and any other source to increase employment and community outcomes.
- Funding in the FY2024 budget to implement transformation projects at scale.
- Intense Statewide Recruitment to resolve the documented workforce gap.

Note - The Court will review the rate review recommendations and the proposed FY2024 budget to ensure that there is sufficient support to continue to expand these models.

Note – During the next five months the Monitor intends to visit the remaining high schools and all adult agencies, to review a sample of career development plans in each and to review the implementation and impact of the Transformation Projects…..in preparation for the Spring, 2023 Monitor's Report.

| | Continuous | 10/31/2022 | 12/31/2022 | 4/1/2023 | 7/1/2023 | 3/31/2024 |
|---|---|---|---|---|---|---|
| **Transition** | | | | | | |
| Job before exiting school | X | | | | | |
| Community connections before exit | X | | | | | |
| Additional Resources – ORS/BHDDH | | | X | | | |
| Same CDP school – adult provider | X | | | | X | |
| Incentivize provider school connection | | | X | | | |
| Revise CDP | | | X | | | |
| Consistent Family Contact | X | | | | | |
| Increased Access to CTE | X | | | | | |
| Report # of Students with IDD in CTE | | | X | | | |
| Access to Transportation | X | | | | | |
| | | | | | | |
| **Administrative Process** | | | | | | |
| FULL implementation of rate review recommendations | | | | | X | |
| Review and recommendations for ALL funding sources other than Medicaid | | | | | X | |
| Alternative to SIS-A | | | | | | X |
| Additional Needs questionnaire | | X | | | | |
| Finalize process – needs assessment, independent facilitation, individual budgets | | X | | | | |
| Implement above process | | | X | | | |
| Simplify application process | | | | X | | |
| Implement revised application process | | | | | X | |
| Quarterly budget statements | | X | | | | |
| Comprehensive communication plan | | | X | | | |
| Professional Development curriculum | | | X | | | |
| | | | | | | |
| **Adult System Recommendations** | | | | | | |
| FULL implementation of work group recommendations | | | | | X | |
| FULL funding and implementation of rate review recommendations | | | | | X | |
| Through new rates, adequate funding for transformation to go to scale | | | | | | |
| Recruitment and Workforce Initiative | X | | | | X | |
| Plan to provide benefits to self-direct workforce | | | | | | X |
| Report to Monitor re: self-direct issues | | | X | | | |
| Increased employer outreach | X | | X | | | |
| Increased customized employment | X | | X | | | |
| Targeted Employment Funding | | X | | | | |
| Increased number employed | X | X | X | X | X | X |
| Increased number community activity | X | X | X | X | X | X |
| Guidance re: braiding/blending all funding sources | | | X | | | |

**Appendix A – State's March 31, 2022 Report Re: Fiscal Issues and Administrative Barriers**

(1) The following Fiscal and Administrative Issues have been identified by individuals, families, and service providers as barriers to efficient implementation of the goals of the Consent Decree. State Parties will review and address each of these issues and will develop a strategy for resolving each of the issues.

1. The process for determining the support needs of each individual found eligible for services through the RI Division of Developmental Disabilities.
   a. The SIS is being maintained.
   b. An additional needs questionnaire has been developed based on input from the workgroups. It will be implemented on April 18, 2022. The State will continue to review and revise the questionnaire with stakeholders to better meet consumer needs over time.
   c. See attached: 1- ADM BUR Additional Needs and Supports Supplement to SIS.

2. The process and timeline for developing annual individual budgets.
   a. Letters have been developed to identify an individual's budget under item #6. The letters are designed to assist people in managing their budgets. Final technical equipment difficulties are being resolved in order to deliver the letters to individuals.
   b. Continued work on the level of control that people have over their budget will occur under the Rate Methodology Project that will be completed by 12/1/22.

3. The need to consolidate the application (by individuals) for all pertinent RI services into one process. This includes outreach and communication to families, simplifying language on all forms and directions, shortening timelines for the various stages of application and eligibility, and melding the various eligibility processes (e.g., Medicaid eligibility and developmental disability eligibility) into one process.
   a. The Individual or Family needs to apply for Medicaid, DD, SSI (with pre-fills), and RIPTA.
   b. DD will work on this through the LTSS process. The workgroups have completed their work. Further work will be completed, with Quality Advisory Committee input, through LTSS and the Conflict Free Case Management implementation process.
   c. DD has a new policy that aligns with DHS policy on assisting individuals in completing applications.
   d. Training was completed with DHS staff on reducing unnecessary applications. Table developed to determine what applications are needed to reduce burden for families (reflected in policy).
   e. See attached:  3 - ADM BUR LTSS waiver application assistance.

4. The need for eligible individuals to re-determine eligibility more than once.
   a. Financial eligibility (DHS) is now done with less frequency. SSI eligible people do not have to redetermine eligibility.
   b. For DD, once an individual is eligible, their status remains eligible. If the case closes and the person needs to reactivate the case, that individual will not need to reverify the eligibility. Eligibility is based on the person's status prior to the age of 22. That does not change over the course of the person's life.
   c. Applications are accepted for individual who reach the age of 17 years of age. Their final eligibility is determined based on their status prior to their 22nd birthday.

5. The appeals process for individuals as it relates to eligibility, level of need or funding level.
   a. Changes have been implemented to reflect Medicaid rules. Initial review of disputed DD decisions occurs through an administrative process and not a "pre-hearing." The turnaround time from a request for review to a decision is 15 business days.
   b. See attached:
      i. 5 - ADM BUR BHDDH Appeals Notice 3.31.22
      ii. 5 - ADM BUR Appeals Process Guidance 3.31.22

6. Quarterly authorizations
   a. The quarterly authorization process transitioned to an annual authorization process.
   b. The notification process for reports to consumers, Social Caseworker and providers has been developed.
   c. See attached: ADM BUR Annual Auth Quarterly Letter - Part 1 - Service breakdown

7. Ratios.
   a. Met with NASDDDS to determine other States' processes on 2/8/22.
   b. Determined that interim steps to alleviate burden were impractical as they will not be completed in a timelier manner than the Rate Methodology Process. The issues of ratios will, therefore, be addressed through Rate Methodology.

8. 15-minute billing units.
   a. Met with NASDDDS to determine other States' processes on 2/8/22.
   b. Determined that interim steps to alleviate this burden were impractical as they will not be completed in a timelier manner than the Rate Methodology Process. The issues of 15-minute billing units will, therefore, be addressed through Rate Methodology.

9. The need to develop a clearly defined list of functions and activities for which funding is allowable. Definitions for each function or activity approved for funding and the rates connected to each.
   a. Definitions have been completed. See attached with Billing Guide and Self Directing Allowable Costs.
   b. See attached:
      i. 9 - ADM BUR TB 19-02 Self Direct Allowable Costs REVISION
      ii. 9 - ADM BUR DD Billing Manual
      iii. 9 - ADM BUR Service Definitions

10. The need to provide a range of funding levels for each function or activity that are responsive to individual support needs.
   a. This will be completed as part of the Rate Review and related in individual budgets by 12/1/22. The workgroup phase and input in this has been completed and referred to the Rate Review.

11. The need for guidance re: flexibility permitted within each function or activity.
   a. All application documentation for transportation that has been completed and posted on the BHDDH website. Guidance documentation is pending a final determination on the RIPTA contract on which BHDDH is working with EOHHS to complete.
   b. The State verified and communicated that the "goods and services" code is not available for provider agency use, but a self-directing code only. Further review of this issue has been referred to the Rate Methodology process.

12. The need for guidance re: the combining of individual budgets, at the request of individuals.
    a.  Guidance documentation has been completed and posted to the website.
    b.  See attached:  12 - ADM BUR Collectively Sharing Support Guidance.

13. The L9 process for requesting additional funding.
    **a.**  The appeal process for this was streamlined**.** (Adm reviews has replace pre-hearings; policies under development.)
    b.  New questionnaire has been created to replace the S109 process to address funding needs at the time of the initial SIS and at subsequent ISP meetings.  The intent of the new process is the eliminate the need for unnecessary appeals for funding and to reduce the burden on consumers, families and providers.
    c.  See attached:
        i.  13 - ADM BUR Policy-Admin Rev of Level of Need
        ii.  13 - ADM BUR Policy-Admin Rev of Eligibility
        iii.  1 - ADM BUR Additional Needs and Supports Supplement to SIS

14. The S109 process for appealing funding decisions.
    If an S109 is needed:
    **a.**  The appeal process for this was streamlined**.** (Adm reviews has replace pre-hearings; policies under development.)
    b.  An explanatory/guidance document will be completed by 3/15/22
    c.  An internal policy has been finalized.
    d.  See attachments under item # 13.

15. The process and timeline by which individuals' contract with provider organizations.
    a.  This issue will be resolved through the Conflict Free Case Management process.
    b.  As part of the issues in this item relate to capacity, the Transformation fund money under implementation will begin to assist in some of the timeliness issues as the staffing issues are addressed.
    c.  The work on this issue is completed for the workgroups.

16. Provider contractual and billing procedures. *[this relates to how providers set up service delivery with consumers]*
    a.  A letter has been developed to assist individuals with better understanding and navigating the process.
    b.  See attached:  ADM BUR SIS letter sample

**Appendix B**
**Staff Stability Survey**
**Reporting Period – July 1, 2021 to December 31, 2021**

**31 Provider Organizations**

**Agency Profile(s)**

Do you provide residential services?
- Yes    24    77%
- No      7    23%

How many adults receive residential supports from your agency on 2/31/21?
- 0          7    23%
- 1-10       3    10%
- 11-20      2    6%
- 21-50      6    19%
- 51-99      7    23%
- 100-499    6    19%

Did your agency provide in home supports?
- Yes    21    68%
- No     10    32%

How many adults were receiving in home supports from your agency on 12/31/21?
- 0          10   32%
- 1-10       8    26%
- 11-20      5    16%
- 21-50      4    13%
- 51-99      4    13%

Did your agency provide non-residential supports on 12/31/21?
- Yes    30    97%
- No      1    3%

How many adults were receiving non-residential services on 12/31/21?
- 0          1    3%
- 1-10       4    13%
- 11-20      2    6%
- 21-50      10   32%
- 51-99      8    26%
- 100-499    6    19%

How many adults were enrolled/approved for residential/in home/non-residential services on 7/1/21?  *(unduplicated count)*
- Total      2687
- Average    90
- Range      9-242

How many adults were enrolled/approved for residential/in home/non-residential services on 12/31/21?  *(unduplicated count)*
- Total      2512
- Average    84
- Range      9-240

Difference
- Total      -175
- Average    -2

Between 7/1/21 and 12/31/21 did your agency have to turn away or step receiving new service referrals due to DSP staffing issues?
- Yes    23    74%
- No      8    26%

Is your agency
- Private For Profit      5     16%
- Private Nonprofit       26    84%

**Payroll Data**

How many DSPs on your payroll on 7/1/21?
- Total            2589
- Range           2-281

How many DSPs on your payroll 12/31/21?
- Total            2720
- Range           3-298

**Difference**            **+131**

Percent of DSPs on your payroll on 12/31/21 who were continuously employed in a direct support capacity for:
- Less than 12 months        23%
- Between 12-36 months       27%
- More than 36 months        50%

Percent of DSPs as of 12/31/21 who identify as:
- Amer Indian/Alaska Native   <1%
- Asian                       1%
- Black/African American      32%
- Pacific Islander            <1%
- White                       48%
- Hispanic/Latino             8%
- More than one race/ethnicity 3%
- Other race/ethnicity        <1%
- Do not Know                 7%

Percent of DSPs as of 12/31/21 who identify as:
- Male                        27%
- Female                      62%
- Non-Conforming              <1%
- Don't Know                  10%

**Separations**

Percent of DSPs who permanently separated from your agency between 7/1/21 and 12/31/21
- Total            494
- Range           0-66

**Turnover Rate**            **18%**

DSPs who permanently separated between 7/1/21 – 12/31/21 who were continuously employed for
- Less than 12 months        59%
- Between 12-36 months       22%
- More than 36 months        19%

Percent who separated in each of the following circumstances:
- Voluntarily left/retired/quit   28%
- Employment was Terminated 20%
- Laid Off                    <1%
- Don't Know                  2%

Minimum Number of hours to be considered full-time:
- 30 hours                 43%
- 31-39 hours              50%
- 40 hours                 7%

Number of Full Time DSPs on your payroll on 12/31/21:
- Total                 1899

Number of Full Time DSP vacancies on 12/31/21:
- Total                 390

Total Full Time DSP positions:
- Total                 2289

Number of Part Time DSPs on your payroll on 12/31/21:
- Total                 681

Number of Part Time vacancies on 12/31/21:
- Total                 228

Total Part Time DSP positions:
- Total                 909

Number of On-Call DSPs employed by your agency on 12/31/21:
- Number of Agencies       14
- Number On-Call DSPs      366

Total Number of positions (full time + part time):
- Total                 3198

**Total Vacancies (full time + part time):**
- **Total                 618**

**Vacancy Rate (*HSRI formula – total vacancies/total positions on 12/31/21*):**
- **19.3%**

**Compensation**

**Average DSP starting hourly wage**
between 7/1/21 – 12/31/21:
- **All Settings**        **$16.04**
- Residential            $15.94
- At Home                $15.91
- Non-Residential        $16.1-

**Average DSP hourly wage** between 7/1/21 – 12/31/21:
- **All Settings**        **$16.60**
- Residential            $16.59
- At Home                $16.64
- Non-Residential        $16.81

Do you use a different pay scale for full time and part time employees?
- Yes              1
- No               30

Do you use a pay differential for DSPS who communicate in languages other than English?
- Yes              3
- No               28

**Bonuses and Overtime**

Did your agency give wage bonuses to DSPs between 7/1/21 – 12/31/21?
- Yes          18      58%
- No           13      42%

Unduplicated Count of DSPs who receives at least one wage bonus between 7/1/21 – 12/31/21:
- Agencies that gave bonuses    18
- Total Number of DSPs          1777
- Average                       99
- Range                         3-298

Average wage bonus given by your agency:
- Less than $50          0
- $50-$100               0
- $101-$200              1
- $201-$300              2
- $301-$400              1
- $401-$500              0
- More than $500         13

Total Payroll Costs between 7/1/21 – 12/31/21:
- Agencies Reporting    27
- Total                 $119,242,000

Total Overtime Costs between 7/1/21 – 12/31/21:
- Agencies Reporting    23
- Total                 $7,745,298
- Percent of total payroll    6.3%

Unduplicated Number of DSPs receiving at least one hour of overtime between 7/1/21 – 12/31/21:
- Total                 1868
- Percent of all DSPs   69%

**Benefits**

Did your agency provide **paid time off** to DSPs between 7/1/21 – 12/31/21?
- Yes               **31 (100%)**
- No                0

Did your agency offer **pooled paid time off** to DSPs between 7/1/21 – 12/31/21?
- Yes               **6 (19%)**
- No                25

Requirements to be eligible for pooled paid time off:
- Must be working full time          2
- Must work minimum number of   3
  hours during a defined period (35
  hours per week)
- Been employed for a certain length
  of time                               1
- All employees are eligible       4

Did your agency offer **paid vacation time** to DSPs between 7/1/21 – 12/31/21?
- Yes               **21 (68%)**
- No/No Answer      10

Requirements to be eligible for paid vacation time:
- Must be working full time          7
- Must work minimum number of
  hours during a defined period (35
  hours per week)                     14
- Been employed for a certain length
  of time                               5
- All employees are eligible       8

Did your agency offer **paid sick time** to DSPs between 7/1/21 – 12/31/21?
- Yes               **25 (81%)**
- No/No Answer      6

Requirements to be eligible for paid time sick time:
- Must be working full time          4
- Must work minimum number of
  hours during a defined period (35
  hours per week)                     15
- Been employed for a certain length
  of time                               5
- All employees are eligible       8

Did your agency offer **paid personal time** to DSPs between 7/1/21 – 12/31/21?
- Yes               **19 (61%)**
- No/No Answer      12

Requirements to be eligible for paid personal time:
- Must be working full time          4
- Must work minimum number of
  hours during a defined period (35
  hours per week)                     14
- Been employed for a certain length
  of time                              10
- All employees are eligible       0

Did your agency offer **health insurance coverage** to DSPs between 7/1/21 – 12/31/21?
- Yes               **30 (97%)**
- No/No Answer      1

Requirements to be eligible for health insurance coverage:
- Must be working full time          17
- Must work minimum number of
  hours during a defined period (35
  hours per week)                     14
- Been employed for a certain length
  of time                              12
- All employees are eligible       2

As of 12/31/21 number of DSPs eligible for health insurance coverage:
- Total   2001

As of 12/31/21 number of DSPs **actually enrolled in the health insurance benefit**:
- Total   **1199 (44% of all DSPs)**

Did your agency offer **vision coverage** to DSPs between 7/1/21 – 12/31/21?
- Yes                              **18 (58%)**
- No/No Answer            13

Did your agency offer **dental coverage** to DSPs between 7/1/21 – 12/31/21?
- Yes                              **29 (94%)**
- No                                2

Did your agency offer **employer sponsored retirement plan** to DSPs between 7/1/21 – 12/31/21?
- Yes                              **26 (84%)**
- No/No Answer            5

Requirements to be eligible employer sponsored retirement plan:
- Must be working full time        5
- Must work minimum number of hours during a defined period (35 hours per week)            11
- Been employed for a certain length of time            10
- All employees are eligible        9

Did your agency offer **any other benefits** not described to DSPs between 7/1/21 – 12/31/21?
- Yes                              **29 (94%)**
- No                                2

Does your agency offer a pay incentive or referral bonus to current DSPs to bring in new recruits?
- Yes                              29 (94%)
- No                                2

If yes, what is the incentive amount?
- $1-$50                          0
- $51-$100                      3
- $101-$150                    1
- $151-$200                    0
- More than $200            24
- Don't Know                  1

Which strategies does your agency use to retain staff in DSP positions:
- Realistic Job Preview            81%
- Training on Code of Ethics    100%
- DSP Ladder                            45%
- Credentialing                        68%
- Bonus, Stipends or Raises for completing steps or all of a credentialing process            48%
- Employee Engagement Surveys 68%
- Employee RecognitionProgram  75%
- DSPs involved in agency Governance                        26%
- DSP Training                          84%

**Recruitment and Retention**

**Frontline Supervisors**

How many Frontline Supervisors were employed by your agency on 12/31/21?

- Total          350

Are Frontline Supervisors paid hourly wages or salaried?
- All are paid an hourly wage   26%
- All are salaried            55%
- Some hourly, some salaried   19%

Did Frontline Supervisors receive additional wages/salary for working overtime hours between 7/1/21 – 12/31/21?
- Yes                    14 (45%)
- No/No Answer           17

How many hours of overtime did your agency pay to Frontline Supervisors between 7/1/21 – 12/31/21?
- Total            18,647
- Average (14 agencies)  1,332
- Range            102-3393

How many Frontline Supervisors received overtime pay between 7/1/21 – 12/31/21?
- Total          160 (46% of all)

Percent of Frontline Supervisors as of 12/31/21 who identify as:
- Amer Indian/Alaska Native   1%
- Asian                  1%
- Black/African American    24%
- Pacific Islander          1%
- White                 59%
- Hispanic/Latino          5%
- More than one race/ethnicity  2%
- Other race/ethnicity       0%
- Do not Know            7%

Percent of Frontline Supervisors as of 12/31/21 who identify as:
- Male             22%
- Female           76%
- Non-Conforming    0%
- Don't Know        2%

**Emergency and Disaster Planning**

Does your agency have an emergency management or disaster preparedness plan?
- Yes                 31
- No                  0

Does your agency emergency management or disaster preparedness plan include actions to take in case of DSP staffing shortages?
- Yes                 23
- No                  8