**Monitor's Report and Addendum Review**
**September, 2025**

## Section I.  Introduction and Executive Summary

Before providing a detailed assessment of the major areas of activity, given where we are in the Consent Decree/Addendum timeline, there is value in looking at the "big picture".

I have used the simple logic model below as my basic structure for assessing compliance for several years.  The model defines the stages of change in achieving substantial compliance with Consent Decree benchmarks and objectives. Said simply, the system needed to change before the benchmarks changed and before the primary criterion was reached – changes in individual lives. So….let's take a broad look at each of these three components.

| **First, Systemic Change:** | **Then:** | **Then,** |
|---|---|---|
| Administrative Process Funding System Model for Providing Supports Increased Capacity | Increased Employment Increased Community Activity Increased Combined Time Personal Networks | **Individual Lives Change** |

**First**, **has the system changed?**   The September, 2020 Monitor's Report did a comprehensive analysis of all aspects of the Consent Decree.  Based on interviews/focus groups/surveys from more than 500 individuals, families, service providers, school personnel and others; the following needs were identified.[1]

1. The system was **significantly underfunded**.  Provider agencies were described as "fragile and profoundly undercapitalized".
2. The need **to remove the administrative barriers** that make the system difficult to navigate, that hinder efficient provision of services and limit the flexibility needed to meet the unique circumstances of each person's life.
3. The need to **develop new service models** that focus on supporting individualized comprehensive **person-centered plans** for employment and integrated community activity **facilitated by independent plan writers**.  Focus should be on (a) identifying opportunities and resources through community mapping and (b) the  development of individualized support networks, including the enhanced use of **technology** and increased **transportation** options.
4. The need to ensure sufficient **provider capacity** and the need to stabilize the  **workforce.**
5. The need to **enhance the fluency with which all transition services come together**, especially during the two years before school exit.  Youth in Transition and families need

---

[1] Monitor's Report in Response to February, 2020 Court Order; September, 2020; pp. 15-16.

      **enhanced knowledge and support** both to have high expectations and to be able to plan for and navigate the transition process.

6. The need for **deeper family outreach and support.**
7. The need for **enhanced communication** that is consistent and accurate. The need for all stakeholder groups to have an **equal role in decision-making** and in development of the new administrative procedures and the new service models

The following paragraphs address each of those identified needs.

1. The enacted DD budget for FY2019 was 229.4 million. Rate review was part of the 2021 Action Plan and occurred between 2022-2024. The enacted budget for FY2026 was 452.5 million (97% increase). Salary increases were implemented beginning in FY2023 and the new rates were in place by FY2024. To maintain sufficient funding, DD is now included in the semi-annual caseload estimating conference and is subject to the legislatively-mandated bi-annual review by the Office of Health Insurance Commissioner (OHIC). **However**….(as of 9/01.2025) the final algorithm for tier assignment has not yet been implemented and the mechanism for automating additional needs documented through the Additional Needs and Supports Questionnaire (ANSQ) and/or follow-up has not yet been finalized.

2. In response to the July, 2020 court order, the State created four workgroups to address a list of administrative barriers. Individual budgets are now the norm. Quarterly budgets have been replaced by annual budgets. S109 requests are trending downward. The appeals process has been refined. There is a new billing manual. There are frequent conversations between the State and stakeholders re: administrative procedures that can be simplified. **However**…..many individuals and families do not really understand their budgets and don't fully access them. The transition from Therap to WellSky is in its early stages.

3. The rate review developed several new services – family SLA, non-congregate residential options, companion room and board, remote supports, peer supports, family-to-family, others. Five types of employment services were defined as "add-on services", so that individuals no longer have to choose between community services and employment services. The transition grants (ordered in the 2021 Action Plan) resulted in an increased use of "Community Facilitators", the development of an "Advisor Model" and an increased focus on employment. The Technology Fund (again, part of the Action Plan) has resulted in almost 1700 individuals acquiring technology. The Independent Facilitation/Conflict Free Case Management (IF/CFCM) system is now being implemented with a focus on increasing the quality of Person-Centered Plans. **However**…..the IF/CFCM system is new and only about one third of the total statewide IDD population has been assigned. The IF/CFCM workgroup is working with the State to improve quality and efficiency. The definition and billing procedures for the Advisor Model have not yet been finalized. Many individuals continue to report issues with transportation.

4. Wage increases have had a significant impact on the workforce – the DSP hourly wage has increased from $13.18 in 2020 to $21.77 in 2025. The increased rates have stabilized the provider organizations. Providing capacity for accepting new referrals and for facilitating job development has increased. The "Statewide Workforce Initiative" has brought new

recruitment and retention tools to both provider organizations and individuals who self-direct. **However**…..although the number of DSPs had increased and the vacancy rate had decreased between 2021 and 2024, both of those metrics have seen a downward trend in the most recdnt reporting period. Turnover rate has been consistent at +/- 16% throughout the last several years. Anecdotally, some individuals who self-direct continue to report difficulty in finding staff. There is also national data that suggests that the populations from which DSPs are typically drawn is shrinking – suggesting a need to broaden recruitment efforts.

5. The Consent Decree has resulted in increased focus and increased services to transition youth with IDD. In 2013 competitive employment was rarely considered as an option for these students. The new Career Development Plans have transformed from a data collection tool to a comprehensive planning process that focuses both on preparation for employment and participation in the community. Virtually all youth are having long term experiences with employment and an increasing number are exiting school with paid employment. An increasing number of youth are participating in Career Technical Education (CTE) and in Pre-Employment and Transition Services (Pre-ETS). An increasing number of youth are applying for DD services earlier, more than 80% are approved and are receiving funding and services. Collaboration among RIDE, IRS and BHDDH is strong with a focus on the last two years before school exit. **However**…..many youth and many families are still reporting a gap between school exit and the onset of adult services. Guardianship and concerns about employment continue to be a primary barrier to employment for many youth and young adults. Several special education administrators report difficulty in finding teachers appropriately certified and experienced to teach secondary youth with IDD.

6. The breath and depth of information available to individuals and families has significantly increased during the term of the Consent Decree/Addendum. Youth in Transition have access to information provided by the BHDDH transition team and the ORS counselor assigned to every school. Adults have access to the array of "easy-to-read" materials and guides developed by the BHDDH communications team. RIPIN provides information both to Transition Youth and to adults who self-direct. BHDDH has increased outreach to families of transition youth. RIDE and BHDDH make use of "charlas" to provide more personalized information. One of the primary functions of the IF/CFCMs is to provide information and support. **However**…..families of transition youth continue to request a consistent "family-to-family" mentor to advise and guide them through the process. The IF/CFCM system is still in its initial stages – more than half have not yet been assigned a facilitator. There is anecdotal evidence that many individuals and families are not aware of the opportunities and resources available to them or how to access them.

7. For years one of the primary complaints the Monitor heard from all stakeholder groups was "poor communication" between the State and stakeholders and a belief that their "voice was not heard". Now the Monitor regularly hears that "communication has never been better". The DD forums, the biweekly newsletter and the multiple 'easy-to-read' guides are indicators are indicators of the significant effort that has gone into improving communication. DDD now has a team of professionals focused exclusively on improving communication. BHDDH has also made a significant effort to include stakeholders in the decision-making process. The administrative barriers workgroups (2020), the workgroups to

address specific needs and issues identified by the Monitor and the Continuous Systemic Improvement workgroups are indicators of that effort – all include individuals, families, service providers, state personnel, others.  Discussions are respectful and decisions are made jointly.  **However**…..there are individuals and families who do not receive information in the most typical modalities – the DDD communications team has committed to developing alternative strategies for providing information.  There is also need to formalize the joint decision-making process so that it continues into the future.

In summary, the system is very different than it was in 2014.  The culture of service provision and communication is significantly better than it was in 2014.  **The State and the stakeholders are to be commended for the efforts that led to those changes.  However**…..as indicated in the paragraphs above and the detailed analysis in section II of this report, many of the systems and practices are still in the early stages of implementation.


**Second, have the metrics required by the Consent Decree and Addendum been achieved?**
Many of the requirements of the Consent Decree are procedural and are addressed in the paragraphs above or in section II of this report.  There are few quantitative metrics in the Consent Decree.  Some of the original employment metrics were revised in the Addendum.  The following is a summary (details in section II).

- All transition youth have Career Development Plans – as indicated above, the CDP format has been revised to facilitate actual planning.  For adults, the CDP has been embedded into the Person-Centered Plan/Individual Service Plan.
- All transition youth have employment experiences, most have more than one long-term experience.
- 59% of the target population for employment have been employed at some time during the Consent Decree – the metric defined in the Addendum is 60%.
- The Addendum requires the development of 500 new jobs by June 30, 2026 – 125 by June 30, 2024; 175 additional jobs by June 30, 2025; and 200 additional jobs by June 30, 2036.  **50% of those new jobs are to be for the Consent Decree target populations**.  The State reports that 330 new jobs have been developed since July 1, 2023 – 91 **(28%) for Consent Decree members** and 239 for individuals who are not part of the Consent Decree.
- Adults who have individual jobs in integrated settings work an average of 11.3 hours per week – the original metric in the Consent Decree was 20, the metric in the Addendum is 14.
- Adults who have individual jobs in integrated settings are paid an average of $15.81 per hour.  The required metric is minimum wage or higher.  The current minimum wage in Rhode Island is $15.
- The Consent Decree required that 1049 individuals have benefit plans.  Currently 712 individuals have benefit plans.  It is important to note that the approach to benefits planning is in revision to more realistic meet the unique needs of the population.
- There are no sheltered workshops in Rhode Island and no 14C certificates,
- There is no one paid a sub-minimum wage.

In summary, although mostly positive, **not all of the metrics have been met**.

**Third, have individual lives changed?**  Improvement in the quality of induvial lives is the ultimate criteria for determining compliance.  For lives to change, each individual needs:

- An advisor to help identify opportunities and resources and to assist them in navigating the administrative process;
- Sufficient information to make decisions;
- Increasing ability to self-determine and make decisions about their own lives;
- A stable base – a home they like, relationships they choose, activities that match their interests, reliable supports;
- Stimulation to try new things;
- New opportunities;
- Sufficient preparation and support to participate in those opportunities;
- Sufficient resources – braided funding from several sources;
- Sufficient resources – access to technology as support;
- Sufficient resources – well-prepared, reliable support staff;
- Flexibility in the system to recognize and respond to life changes.

The table below illustrates how or how not these "needs" are addressed in the Rhode Island.

|  | **Youth in Transition** | **Adults** |
|---|---|---|
| Is there an advisor | IF/CFCMs are beginning to be assigned to youth in transition. There is an ORS counselor in every school.  Charlas have been established in 22 schools. **Teachers** continue to be the primary advisors. | If/CFCMs are assigned to **slightly more than a third** of adults. |
| Sufficient Information | An introduction to adult services and Pre-ETS are available to most youth.  RIPIN is contracted to provide transition-related information.  There is anecdotal evidence that many **families do not understand the decisions they need to make** about adult services. | Information is available through IF/CFCMs and from the state agencies.  Many IF/CFCMs are described **as "really nice people, but they have a lot to learn".** |
| Increased Decision-Making | Instruction in decision-making and self-determination is embedded in the transition process, but many students require **additional instruction and practice**. | Decision-making is a significant component of the person-centered planning process. **About half** of the Monitor interviewees **do not actively participate** in the ISP process. **A third** report community activities are their idea. **Another third** report they are a |

| | | |
|---|---|---|
| | | combination of their ideas and someone else's ideas. |
| Stable Base - Housing | Family homes are the norm, except for those living in DCYF residences. | Housing options have increased, but housing continues to be a **major concern** for many individuals and families. |
| Stable Base - Relationships | No measure available. | Most have friends. **Peers with IDD and staff** are most frequently named as friends. Slightly more than half name community members or others. |
| Stable Base - Interests | No measure available. | **86%** report community activities that help them **learn new things**, but **only a quarter** belong to a **community organization**. |
| Stable Base - Support | Families and school personnel. **More than 80%** of those applying for DD services are **found eligible.** | Provider capacity is improving. Workforce is more stable, but **turnover rate has increased**. Monitor interviewees report a **gap** between having sufficient and having sufficient support. |
| Stimulation | Assumed | **Few** PCP/ISP teams have **new members**. IF/CFCMs are still learning. |
| New Opportunities | Virtually all have employment experiences. | **86%** report community activities that help them **learn new things**, but **only a quarter** belong to a **community organization**. |
| Preparation to Participate | Assumed | **Slightly more than half** complete community maps or relationship maps. IF/CFCMs are still learning. |
| Sufficient Funding | **More than 80%** of those applying for DD services are **found eligible.** | Tier packages and add-on services have **increased**. Use of add-on employment funds has increased, but **only about a quarter** are using them. |
| Access to Technology | No measure available, | **1600 have acquired** technology. Training re: **how to** |

| | | use technology as a support **is limited**. |
|---|---|---|
| Adequate Staff | Anecdotal reports that school districts are having difficulty finding sufficient teachers certified and experienced with secondary youth with IDD. | Workforce is more stable, but **turnover rate has increased**. Many who **self-direct** continue to report having **difficulty finding staff.** |
| System Flexibility – Capacity to Respond to Life Changes | Assumed | To the extent currently possible, flexibility has been **built into the system**. |

In summary, for both youth in transition and adults, the factors and resources needed for individuals to have quality lives and to make decisions about their lives are better and more available than they were in 2014**. However, the changes have not yet reached all the participants, particularly in the adult world….and many adults (documented in the fractions cited above) are not yet using the resources available.**

**Monitor's Overall Assessment of Compliance by Topical Area (**details and analysis are in Section II).

| All Adults will have experienced the new assessment process | **Not in Compliance**. Waiting for the Assessment Process Revisions. |
|---|---|
| All adults will have an individualized budget based on the assessment process | **Approaching** Substantial Compliance |
| All adults will have an independent facilitator | **Not in Compliance.** |
| Employment Services and Metrics | **Not in Compliance.** The new jobs for Consent Decree members, the average hours worked and the use of add-on employment funds metrics have not been met. |
| All adults will participate in community activities in integrated settings | Current Substantial Compliance….**Tasks Remaining** to Demonstrate Durable Compliance. |
| New Rates and Rate Structure will be fully implemented | **Tasks Remaining; utilization rates continue to be low**. |
| Transition Services | Current Substantial Compliance….**Tasks Remaining** to Demonstrate Durable Compliance. |
| Training and Technical Assistance | Current Substantial Compliance….**Tasks Remaining** to Demonstrate Durable Compliance; specifically, **revision and updates** to current employment training. |
| Communication and Outreach | Substantial Compliance |
| Workforce | Statewide Initiative is Substantially Compliant; **Concerning Trends** in the Data |
| Data – Outcome Measurement | Current Substantial Compliance….**Tasks Remaining** to Demonstrate Durable Compliance. |

**Conclusion**

Several times during the past five years I have addressed the concept of "scale". Scale is usually defined as 80% of the target population participating in the intervention or the outcome. The system to support individuals with IDD in Rhode Island has changed…..**but the essential question is – have a sufficient number of individuals experienced that change in a practical way in their immediate lives**?

It is unrealistic to expect that 80% of the Consent Decree population (or the total statewide IDD population) will be employed; however, it **IS** realistic to expect that 80% of the individuals supported by a system should have experienced the changes in a way that directly improves their lives. That continues to be my focus and my concern. Following is a list of system variables or practices that, in my opinion, are not yet at scale and/or are not yet being accessed by a sufficient number of participants.

1. Sufficient Funding and Utilization – The enacted budgets are sufficient, but utilization of appropriated funds continue to be in the low 70% range. Many individuals and families do not understand their budget. In the current context, the possibility of budget reductions that will impact services is the prime concern of ALL stakeholder groups.
2. The new algorithm for tier assignments has not yet been implemented. Definitions and billing codes for select new services are not yet in place.
3. The assessment process is being revised. The Additional Needs and Support Questionnaire and the Follow-up components are being re-envisioned.
4. The Independent Facilitation/Conflict Free Case Management system is still in the early stages of implementation and require qualitative "tweaks".
5. The employment metrics for Consent Decree populations have not been met.
6. Although transition services have met Consent Decree expectations, policies and procedures for continuing current practices have not been finalized.
7. Current trends suggest a potential decrease in workforce stability.
8. Specific actions cited in the analysis in section II of this report may not be finalized in the next nine months. Implementation will likely occur in subsequent years.

The State has approached Consent Decree/Addendum requirements with seriousness and good will. The system is significantly better than it was in 2014. The metrics are mixed. Many individuals have not yet experienced the changes in their daily lives. There is concern in all stakeholder groups about the possibility of recission after the Court exits. And, perhaps most significantly, many of the changes are still in early stages of implementation and will take more time to become routine. **For all these reasons, the Monitor recommends continued "high level" oversight by the Court for the next two-three years**.

**Section II. Topical Analysis of Compliance with Specific Requirements**

As in previous Monitor Reports, the requirements of the Consent Decree, the Addendum and Court Orders have been grouped into 11 topical areas.  For each topical area, this report (a) summarizes progress as reported by the various sources, (b) provides pertinent data, (c) provides responses from a random sample of adults interviewed about pertinent practices and (d) assesses and comments on the status of compliance.

1.  **All adults will have experienced the new three-step assessment process.** *(Addendum ii 3; December, 2022 Court Order*)
    - SIS-A (administered upon eligibility and every five years thereafter)
    - Additional Needs Questionnaire
    - Individual Follow-Up
    - Preparation of interviewers and caseworkers
    - Communication to Individuals/Families

**Progress:**
The Consent Decree Quarterly Report states that 126 individuals have participated in the three-step assessment process this quarter and 1569 since March, 2023.  The two-step process is still essentially on hold waiting for three SIS caseworker positions to be filled.  There were 99 S109 requests this quarter – as the revised SIS and assessment process is being more fully implemented and the simplified administrative process that allows existing S109s to be automatically carried forward, requests for new S109 seem to be declining slightly.[2]

Approved requests for additional funding are addressed through the S109 process.  Requests for services are referred to caseworkers or IF/CFCMs.  Most of these service requests are for transitioning youth or other life changes.

The Monitor continues to be concerned that (a) certain types of needs are being missed (e.g., individuals who need alternative or augmentative communication strategies) and (b) there is need to develop services or expertise to respond to unique needs.  Example - In preparation for my first report as Monitor (2020) I visited several members of the population of the Interim Settlement Agreement (ISA).  I encountered several individuals who had minimal if any communication (AAC strategies were needed); two individuals with low vision who could have profited from orientation and mobility training; and a few individuals with physical disabilities who needed more individualized mobility and/or other adaptive equipment.  **The State needs to identify (or develop) resources and individuals with expertise to address these needs.**

There have been several discussions between the State and HMA, HMA and the providers and State/HMA with the Monitor re: the Additional Needs and Services Questionnaire (ANSQ) and the follow-up.  **The original intent was to provide every individual/family with multiple opportunities to express their needs and make requests.**  HMA was/is developing a mechanism for automating requests for additional funding from the ANSQ and follow-up.  Both the Monitor and the State, based on anecdotal experiences, that the ANSQ and follow-up are not meeting the original purpose.  Doing the ANSQ at the same session as the SIS is proving

---

[2] Consent Decree Quarterly Report; August 15, 2025.

duplicative and tiresome for individuals who have just completed a lengthy SIS. Monitor interviewees have expressed uncertainty about the ANSQ. Most respondents don't participate in the follow-up and view it as "one more meeting". Thus, the State has proposed a reworking of the assessment process. The Monitor is open to that idea and designing a process that most efficiently accomplishes the original intent.

**Monitor Interviews - Assessment Process – Individuals Who Have Had a SIS**

Note - Given where we are in the Consent Decree/Addendum timeframe, the random sample of interviewees was selected from the total DD population, not just the Consent Decree population.

As has been the trend, interviewees reported that SIS caseworkers explained how to respond. Most felt the SIS accurately reflected their needs. This quarter the one individual who did not feel that way was an individual with medical needs that were not addressed by the SIS medical questions. This reinforces the need for something like the ANSQ. The low percentages for whether the ANSQ and/or the follow-up occurred and whether they identified additional needs reinforces the need to rework the ANSQ and follow-up process, as was addressed in the preceding paragraph.

| Questions | 11/23-9/24 Totals | 10-12/24 Totals | 1-3/2025 | 4-6/2025 |
|---|---|---|---|---|
| Sample Respondents (Denominator) | 24 | 4 | 6 | 4 |
| Explain how to respond | 21 (87%) | 3 (75%) | 5 (83%) | 4 (100%) |
| SIS Accurately Reflect Your Support Needs | 19 (79%) | 4 (100%) | 5 (83%) | 3 (75%) |
| Medical/Behavioral Questions Clarify Needs | 18 (75%) | 4 (100%) | 6 (100%) | 1 (25%) |
| Additional Needs Questionnaire | | 3 (75%) | 6 (100%) | 1 (25%) |
| Follow Up | | 3 (75%) | 5 (83%) | 1 (25%) |

**Monitor Interview - Assessment Process – Summary ALL Interviews**

| Questions | 11/23-9/24 Totals | 10-12/24 Totals | 1-3/2025 Totals | 4-6/2025 |
|---|---|---|---|---|
| Sample Respondents (Denominator) | 149 | 31 | 44 | 50 |
| Additional Needs Questionnaire | 53 (36%) | 9 (29%) | 8 (18%) | 10 (20%) |
| Identify Additional Needs | 32 (21%) | 1 | 1 | 2 (4%) |
| Follow up | 13 (6%) | 5 (16%) | 9 (20%) | 4 (8%) |
| Identify Additional Needs | 4 (3%) | 1 | 1 | 1 (2%) |

**Overall Assessment** – Not in Compliance, Waiting for the Assessment Process Revisions. The State has made significant efforts to improve the overall assessment process. The majority of Monitor interviewees believe the SIS accurately reflects their needs. The State has made qualitative efforts to implement the three-step process – the 1569 people who participated in the process is an indicator of that. Both the State and the Monitor recognize the need to revise the process. Assessment of compliance will wait till those revisions are developed and implemented.

The revision and continued roll out of the assessment process merits continued court observation beyond the Addendum.

**2. All adults will have an individual budget based on the three-step process.** *(Addendum ii 4; Consent Decree, Section XIV; December, 2022 Court Order)*

**Progress:**
The "Notice of Assessment Results" letter now includes information specifying what funding is received and why (i.e., what source). Purchase Orders will now be called "Planned Services" in Wellsky. Training is being provided to IF/CFCMs re: how to use the "Planned Services" process and fixed and flexible funding. The intent (**and focus of the Court**) is that IF/CFCMs have indepth discussions with individuals to maximize their understanding and use of allocated funding.

**Monitor Interviews – Budget Letter**

| Questions | 11/23-9/24 Totals | 10-12/2024 Totals | 1-3/2025 Totals | 4-6/2025 |
|---|---|---|---|---|
| **Sample Respondents (Denominator)** | 149 | 31 | 44 | 50 |
| **Received a Budget Letter** | 30 (20%) | 9 (29%) | 12 (27%) | 8 (16%) |
| **Budget letter make sense** | 22 (15%) | 5 of 9 | 9 (20%) | 8 (16%) |
| **Budget letter provides detail** | 7 (5%) | 2 of 9 | 4 (9%) | 3 (6%) |
| **Explained how to use your flexible budget** | 72 (48%) | 17 (55%) | 26 (60%) | 35 (70%) |

**Overall Assessment –** Approaching Substantial Compliance
Individual annual budgets have been the norm for several years. The revised format of the "Notice of Assessment Results" letter is acceptable and provides sufficient detail. Despite the fact that less than a third of interview respondents report receiving a letter, the Monitor is confident that letters are mailed. The issue is who receives the letters and whether individuals and families understand the information they receive. **Budget (and budget letter) discussions need to be embedded into the CFCM follow-up process**. Thus, Independent Facilitators (IF), Conflict Free Case Managers (CFCM), DD Caseworkers, Agency Personnel and other related staff need to understand the budget process and the budget letter, so they can explain it and assist individuals and families and providers to develop plans and strategies for using their funding and resources.

3.  **All adults will have an independent facilitator who will (a) provide information about employment and community activity, (b) facilitate the development of a person-centered plan, (c) explain the resources and opportunities available through the new rate structure, (d) assist the individual to use their individual budget to access employment and community services.** *(Addendum ii 5; December, 2022 Court Order)*,

**Progress:**

As of June, 2025 1550 individuals have been assigned to an Independent Facilitator or Conflict Free Case Manager.[3]  This includes the 527 individuals who have never been employed who were the initial priority.  Assignments are being completed on a rolling basis.

43 Independent Facilitators have completed training and have started (or will start soon) supporting people.  16 state CFCMs have been hired – due to turnover issues, 13 are currently in service.  Four private agencies (Care Link, West Bay Community Action, Child and Family Services, East Bay Community Action) have completed training and are supporting individuals…and a fifth agency (Bethel Behavioral Associates) have applied to EOHHS for certification.[4]  462 individuals have been assigned to an IF, 523 are being assigned to the private agencies and (when at full capacity) 768 will be supported by State CFCMs.

The CFCM Program Manual can be found on the EOHHS website.  BHDDH has developed a "Training Standards" document and a curriculum aligned to these standards.  The Monitor has reviewed both of these.  The IF/CFCMs are completing the "Qualitative Review of Life Domains" and the monitoring forms.  The intent is for IFs to develop "person-centered plans" (formerly, Individual Service Plans) and purchase orders/planned services and work with Fiscal Intermediaries to submit them.  Providers are transitioning from Therap to WellSky to submit plans.

At the Monitor's request, a CFCM/IF work group was formed consisting of both state personnel and stakeholders (individuals receiving support, families, providers).  This group has met several times and had very productive discussions about implementation issues.  With direct input from this workgroup, the State has refined the process and defined how IF/CFCMs are introduced to the person, what happens before the first meeting, what happens at the first meeting, what materials and resources are left behind and what happens (follow-up and regular contact) after the initial meeting.  Again, with direct input from the work group, the State has developed several related documents, including:

- The DD Guidebook
- Conflict Free Case Management Guidebook
- What Happens When You Start CFCM
- Roles and Responsibilities Under CFCM.

These materials can be found on the Division's web page.

---

[3] Consent Decree Quarterly Report; August 15, 2025
[4] Consent Decree Quarterly Report; August 15, 2025

**Monitor Interviews – Who Facilitated**

Respondents to these questions were fairly equally split between individuals who self-direct and individuals who are agency-supported.  The Monitor recognizes that the IF/CFCM process was still in initial rollout during the past two quarters.  Staff are still the facilitators for most people…but all three categories of IF/CFCMs are now showing up in the interviews.  Most facilitators are assigned, not chosen by the person.  The Monitor would like to see that flip.

| Questions | 11/23-9/24 Totals | 10-12/2024 Totals | 1-3/2025 Totals | 4-6/2025 Totals |
|---|---|---|---|---|
| Sample Respondents (Denominator) | 149 | 31 | 44 | 50 |
| Parent or Guardian | 5 (3%) | 1 (3%) | 0 | 0 |
| Agency Staff | 70 (47%) | 15 (48%) | 34 (78%) | 35 (70%) |
| State Social Worker/CFCM Case Worker* | 38 (26%) | 3 (10%) | 5 (11%) | 2 (4%) |
| Independent Facilitator | 29 (19%)**** | 12 (39%) | 1 | 6 (12%) |
| Community CFCM Agency** | | 0 | 0 | 2 (4%) |
| Other | | | 4 | 5 (10%)*** |
| Did you choose your facilitator** | | 8 (26%) | 7 (16%) | 6 (12%) |
| Was facilitator assigned to you** | | 23 (74%) | 36 (84%) | 44 (88%) |
| Did you know your facilitator before** | | 21 (72%) | 38 (86%) | 45 (90%) |

*Question changed for 10-12/2024 to reflect new CFCM State Caseworkers
**New Question beginning 10-12/2024
***Plan Writers who were NOT Independent Facilitators
****Chances are that facilitators identified as IFs in earlier interviews were plan writers

**Monitor Interviews – Experience with ISP Process**

ISPs are now "Person-Centered Plans".  Providing information and facilitating the development of the ISP/PCPs are the most important functions of the IF/CFCMs.  As described above, the State, with direct input from the IF/CFCM work group, developed several information products.  Many of the interviews referenced in this table occurred before those products were developed; thus, the percentages are expected to change.  The State has developed an ISP/PCP guidebook to be used as part of the facilitation process.  The responses in the table below highlight four important factors that require focus in the ongoing "upskilling" of the IF/CFCMs.

1. **Preparation** for the ISP/PCP predicts the quality of the PCP.  Only about have are participating in community mapping and relationship mapping.
2. Many individuals are **not actively participating…..because they are not adequately prepared**.
3. PCP **teams are essentially static.**  Recruiting **new members** (friend, community members with similar interests) would change the dynamic and quality.
4. PCPs are getting better, but need to include **more of the details that will increase the likelihood of actual implementation**.

| Questions | 11/23-9/24 Totals | 10-12/2024 Totals | 1-3/2025 Totals | 4-6/2025 Totals |
|---|---|---|---|---|
| Sample Respondents (Denominator) | 149 | 31 | 44 | 50 |
| Facilitator Took Time to Get To Know You | 138 (93%) | | | |
| If you didn't know facilitator before, did they take time to get to know you* | | 7 of 10 | 6 of 6 | 5 o 5 |

| | | | | |
|---|---|---|---|---|
| **Did facilitator send you information before first meeting\*\*\*** | | | | 11 (22%) |
| **Did the information help you get ready for the meeting\*\*\*** | | | | 11 (22%) |
| **After the meeting, did the facilitator leave any information or materials\*\*\*** | | | | 5 (10%) |
| **Were these materials helpful to you in thinking about what you wanted to do or need\*\*\*** | | | | 5 (10%) |
| **Did a Community Map** | 81 (54%) | 18 (56%) | 35 (80%) | 26 (52%) |
| **Did a Relationship Map** | 98 (66%) | 14 (44%) | 30 (68%) | 28 (56%) |
| **Individual Actively Participated (Had Ideas/Goals)** | 73 (49%) | 16 (52%) | 25 (57%) | 22 (46%) |
| **Team included other than family/staff/caseworker** | 8 (5%) | 0 | 1 | 2 (4%) |
| **Any new team members this year** | 8 (9%) | 9 (31%) | 5 (18%) | 8 (16%) |
| **Goals express what you want to learn/do/change** | 121 (81%) | 25 (81%) | 42 (95%) | 45 (90%) |
| **Specific action steps** | 103 (69%) | 23 (77%) | 33 (77%) | 40 (80%) |
| **Timeline** | 93 (62%) | 18 (58%) | 27 (63%) | 30 (60%) |
| **Who will provide support** | 134 (90%) | 29 (94%) | 43 (96%) | 47 (94%) |
| **How you will Get There** | 123 (83%) | 27 (87%) | 40 (91%) | 48 (96%) |
| **Discuss How Often Check In Will Happen** | | 22 (71%) | 30 (62%) | 30 (60%) |
| **Is your ISP essentially the same as last year\*\*** | | 7 (23%) | 5 (11%) | 14 (28%) |
| **One or two new goals\*\*** | | 18 (58%) | 27 (61%) | 36 (72%) |
| **Is your ISP essentially new\*\*** | | 6 (19%) | 12 (27%) | 10 (20%) |

*Revised Question for 10-12/2024*
*\*\*New Question for 10-12/2024*
*\*\*\*New Question for 4-6/2025*

**Overall Assessment** – Not in Compliance
In many ways, the IF/CFCM system is the "glue" that connects the various components of individual support. It works better if the individual supported chooses and knows his/her IF/CFCM. Currently, most are assigned, but there is a mechanism for requesting a different facilitator. The IF/CFCM prepares the person for the PCP/ISP, provides information and stimulation, helps facilitate the PCP/ISP meeting, helps connect to needed services and supports and monitors to ensure plan is implemented. There are three components to this. First - the development of the system. Although it took longer than expected, there is a system in place and a plan for reaching receiving the service. Second - is everyone receiving the service. Not yet. Assignments are being made in a rolling fashion. Third - the overall quality of implementation. The IF/CFCM work group has made several suggestions to which the State has been very responsive. The other issue is, as has been referenced, the fact that most of the IF/CFCMs do not know the individuals well and some (particularly the community agencies) do not really know the intricacies. Knowledge and understanding take time and experience. IF/CFCMs need to understand their role and recognize the expertise that others have deeper knowledge of the person and the system. Some of the IF/CFCMs would profit from being mentored by more experienced staff.

Given that the IF/CFCM is still in early stages of implementation, it merits continued court observation beyond the Addendum.

4. **Employment** *(Addendum ii 6, 7, 8, 9; Addendum iv 3 )*
- By June 30, 2024 125 individuals seeking employment will be employed in new individual jobs in integrated settings. *(Addendum ii 8; (Consent Decree, Section IV, 9; V, D)*
- By June 30, 2026 at least 60% of the adults in the target population for employment will have been employed during the term of the Consent Decree. *(Addendum iv 3)*
- By June 30, 2024 the average number of weekly hours of employment will increase to 12. *(Addendum ii 9; Consent Decree, Section V, K)*
- Supported Employment Services will be provided at a sufficient quantity so that all members of the Consent Decree populations should have access to jobs that meet the criteria defined *(Addendum ii 7; Consent Decree, Section V, A-C).*
- The majority of adults in the target populations will be using the add-on employment funds to obtain or maintain employment in integrated settings. *(Addendum ii 8; Consent Decree, Sections IV, V, XIV; December, 2022 Court Order)*

**Progress:**
The Consent Decree Quarterly Report (pages 10-14) details a variety of strategies targeted to increasing employment. Most notably, the State had individual meetings with each of the employment providers to document both capacity (refer to Provider Capacity section later in this report) and needs. The State has focused on the individuals who have "never been employed". This population was the initial target for assignment of IF/CFCMs. The April-June "Supported Employment Activity Tracker"[5] list 41 specific outreach and/or technical assistance activities. The "Business and Community Engagement Report"[6] lists 28 specific outreach activities. Most notably, information about employment and benefits of hiring individuals with IDD was sent to 100 business owners (listed in the outreach report) during the quarter – an excellent idea. Elvys Ruiz has provided the Monitor with information re: follow-up to this outreach and the employers that have hired individuals.

ORS continues to provide fee-for-service employment services and annually reviews and updates services based on employment trends and client demands. ORS continues to meet regularly with providers.to review needs and assigns a counselor liaison to every provider agency. ORS and BHDDH continue to provide information re: braiding and sequencing of employment-related funding resources. ORS also supports, in partnership with BHDDH and DLT, Project Search at Bally's Casino in Lincoln.

The Department of Labor and Training (DLT) continues to support several initiatives.[7]
- As of June 30, 2025, the Department has awarded $95,086 in work accessibility grants (WAG) with 27 contracts to 17 unique employers.
- Industry and Community Workforce Partnerships:
  Project Seach at Bally's/Twin River – 4 current participants

---

[5] Supported Employment Activity Report, Appended to Consent Decree Quarterly Report; August 15, 2025.
[6] Business and Community Engagement Report, , Appended to Consent Decree Quarterly Report; August 15, 2025.
[7] Consent Decree Report; August 15, 2025.

Self-Employment Business Incubator – 12 current participants
SkillsRI/Workability – 16 current participants
UMN Supervisor Training – 40 current participants
Looking Upwards PCA Training - 10 current participants
CPNRI Upskilling Workers – projected 300 participants.

- As of June 30, 2025 DLT IDD-focused community partnerships have resulted in 348 job placements (most, but not all for individuals with IDD). These workers average 20.12 hours per week at $14.69 per hour.

It is worth noting that DLT was not originally part of the Consent Decree State team, but since 2020 have participated willingly. The community partnerships have been the stimulus for several innovative activities.

**Employment Metrics:**

The agreed-on target population for employment[8] is 1465 individuals. The Consent Decree Quarterly Report states that 864 individuals from that target population have been employed (59%)[9] since the beginning of the Consent Decree. The required metric is 60% by June, 2026.

The second required metric is the development of 500 new jobs by June 30, 2026 – 125 by June 30, 2024; 175 additional jobs by June 30, 2025; and 200 additional jobs by June 30, 2036. 50% of those new jobs are to be for the Consent Decree target populations. The State reports that 330 new jobs have been developed since July 1, 2023 – 91 (28%) for Consent Decree members and 239 for individuals who are not part of the Consent Decree. During the current quarter 37 new jobs have been developed, 13 (35%) for the Consent Decree population, 24 for individuals who are not part of the Consent Decree[10]. The total number of new jobs meets the overall metric for new jobs; the number of new jobs developed for the Consent Decree population does not meet the defined metric**.**

The third required metric is that the required average weekly hours of employment will increase to 14 by June, 2025. The Consent Decree Quarterly Report documents 7.7 average hours for the youth exit population, 10.1 average hours for the day activities population and 9.9 average hours for the sheltered workshop population.[11] Sherlock Survey data reports that the average weekly employment hours for Consent Decree members in individual employer-paid jobs is 11.3[12] (a decrease from 2024. The average weekly hours worked does not meet the required metric.

The fourth metric requires that individuals have an hourly wage equal or higher than the minimum wage. The minimum hourly wage in RI is $15. The average hourly wage reported by the State is $15.49 for the youth exit population, $15.70 for the day activities population and $15.51 for the sheltered workshop population.[13] The Sherlock Survey reports an average hourly wage of $15.81.[14]

---

[8] Addendum Review and Monitor's Report; March 25, 2024.
[9] Consent Decree Census Report; August 15, 2025.
[10] Consent Decree Census Report; August 15, 2025.
[11] Consent Decree Data Report; August 15, 2025.
[12] Sherlock Employment and Day Activity Survey; date collection April, 2025, report August, 2025.
[13] Consent Decree Data Report; August 15, 2025.
[14] Sherlock Employment and Day Activity Survey; date collection April, 2025, report August, 2025.

The final required metric relates to the use of the add-on employment funds. This quarter 30 additional individuals were authorized to receive add-on employment funds. As of June, 2025 972 individuals have been authorized for add-on employment funds, 475 are members of the Consent Decree population.[15] The Consent Decree Quarterly Report (page 10) references several strategies to increase access to and use of add-on employment funds.

**Sherlock Survey Employment Data – Consent Decree populations.**

|  | 10/ 2022 | 4/2023 | 10/2023 | 4/2024 | 10/2024 | 4.2025[16] |
|---|---|---|---|---|---|---|
| **Total Respondents** | 2036 | 1990 | 1870 | 1917 | 1835 | 1783 |
| **Number Receiving Employment Services** | 1680 | 1587 | 1522 | 1594 | 1529 | 1527 |
| **Number Self-Employed*** | 12 | 12 | 13 | 10 | 8 | 9 |
| **Number Employer Paid Individual Jobs** | 277 | 260 | 281 | 265 | 258 | 286 |
| **Number Provider Paid Individual Jobs**** | 39 | 50 | 43 | 50 | 49 | 42 |
| **Number in Provider Paid Group Jobs** | 43 | 38 | 25 | 34 | 34 | 36 |
| **Percent in Individual Jobs**** | 20% | 20% | 22% | 20% | 20.6% | **22%** |
| **Number New Jobs in Prior Six Months** | 19 | 20 | 24 | 15 | 22 | 20 |

*The Developmental Disabilities Council has a registry of more than 50 individuals who are self-employed….so this number is low.*
**The Monitor has evaluated provider paid individual jobs. The Monitor believes many of these jobs meet the Consent Decree definition of individual jobs in integrated settings.*
***Number in Employer Paid Individual Jobs + Number in Provider Paid Individual Jobs + Number Self-Employed divided by Number Receiving Employment Services.*

For comparison, the **statewide** Sherlock Survey data reported 2,533 individuals were receiving employment services (84% of all respondents). 17 were self-employed, 545 had employer paid individual jobs and 69 had provider paid individual jobs – thus, 24.9% were employed, a minimally higher rate than the Consent Decree population. 33 individuals obtained new jobs in the prior six months.

The State quarterly census reports that 467 individuals – 32% of the target population is currently employed. The difference between the percent reported in the Sherlock Survey and the state census is primarily due to the data collection methodology.

The State has increased outreach to employers. One of the "hoped-for" outcomes is an increase in the diversity of jobs beyond the three job types typical associated with people with IDD. The table below documents that (although retail trade and food services are still the primary industries) in the last five years there has been an increase in the number/percent of individuals employed in health care/social assistance and other industries.

---

[15] Consent Decree Quarterly Report; August 15, 2025.

[16] Sherlock Employment and Day Activity Survey; date collection April, 2025, report August, 2025.

| Industry | 2020[17] | April, 2024[18] | April, 2025[19] |
|---|---|---|---|
| Total Respondents* | 271 | 311 | 320 |
| Retail Trade | 113 (42%) | 108 (35%) | 113 (35%) |
| Food Services | 70 (26%) | 62 (20%) | 67 (21%) |
| Health Care-Social Assistance | 26 (10%) | 47 (15%) | 52 (16%) |
| All Other Industries | 62 (23%) | 94 (30%) | 88 (28%) |

*Individuals reporting individual jobs in integrated settings.*

Participants in individual jobs work an average of 10.13 hours per week[20], a decrease from 11.4 hours reported in 2024. The average hourly wage was $15.81[21], an increase from $15.19 reported in 2024.

**Provider Capacity:**

Provider capacity continues to be an important factor in projecting and supporting the number/percent of people in individual jobs. Three sources document the "slow but steady" increase in provider capacity.

- As documented later in this report by the statewide workforce data, the number of Direct Support Professionals (DSPs) is growing and the vacancy rate is decreasing;
- DDD's employment team had individual meetings with 37 provider organizations.[22] The summary documented that (a) 18 (67% of respondents) are now accepting new referrals and projected being able to support 88 new people during the current quarter; (b) identified 269 job seekers, of whom 113 were projected to be employed by the end of the quarter; and (c) identified specific industries and/or employers they are targeting for future employment.
- Data from the Sherlock Survey was analyzed to document the rate of employment by agency size[23]. During the past six months the employment rate increased in 15 (44%) of provider organizations. The employment rates ranged from 4% to 83%.

| | Number of Provider Agencies with employment rates less than 20% | | Number of Provider Agencies with employment rates between 20-40% | | Number of Provider Agencies with employment rates more than 40% | |
|---|---|---|---|---|---|---|
| | 10/2024 Data | 4/2025 Data | 10/2024 Data | 4/2025 Data | 10/2024 Data | 4/2025 Data |
| Agencies with less than 50 respondents | 7 | 4 | 2 | 1 | 5 | 5 |

---

[17] Consent Decree Annual Report; January, 2020.

[18] Sherlock Employment and Day Activity Survey; date collection April, 2024, report August, 2024.

[19] Op. Cit.; Sherlock Survey; August, 2025.

[20] Op. Cit.; Sherlock Survey; August, 2025.

[21] Op. Cit.; Sherlock Survey; August, 2025.

[22] Summary of Provider Meetings; June, 2025.

[23] Analysis Done for Monitor; August, 2025.

| Agencies with 50-100 respondents | 4 | 5 | 5 | 4 | 2 | 3 |
| Agencies with more than 100 respondents | 5 | 4 | 4 | 8 | | |
| Respondents who self-direct | | | N=97 30% | N=119 28% | | |

**Benefits Counselling**

Using the Sherlock Center and other sources, the State has provided benefits counselling to individuals approaching employment.  The Monitor has identified two related issues.  First, the information needed and the process is complicated and difficult for some individuals and families to understand.  The Sherlock Center and the State have a developed a draft of a simplified reporting format which has been reviewed by the Monitor.  Second, there are families with limited literacy who are simply "afraid to start" the employment process.  These families need a one-two page document that simply and graphically explains the financial (and other) value of employment v. the threshold at which benefits begin to be decreased.

**Monitor Interviews – Employment Information and Supports**

As in previous quarters, interviews indicate that individuals are receiving information.  90% report having sufficient information, but only 60% report having sufficient support.  Only one is using add-on employment funding and 26% are employed.

| | 11/23-9/24 Totals | 10-12/2024 Totals | 1-3/2025 Totals | 4-6/2025 Totals |
| --- | --- | --- | --- | --- |
| **Sample Respondents (Denominator)** | 149 | 31 | 44 | 50 |
| **Received Information about Employment** | 102 (68%) | 21 (69%) | 30 (68%) | 26 (72%) |
| **Received Information about Add-On Funds** | 34 (23%) | 11 (37%) | 9 (21%) | 8 (16%) |
| **Individual is Using Add-On Employment Funds** | 7 (5%) | 4 (13%) | 3 (7%) | 1 (2%) |
| **Do you have enough info to gain employment** | 117 (78%) | 25 (81%) | 33 (75%) | 45 (90%) |
| **Do you have Enough support to get employment** | 76 (51%) | 18 (58%) | 27 (61%) | 30 (60%) |
| | | | | |
| **Employed** | 18 (29%)* | 11 (34%) | 7 (16%) | 13 (26%) |
| **Retired or Has a Waiver** | 11 (17%)* | 2 (6%) | 10 (23%) | 15 (30%) |
| **Age 50+** | 25 (40%)* | 2 (6%) | 18 (42%) | 7 (14%) |

*Data from 6-9/2024 respondents only.*

**Overall Assessment –** Not in Compliance, the new jobs for Consent Decree members, the average hours worked and the use of add-on employment funds metrics have not been met, Increased employment is obviously one of the primary intended outcomes of the Consent Decree.  My assessment of compliance is rooted in four factors.

1. Has the system changed in ways that will facilitate access to employment?  Rate review has increased rates for services; add-on employment funds have eliminated the need for individuals to choose between community supports or employment supports; training and technical assistance has increased; outreach to potential employers has increased.  So, yes, **the system is significantly better**.

2. **The metrics are mixed**.  The percent of the target population that has been employed at some time during the Consent Decree has hovered at 58-59%.  The overall number of new jobs is good, but the number of new jobs for the target population has not met the metric.  The average hourly wage is above minimum wage, but the average number of hours worked has actually decreased.  Using the Sherlock Survey (a point-in-time measure), the employment rate has essentially been flat for several years.  State data (a continuous measure) documents a progressive increase.

3. **Provider capacity is improving**.  The state-provider meetings documented capacity to support an increasing number of individuals.  Overall workforce stability, as discussed later in this report, continues to be an issue.

4. **Are individuals using the resources**?  The number of individuals using add-on employment funds is increasing but is (at present) only about a third of the possible users.  Outreach and information has significantly increased, but there are still individuals who need support.  The individuals interviewed for the monitor continue to document a gap between having sufficient information and having sufficient support.

Two additional comments.

First, as we approach the end of the Addendum period, the difference in the employment numbers reinforces the need for one methodology and one metric.  This is one of the focus areas in the Continuous Systemic Improvement (CSI) process.

Second, one of the recommendations from the state-provider meetings was a recommendation (request from the providers) for a "nimble" revised employment training sequence.  There is a broad array of quality training offered by the various partners, but participation for some employment staff is piecemeal.  **The recommendation is for a defined sequence of trainings that is flexible** (different modalities and schedules) **and addresses needed competencies and current issues and needs throughout the state.**   Employment related training needs are discussed in greater detail in the Training and Technical Assistance section (Topic 8) later in this report.

Given that some of the metrics have not been met and the need to increase the number of people using add-on employment funding, employment merits continued court observation beyond the Addendum.

5. **All adults covered by the Consent Decree will participate in community activities in integrated settings such that community activities and services will meet the criteria defined in the Consent Decree.** *(Addendum ii 10; Consent Decree VI, B 1-10)*

**Sherlock Survey Community Participation Data – Consent Decree Members**

The Sherlock Employment and Day Activities Survey[24] (see the five tables below) documents that **1447 (94.7% of the 1527 Consent Decree class member respondents receiving Supports) participate in community activities.**[25] The table below documents a progressive increase in both the percent of respondents participating in community activities and the mean weekly hours.

|  | 02/2023 | 8/2023 | 2/2024 | 8/2024 | 2/2025 | 8/2025 |
|---|---|---|---|---|---|---|
| **Total Respondents** | 2036 | 1990 | 1870 | 1917 | 1835 | 1783 |
| **Number Receiving Services** | 1797 | 1780 | 1696 | 1594 | 1529 | 1527 |
| **Number Participating in Community Activities** | 1482 (82%) | 1464 (82.2%) | 1424 (84%) | 1513 (95%) | 1432 (93.6) | **1447 94.7%** |
| **Average Weekly Hours** | 13.83 | 14.46 | 15.67 | 15.66 | 15.39 | 15.23 |

The settings in which community activities occur have essentially remained consistent.

|  | 2/2023 | 8/2023 | 2/2024 | 8/2024 | 3/2025 | 8/2025 |
|---|---|---|---|---|---|---|
| **Virtual** | .9% | 1% | <.0005% | .003% | <.01% | <.01% |
| **Public Venue** | 69,1% | 67% | 68.4% | 67.4% | 68.7% | 65.8% |
| **School/Training Facility** | 1.2% | <1% | <1% | 1% | <.01% | <.01% |
| **Senior Center/Facility** | 4.1% | 2.7% | 3% | 4.6% | 2.8% | 3,7% |
| **Employer/Business** | 14.3% | 15.8% | 13.9% | 16.6% | 13.4% | 14,4% |
| **Member Organization** | 11.9% | 12.8% | 14.3% | 14.4% | 14.4% | 15.2% |

A new question was added to the October, 2023 Sherlock Survey measuring (a) whether the activity was primarily for individuals with IDD or for a broader array of community/public participants and (b) who participated with/accompanied the individual. Those two factors are considered to be **indicators of integration**.

|  | 2/2024 | 8/2024 | 2/2025 | 8/2025 |
|---|---|---|---|---|
| **Activities Primarily for Individuals with IDD** | 1110 (23.3% | 1196 (30.6%) | 901 (24.7%) | 1080 (28.6%) |
| **Activities for Broad Array of Community Participants** | 3643 (76.7%) | 2708 (69.4%) | 2740 (75.3%) | 2685 (71.4%) |

For the Consent Decree population 71% of activities were for a broad public audience, only 28% were for people with IDD. Similarly, there were 6,081 community activities reported for the

---

[24] Op. Cit.; Sherlock Survey; August, 2025.
[25] Op. Cit.; Sherlock Survey; August, 2025

total statewide IDD population.  72.8% of these were primarily for broader community members (i.e., the public).[26]  Most common companions continue to be staff.

| Who Else Attended or Participated With You | 2/2024 | 8/2024 | 2/2025 | 8/2025 |
|---|---|---|---|---|
| | Participation by Number of Activities Percent of All Community Activities | | | |
| I Attended by Myself | 368 (7.7%) | 735 (12.1%) | 266 (4%) | 374 (5.6%) |
| One or More Family Members | 189 (3.9%) | 280 (4.6%) | 220 (3.3%) | 190 (2.8%) |
| One or More Community Members | 559 (11.7%) | 718 (11.8%) | 839 (12.6%) | 755 (11.4%) |
| One or More Staff | 3016 (63.4%) | 3153 (51.9%) | 3152 (47.2%) | 3078 (46.5%) |
| One-Two Individuals with Disability | 1880 (39.5%) | 1658 (27.3%) | 1468 (22%) | 1293 (19.5%) |
| Three-Five Individuals with Disability | 740 (15.6%) | 626 (10.3%) | 589 (8.8% | 648 (9.8%) |
| More than Five Individuals with Disability | 220 (4.6%) | 144 (2.4%) | 148 (2.2%) | 274 (4.1%) |

The table below summarizes the number of individuals who participate in each type of the activity and the average weekly hours spent on each activity.  comparative   The average weekly hours are comparable for both the Consent Decree populations and the statewide DD population.

| Type of Activity | Consent Decree Participants | Consent Decree Average Weekly Hours | Statewide Total IDD Population Comparison | Statewide Average Weekly Hours |
|---|---|---|---|---|
| Arts/Leisure/Recreation | 1364 | 9.56 | 2172 | 9.51 |
| Health & Fitness | 905 | 3.77 | 1464 | 3.82 |
| Adult Education | 99 | 1.60 | 181 | 1.97 |
| Soft Employment | 196 | 3.73 | 314 | 3.62 |
| Daily Living | 854 | 4.92 | 1359 | 5.12 |
| Volunteering | 239 | 2.56 | 406 | 3.38 |
| Other | 101 | 3.49 | 172 | 3.59 |

As they have been in previous reports, arts/leisure/recreation, daily living and health and fitness continue to be the most common community activities.[27]  Again, the number of hours spent in various community activities are consistent between the Consent Decree population and the total statewide population.  This is an indicator that the impacts and outcomes of the Consent Decree have been experienced by individuals who are not part of the Consent Decree population.

**Monitor Interviews – Community Participation - Information and Supports**

| Questions | 11/23-9/24 Totals | 10-12/2024 Totals | 1-3/2025 Totals | 4-6/2025 Totals |
|---|---|---|---|---|
| Sample Respondents (Denominator) | 149 | 31 | 44 | 50 |

[26] Op. Cit.; Sherlock Survey; August, 2025.
[27] Op. Cit.; Sherlock Survey; August, 2025

| | | | | |
|---|---|---|---|---|
| **Received Info about Community Participation** | 134 (90%) | 25 (78%) | 43 (97%) | 48 (96%) |
| **Received Information about Other Opportunities** | 94 (63%) | 21 (61%) | 30 (68%) | 34 (68%) |
| **Explained how to use your flexible budget** | 72 (48%) | 14 (68%) | 26 (59%) | 35 (70%) |
| **Do you have enough info community opportunities** | 128 (86%) | 25 (81%) | 41 (93%) | 46 (92%) |
| **Do you have enough support to participate** | 116 (78%) | 27 (87%) | 41 (93%) | 44 (88%) |
| **Talk about role of technology** | 105 (70%) | 21 (68%) | 32 (73%) | 40 (80%) |

Most interviewees report having both sufficient information and sufficient support to participate in community activities.  80% report that technology was discussed in the ISP/PCP process.

**Monitor Interviews – Community Connections**

Community participation patterns have been consistent.  Individuals typically spend between 10-20 hours in the community each week.  Staff, family and peers are the most frequent companions.  Only 1 in 5 belong to a community organization.  Virtually all report having friends – 60% report having friends from the broader community.  Similarly to previous quarters, 78% report that life is better than it was a year ago and 92% report being satisfied with how their life is going.

| Questions | 11/23-9/24 Totals | 10-12/2024 Totals | 1-3/2025 Totals | 4-6/2025 Totals |
|---|---|---|---|---|
| **Sample Respondents (Denominator)** | 149 | 31 | 44 | 50 |
| **Reports participation in community activities** | 149 (100% | 31 (100%) | 44 (100%) | 50 (100%) |
| **Less than 10 hours per week*** | | 10 (32%) | 7 (16%) | 9 (18%) |
| **10-20 Hours per week*** | | 4 (13%) | 14 (32%) | 21 (42%) |
| **More than 20 hours per week*** | | 17 (55%) | 23 (52%) | 20 (40%) |
| **Community activities are their idea** | 64 (43%) | 16 (52%) | 17 (39%) | 19 (38%) |
| **Community activities blend of their ideas and someone else's** | 46 (31%) | 7 (23%) | 19 (43%) | 19 (38%) |
| **Community activities are someone else's ideas** | 41 (28%) | 8 (26%) | 8 (18%) | 12 (24%) |
| **Community companions are family** | 97 (65%) | 27 (87%) | 29 (67%) | 32 (64%) |
| **Community companions are staff** | 136 (93%) | 29 (94%) | 41 (93%) | 45 (90%) |
| **Community companions are peers with IDD** | 84 (56%) | 17 (55%) | 36 (82%) | 35 (70%) |
| **Community companions - community members** | 39 (26%) | 12 (39%) | 12 (27%) | 10 (20%) |
| **Belong to a community organization** | 53 (36%) | 10 (32%) | 15 (34%) | 11 (22%) |
| **Reports having friends** | 141 (95%) | 30 (97%) | 43 (96%) | 49 (98%) |
| **Friends are family members** | 96 (64%) | 24 (67%) | 30 (68%) | 35 (70%) |
| **Friends are staff** | 102 (68%) | 18 (42%) | 27 (61%) | 30 (60%) |
| **Friends are peers with IDD** | 117 (79%) | 27 (87%) | 34 (77%) | 38 (76%) |
| **Friends are other community members** | 68 (46%) | 19 (61%) | 35 (79%) | 30 (60%) |
| **Community activities to learn or do new things** | 120 (81%) | 26 (84%) | 39 (85%) | 43 (86%) |
| **Reported life was better than it was a year ago** | 108 (72%) | 23 (74%) | 31 (71%) | 39 (78%) |
| **Reported life was about the same** | 34 (23%) | 7 (23%) | 9 (20%) | 10 (20%) |
| **Report being satisfied with the way life is going** | 139 (93%) | 30 (97%) | 41 (93%) | 46 (92%) |

*Revised Question for 10-12/2024*

There are several other projects and work groups referenced in prior Monitor reports that relate to the community service requirements.

The **Aging Workgroup** has met three times. They have developed a mission statement and discussed service and billing issues. The State affirmed that the services provided in the individual's home can be billed at the community services rate. Questions were raised re: provision of services in the group home rate. These were discussed with HMA. Both a flyer and guidance re: billing issues are currently pending.

The **Goods and Services Workgroup** identified a number of issues the needed to be resolved. A spreadsheet listing 12 specific issues was included in the quarterly report (pp. 45-46). Most of the issues focused on confusion about what could/could not be billed, inconsistencies between fiscal intermediaries, administrative process, etc. The State updated its goods and services form and will update the goods and services brochure and guidebook. A self-direct guidebook is in process. The State has also met with and provided training/guidance to providers. As with many other things, the State believes assignment of IF/CFCMs will alleviate many of the issues.

**Person-Centered Plan/Individual Service Plan.** The Monitor has requested the State to provide additional guidance re: writing PCP/ISP goals. Monitor's concern was/is twofold – (a) writing goals in a way that does not require formal revisions or S109 requests when activities change and (b) goals/plans including sufficient detail to increase the likelihood of actual implementation. Monitor has emphasized that the quality of plans and increased participation by the individual is directly connected to preparation. The Monitor expects heavier focus on the process of preparing the individual for the PCP/ISP. The State has developed an ISP/PCP guidebook. A shorter easy-to-read version is in process.

**Advisor Model.** The advisor model needs to be clearly defined and billing procedures developed. The Advisor Model is a model that provides personalized advice in helping individuals develop life plans using many resources and types of support. The Advisor Model represents an alternative to current service models.

**Technology Fund**

The October, 2021 Action Plan required the creation of a $2,000,000 technology fund. As of June 30, 2025 there have been 12 rounds of applications. 1765 requests have been received, 1515 have been approved and 151 are pending. $766,347 has been expended to date.[28]

Page 19 of the Quarterly Consent Decree Report describes several technology related activities. The State has proposed using some of the unspent technology fund to support a training program to increase technology competence in provider agencies – both staff and individuals. The Monitor has seen pieces of a proposed curriculum, but is waiting for a complete curriculum and a plan.

**Overall Assessment –** Currently in Substantial Compliance….but there are tasks to be completed.
Community participation continues to be one of the systems strengths. However, there are tasks to be completed.

---

[28] Consent Decree Report; August 15, 2025.

- Guidance re: program and billing issues for aging population.
- Curriculum and plan for developing technology competence in staff and individuals, including developing statewide augmentative and alternative communication expertise.
- Finalizing goods and services guidance and materials.

Community participation merits continued court observation beyond the Addendum.

6. **The new rates and rate structure will be fully implemented.** *(Addendum ii 2; Consent Decree, Section XIV)*

**Progress:**

The rate review process is in it final stages.  The new rate structure has been implemented with a few exceptions.  BHDDH is working on certification standards and billing codes for remote supports and family-to-family supports.  Peer supports will be operational shortly.

The new algorithm (developed by HMA) will be implemented in Fall, 2025.  The ANSQ revisions described earlier should be included.

The table below documents DD budget increases during the past six years.  Between Fiscal Year 2019 and Fiscal Year 2026 the DD budget enacted by the legislature essentially doubled, from 229 million to 452 million.  Actual expenditures increased from 230 million to 431 million.  Fiscal years 2023 and 2024 were the years in which the court ordered wage increases were implemented.

| Fiscal Year | Enacted Budget | Actual Expenditures |
|:---:|:---:|:---:|
| 2019 | 229.4 million | 230.1 million |
| 2020 | 259.7 | 235.7 |
| 2021 | 260.4 | 232.4 |
| 2022 | 276.3 | 281.7 |
| 2023 | 321.2 | 322.6 |
| 2024 | 403.2 | 407.1 |
| 2025 | 438.7 | 431.4 |
| 2026 | 452.5 | |

Recommendations from the OHIC rate review are expected in September, 2026.  The budget increases of the recent years, the OHIC recommended rates will be proactivity inflationary through 2028.

Utilization rate – i.e., percent of allocations used (per May, 2026 Caseload Estimating) is 70.2%[29].

The Monitor meet with OMB, OHIC, EOHHS, BHDDC and DDD directors to discuss potential impact of HR1.  For the IDD population the primary impact will be the need re-affirm eligibility for Medicaid every six months, rather than annually.

**Overall Assessment –** Currently in Substantial Compliance, but utilization rates continue to be low.  The increases in the enacted budget documents the commitment of the Governor's Office and the Legislature to this process.  The Monitor continues to be concerned with the utilization rate.  In a prior filing, the State agreed to identify and follow-up with every person with a low

---

[29] Caseload Estimating Materials; May, 2025.

utilization rate.  Overall IDD system funding merits continued court observation beyond the Addendum.

7. **Transition** *(Addendum ii 11, 12, 13, 14, 15, 16)*
   - The revised Career Development Plan for transition youth will be implemented in all LEAs and with all transition-aged students. *(Addendum ii 11; Consent Decree Section VIII, December, 2022 Court Order)*
   - The State will document outreach to transition youth with IDD to facilitate application for services as early as possible. By age 20 80% of transition youth with IDD will have applied for adult developmental disability services. All who are eligible will be receiving DD funding and services sufficient to allow them a meaningful choice of integrated community activities and integrated employment. *(Addendum ii 12; Consent Decree Section VIII; December, 2022 Court Order)*
   - The State will document outreach to transition youth with IDD to apply for services as early as possible. By age 20 80% of transition youth with IDD will be connected to an ORS or a BHDDH vendor and will be involved in specific job development. *(Addendum ii 13; Consent Decree Section VIII; December, 2022 Court Order)*
   - The number of transition-aged youth who participate in CTE will increase. *(Addendum ii 14; Consent Decree Section VIII, December, 2022 Court Order)*
   - An individual contact person for all transition youth and their families will be specified. *(Addendum ii 15; Consent Decree Section VIII, December, 2022 Court Order)*
   - A network of family-to-family support and mentorship will be developed and fully implemented. *(Addendum ii 16; Consent Decree Section VIII, December, 2022 Court Order)*

**Progress:**

**RIDE**
**Career Development Plans**
Guidance documents for the revised Career Development Plans were finalized and disseminated in April, 2024 as was the five part training series on the CDPs. All transition youth have transitioned to the revised CDPs. As has been reviewed in previous Monitor Reports, the redesigned CDPs are intended to guide transition youth from initial discovery to targeted work experiences and, ultimately, to job development….with the goal of increasing the number of transition youth who exit school with a paid job. The CDPs also focus on developing community connections….with the goal of all youth exiting school with at least three "deep" community connections.

**Vocational Experiences and Integrated Work Trial Experiences[30]**
This quarter (October-December, 2024) RIDE randomly sampled 37 transition youth in 8 school districts who have CDPs re: their work experience.
   - 34 (97%) had career-related experiences, as required by the Consent Decree.
   - 20 (54%) participated in at least one short term experience.
   - 30 (81%) participated in at least one long term experience.
   - 18 (49%) participated in two or more long term experiences.

---

[30] RIDE Summary in Consent Decree Quarterly Report; February 15, 2024; pg. 41.

- 5 (14%) participated in a paid long term work experience.

75 transition youth were sampled re: Integrated Work Trial Experiences.[31]
- 36 (48%) participated in at least one work trial.
- 39 (52%) participated in two or more work trials.

**Transition Youth Exiting School with a Paid Job**
In the 8 districts sampled 44 transition Youth with IDD exited school during the past twelve months. 11 (25%) exited school with paid employment.

**Career Technical Education (CTE)**
During this quarter RIDE sampled 158 transition youth from 8 school districts who have CDPs. 31 (20%) are participating in CTE. 25 of those youth have accessed CTE in an informal manner for exploration or discovery purposes; 6 youth are formally participating in CTE programs.[32]

**Training**
RIDE summary in the Consent Decree Quarterly Report documented extensive training and technical assistance to school districts. These included training to the Teachers of Life Skills Network, the annual Transition Institutes, 22 participated in a virtual Community of Practice, 41 participants in Job Coach training, 16 participants in Job Development training….and technical assistance provided by the Regional Transition Centers directly to school districts.[33]

**BHDDH**
BHDDH determines (by the end of the school year) if the 80% criterion for percentage of youth applying has been met. During this quarter 60 transition-aged youth completed applications for DD services, 58 (97%) were found eligible.[34] Overall, for the period ending June, 2025 2431 transition-aged youth completed applications for DD services, 1971 (81%) were found eligible. BHDDH continues to implement several outreach strategies intended to increase rate of application.

For students 14-19 the Transition Coordinator is the primary contact for individuals and families. For students 20+ the primary contact is a Division caseworker. As capacity to implement IF/CFCM increases, youth will be assigned to a case manager.

BHDDH has also disseminated information about alternatives to guardianship. The Transition Administrator has also developed and disseminated information comparing the differences between agency-provided services and self-directed services.

BHDDH reports it is in the process of restructuring staff to 14 staff (2 supervisors, 12 caseworkers) into the youth transition unit.

---

[31] RIDE Summary in Consent Decree Quarterly Report; August 15, 2025.
[32] RIDE Summary in Consent Decree Quarterly Report; August 15, 2025.
[33] RIDE Summary in Consent Decree Quarterly Report; August15, 2025.
[34] Consent Decree Quarterly Report; August 15, 2025.

**ORS**

ORS continues to provide a Counselor in every high school in the state.  1846 students are currently participating in Pre-Employment Transition Services (Pre-ETS), 1256 are potentially eligible for ORS employment supports and 64 have entered employment.[35]  ORS has begun a new Pre-ETS program, Future Pathways Academy, which offers support for three consecutive years to students who require additional support as they move through the stages of gaining employment.  ORS is implementing this program with four school districts and four adult agency partners,

ORS continues to support Project Search for transition youth at Miriam Hospital and Blue Cross Blue Shield Headquarters….and are in process of developing a third site at Job Lot Distribution Center.

All three agencies have contracted with Lazo to outreach to families through "charlas".  During the 2024-2025 school year charlas were established in 22 schools and 12 districts and are being developed in two other districts and in some non-public schools.  During the recent quarter 55 new families participated in charlas and continues to support 32 families from last year.  Lazo actively supports these families as they complete applications for BHDDH services.[36]

**Overall Assessment –** Substantial Compliance….tasks remaining to demonstrate durable compliance.  Transition services for youth with IDD have changed significantly since 2014.  The data presented above documents both increase in opportunities and experiences and increases in the number of youth exiting school with a paid job.  I would like to address three additional topics.

- First, I continue to be concerned with the individuals/families who have not participated in charlas and do not have sufficient information or do not understand it.  In the past several years we have discussed the importance of family mentors.  BHDDH will explore using "family-to-family" funding to support mentors in every school district.
- Second, I still hear anecdotally from some families that there is a gap between school exit and the start of adult services.  The issue seems to be with finding and selecting a provider.  The recommendation would be to start the process of finding a provider (or deciding to self-direct) earlier (age 19-21) and invite the provider to transition meetings.
- Third, although transition services have met Consent Decree expectations, RIDE and BHDDH policies and procedures that will continue current practices need to be finalized.

---

[35] Consent Decree Quarterly Report; August15, 2025.
[36] Consent Decree Quarterly Report; August15, 2025.

8. **Training and Technical Assistance** *(Addendum ii  17, 18, 23, 24, 26)*
   - As specified in the Monitor's July, 2023 report, the organizational development, technical assistance to provider organizations and trainings for targeted audiences on specific topics will continue. *(Addendum ii 17; Consent Decree, Section IX)*
   - The State will continue to provide technical assistance and oversight to agencies re: use of evidence-based employment practices, staffing capacity, business models that align with the goals of the Consent Decree. *(Addendum ii 23; Consent Decree, Section XI, 5)*
   - The State will develop and provide competency-based and value-based training to all providers who support individuals who self-direct their own employment and/or community services. *(Addendum ii 18; Consent Decree, Section IX, 2-3)*
   - The State will develop a contract(s) with organizations that have credibility and capacity to assist providers and others to effectively use the new rates and rate structures to develop program models that promote the goals of the Consent Decree. *(Addendum ii 24; Consent Decree, Section XII)*
   - Although the State has developed a Quality Improvement System, these activities should continue throughout the duration of this Addendum with specific focus on translation of the new rates and services into program models that increase employment and community activity in integrated settings. *(Addendum ii 26; Consent Decree, Section XV)*

**Progress:**
The State and it's various partners provide extensive training and technical assistance in a variety of ways.[37]

The "Training and Outreach Tracker"[38] lists 64 activities (attended by 1077 participants) which **BHDDH** personnel either sponsored or participated. Topics ranged from technical assistance re: systems issues to WellSky implementation to CFCM trainings to guardianship and supported decision-making.

**ORS** meets with employment vendors on a regular basis and co-facilitates (with Sherlock Center staff) the Supported Employment Council (SEC). 140 individuals participated in SEC meetings this quarter.

**RIDE**'s outreach and training activities are described in the training section.

**RIPIN** conducted three webinars attended by 78 individuals, facilitated the Self-Directed Advisory Meeting and did outreach calls to 79 individuals.

The **Community Provider Network** (**CPNRI**) provides various topical trainings for both direct support staff and leadership.

---

[37] Consent Decree Quarterly Report; August 15, 2025.
[38] Training and Outreach Tracker; appended to Consent Decree Report; August 15, 2025.

The **Developmental Disabilities Council (DDC) and the RI Cross Disability Coalition** provide training on alternatives to guardianship, employer outreach (targeted to provider agency teams) and other topics.

The **Sherlock Center** facilitates the Self-Directed Supports Networks, provides "Person-Centered Thinking" training and some of the other required training curriculum for IF/CFCMs, provides workshops and demonstrations on various topics and has (since at least 2015) provide the Supporting Meaningful Employment (SME) certification track (aligned with ACRE standards).  Sherlock Center also provides the Family Employment Awareness Training (FEAT).

**Employment training**.
At the beginning of the Consent Decree ACRE/APSE certification was adopted as the "standard" for employment personnel.   There are two pathways to certification – completion of ACRE approved training sequence (typically about 40 hours plus fieldwork assignments) or passing the Certified Employment Support Professional.
- Between 2016-2025 352 employment staff completed an ACRE certification track[39]
- 49 completed an additional "Basic Customized Employment Training"[40]
- 126 took the CESP exam[41].
Additionally, the Sherlock Center developed "stackable" mini-certificates which can lead to ACRE certification.  These include:
- Vocational Assessment – 30 participants
- Job Development – 11 participants
- Job Retention and Coaching – 156 participants.
Most likely, there is some overlap in these numbers.

In recent years the State has used **Griffin-Hammis Associates and Marc Gold & Associates** to provide training on discovery and other employment related topics.


**Overall Assessment –** Substantial Compliance….tasks remaining to demonstrate durable compliance….specifically, revision and updates to employment training.
The above documents the extensive array of training and assistance that is currently available. Recent discussions and requests from providers and others involved with employment have highlighted four basic themes to be considered in **updating employment training**.

First, there has been much discussion about **having all staff (not just employment staff) be part of the employment process.**  A basic training should be developed.  This training should be offered in several modalities and scheduling availability aligned with staffing patterns.

Second, providers have requested a **more "nimble" approach to employment training that more accurately and efficiently addresses current needs**.  On page 12 of the Quarterly Report the State begins to address this.  The list the five levels of employment service (job exploration,

---

[39] Sherlock Center SME data; May 14, 2025.
[40] Sherlock Center data; May 14, 2025.
[41] Communication from APSE; May 14, 2025.

discovery, job development, job coaching, job retention) and very generally list training sources and possible modalities. This effort needs greater detail. The five service types are a good broad structure. For each service there needs to be a description of the skill clusters needed by effective practitioners. The training for each skill cluster needs to be offered in several modalities and with sufficient frequency. The current array of trainings are of high quality and have served the state well, but the employment culture and opportunities are different than they were at the beginning of the Consent Decree; thus, the approach to employment also needs to be different.

Third, **transition youth and adults with significant support needs** are the least likely to be employed. The strengths and capacities of these individuals are often different than others with less significant needs. Matching capacities with job requirements needs to be more precise. Exploration, discovery and job development will take longer. The accommodations and adaptive devices will be more complex. For each of the skill clusters referenced above there needs to be an additional training that demonstrate how to apply those skills to individuals who have greater cognitive, physical, sensory and communication needs.

Fourth, although **outreach to and support for employers** has grown significantly in the last several years, some of the current approaches need updating. The approach needs to focus on demand, not supply. The employer outreach training offered by Doug Crandall has been very well received. The DD Council and/or the Cross Disability Coalition are planning on interviewing 100 employers. The data from these interviews should be the basis for a new paradigm for employer outreach.

The Monitor is VERY impressed with the collective participants in the Continuous Systemic Improvement **(CSI) employment work group**. The Monitor recommends that, as they develop plans for sustainability and growth, the training needs referenced above should be embedded in those plans.

The needed updates referenced above merits continued court observation beyond the Addendum.

9. **Communication and Outreach** *(Addendum ii 19, 20)*
- The State's Communication Plan, as filed with the Court, will be fully implemented. *(Addendum ii 20; Consent Decree, Section X)*
- Plans to outreach to individuals who self-direct and individuals in segregated settings will be fully implemented . Adults in segregated settings will use employment resources to obtain integrated employment in addition to their current day activities. *(Addendum ii 19; Consent Decree, Section X.*

**Progress:**

The State's communication to/from the various stakeholder groups has improved significantly since the beginning of the Consent Decree.

The bi-weekly BHDDH newsletter reaches approximately 1600 people. In addition to BHDDH news and information, the newsletter provides information about other pertinent community events. The Division also holds quarterly community forums. The "Communication Task Tracker"[42] lists 31 specific tasks completed or pending during the current quarter.

BHDDH has developed and disseminated several quality products[43]. Most of these products are available in an "easy to read" format. These products include:
- Guide to Adult Services
- Individual Budget Guidebook
- Guide to Add-On Employment Requests
- Transportation Options Flyer
- Technology Fund Flyer
- Service Spotlights
- Conflict Free Case Management Guidebook
- What Happens When You Start CFCM
- Roles and Responsibilities Under CFCM
- Your Rights, Your Life materials.

All of these products are accessible on the BHDDH website. Some of these were developed in collaboration with the IF/CFCM workgroup and are forwarded to individuals prior to the initial meeting with IF.CFCM and/or are part of the "leave behind" packet of information to increase individuals' understanding of available resources.

**Overall Assessment –** Substantial Compliance.

The efforts of the Division…..and **most notably of the Communication Team**…..are highly commendable. More information is now available to more people. More products are available in Spanish. As part of the Continuous Systemic Improvement planning process there is a workgroup that has identified the various audiences and an increasing variety of modalities for communicating with those audiences.

---

[42] Communication Task Tracker; appended to Consent Decree Report; August 15, 2025.
[43] bhddh.ri.gov/developmental-disabilities

**10. Workforce - The State will fully implement the activities of the statewide workforce initiative** *(Addendum ii 21, 22; Consent Decree, Section XI, 1-2; May, 2022 Court Order; December, 2022 Court Order*)

- The State will fully implement the activities of the Statewide Workforce Initiative.
- Direct Support Staff vacancies will decrease.

**Progress:**

The Statewide Workforce Initiative continues under the guidance of the University of Minnesota (UMN). Aligned with the deliverables in their contract, the following activities have occurred[44]:

- Three cohorts of providers are working with UMN to assess and revise their recruitment and retention processes. Two providers have begun the discovery process. Six are in the Action Planning stage and developing targeted recruitment and retention strategies. Teo others are implementing the strategies they developed.
- UMN continued a webinar series focused on recruitment and retention strategies.
- A Rhode Island specific "Realistic Job Preview", marketing materials and public service announcements have been developed. Videos are captioned in both English and Spanish. A dissemination plan is being developed. The Monitor has watched the job preview and found it to be accurate and effective.
- UMN created a "Modified Comprehensive Workforce Consultation Model for Self-Direction Employers". This involves both data collection and a "learning series". The learning series is being piloted with ten self-directing employers during the current year.
- Continue the Workforce Coaches Train the Trainer model to support provider organizations going through the discovery and action planning process.
- Develop a model to implement the Rhode Island DSP I, II, III certification process, aligned with the National Alliance for Direct Support Professionals.

The table on the following page. documents workforce trends. The most significant increases occurred between July, 2023 and December, 2024 – increased number of DSPs on payroll, increased number of positions, increased average salary, decreased turnover rate and decreased vacancy rate. These were the data collection periods directly following salary increases ordered by the October, 2021 Action Plan. The most current data period indicates a decrease in the number of DSPs currently on payroll and an increase in both the vacancy rate and the turnover rate. Thus, although the overall status of the workforce has improved since the original data collection, there is a continuing workforce shortage. One positive note – 46% of RI DSPs have been in their positions for more than 36 months. This is an indicator of some stability in the workforce.

---

[44] Consent Decree Quarterly Report; August 15, 2025.

| | Historic data (collected via direct submission to court monitor) | | Current time period (collected via SupportWise Data Portal)[45] | | | |
|---|---|---|---|---|---|---|
| | July – Dec 2022 | Jan – June 2023 | **July – Dec 2023** | **Jan-June 2024** | **July-Dec 2024** | **Jan-June 2025** |
| # Agencies reporting | 32 | 32 | **34** | **33** | **33** | **32** |
| Number of agencies that turned away referrals because of DSP staffing issues | 20 (63%) | 13 (41%) | **12(35%)** | **11 (33%)** | **10 (30%)** | **12 (33%)** |
| Total number of DSPs on payroll | 2,957 | 3,015 | **3,062** | **3,210** | **3,275** | 3078 |
| Difference in 6 months | | +58 | **+47** | **+148** | **+65** | -197 |
| Number of separations | 573 | 503 | **518** | **485** | **554** | 491 |
| Turnover ratio (separations/number of DSPs) | 16.1% | 16.6% | **16.9%** | **15.1%** | **16.9%** | **16%** |
| Total full-time DSP positions | 2,328 | 2,464 | **2,592** | **2,657** | **2,668** | 2565 |
| Total part-time DSP positions | 903 | 1,136 | **962** | **987** | **1,001** | 988 |
| Full-time DSP vacancies | 324 | 389 | **303** | **270** | **231** | 298 |
| Part-time DSP vacancies | 152 | 242 | **193** | **164** | **163** | 177 |
| Total vacancies | 476 | 631 | **496** | **434** | **394** | 475 |
| Vacancy rate (vacancies/number of DSP positions) | | 17.5% | **14.0%** | **11.9%** | **10.7%** | **13.4%** |
| Average starting wage | $18.87 | $18.43 | **$20.25** | **$20.69** | **$20.70** | **$20.87** |
| Average hourly wage | $18.94 | $18.97 | **$20.82** | **$21.12** | **$21.48** | **$21.77** |
| % of total salary overtime | 6.7% | 10.8% | **7.7%** | **7.9%** | **11.8%** | **10%** |
| % of DSPs receiving overtime | 63% | 64% | **58%** | **55%** | **63%** | **65%** |
| DSPs eligible for health insurance | 1,966 | NA | **2,657** | **2,555** | **2,583** | 2407 |
| DSPs enrolled in health insurance | 1,089 | NA | **1,293** | **1,206** | **1,349** | 1386 |
| Total number supervisors | 326 | 323 | **310** | **298** | **319** | 332 |
| % supervisors receiving overtime | 59% | 47% | **49%** | **47%** | **55%** | **56%** |

**Overall Assessment –** Statewide Initiative is in Substantial Compliance,  Corning Data Trends. Since the beginning of the Consent Decree the sufficiency and stability of the direct support workforce has been an issue.  The efforts to improve the recruitment and retention procedures through UMN have been commendable.  However, less than half of the provider organizations have participated in the discovery and action planning process.  The wage increases and the UMN efforts resulted in an increasing number of DSPs and reductions in the vacancy and turnover rates during 2023 and 2024.  The current 2025 data suggests a downward dip in all three of those indicators.  Attempting to understand why is important.  On a parallel track, there is anecdotal evidence that school districts are having difficulty finding teachers certified to teach students with significant intellectual disabilities.

Thus, workforce stability merits continued court observation beyond the Addendum.

---

[45] Pettingell, S. L., & Bershadsky, J. (2025). *Rhode Island SupportWise Workforce Data Summary for Reporting Period January 1, 2025 – June 30, 2025: Report for RI Court Monitor.* University of Minnesota, Institute on Community Integration.

11. **Data**  *(Addendum ii  25, 27, 28)*

- By January 1, 2024 the State will develop a methodology for annual assessment of life outcomes for each/every individual member of the Consent Decree population. *(Addendum ii 25; December, 2022 Court Order*)
- The state will provide data and reporting as detailed in Addendum section iii. (*Addendum ii 27; Consent Decree, Section XVI*)
- By January 1, 2024 the State (in collaboration with the Monitor, the Department of Justice, others) will develop a comprehensive methodology for data collection and reporting.  *(Addendum ii 28; Consent Decree, Section XVI*)

**Progress:**
The State produces a quarterly Consent Decree report aligned with requirements specified in the Addendum.  Report includes (a) appendices documenting activities and (b) reports/updates from BHDDH, ORS, RIDE, DLT.

BHDDH provides an updated quarterly census with reporting on a number of variables, including employment status.  Census includes data dashboards both for the Consent Decree population and the non-Consent Decree population.

RIDE samples approximately 25% of school districts each quarter and reports on employment experiences, participation in Career and Technical Education, the number/percent of transition youth exiting school with paid employment and the number/percent of youth exiting school with community connections.

As part of the Continuous Systemic Improvement plan, the State (with stakeholder input) is (a) identifying key metrics and indicators for documenting continuing progress and (b) developing strategies for collecting and reporting on these metrics.  This includes using the annual assessment of quality of life outcomes as the primary tool for assessing changes in dividual lives.


**Overall Assessment –** Substantial Compliance….tasks remaining to demonstrate durable compliance.  The Monitor expects to review the plan for long-term data and reporting in early 2026.  The CSI data plan needs to focus on two levels of data – (1) systems data that measures statewide benchmarks and (2) assessment of changes in individual lives that can both assess individual and be aggregated to provide a statewide picture.  The annual assessment of "Quality of Life" domains can be an excellent base.   Developing a system for collecting and reporting data merits continued court observation beyond the Addendum.

**Continuous Systemic Improvement (CSI) Plan**[46]

The State is developing a plan to sustain the improvements that came about through the Consent Decree and to continue to expand the quality and efficacy of "the system",  A planning group consisting of representatives for all stakeholder groups – state agency leadership, individuals, families, providers and advocates.  The planning group has met twice and has identified seven themes for the plan.

- Helping Individuals Build Quality Lives
- Increasing Community Access and Participation
- Increasing Employment
- Increasing Housing Options
- Communicating with Stakeholders
- Metrics
- Maintaining/Developing/Expanding the Systems Needed to Support the Above

Six workgroups were developed to address the first six topics.  Each of these workgroups has met several times.  The Monitor has attended most of these meetings and has found the discussions to be substantive.  Notes are being developed and will be presented and discussed at a full planning group meeting in October.

Some of the ideas and systems needs from the CSI workgroups have been referenced throughout this report.

---

[46] Consent Decree Report; August 15, 2025.

**Summary of the tasks/needs Described in the Report.**

1. Re-envisioning the ANSQ and follow-up components of the assessment process.
2. Ensuring that budget (and budget letter) discussions are embedded into the IF/CFCM follow-up process.
3. Finalize PCP/ISP materials; increase focus on four factors identified by the Monitor in the ongoing training of facilitators and plan writers.
4. Continue new job development with increased intensity on developing new jobs for Consent Decree populations.
5. Benefits Counselling process for individuals/families with low literacy and/or "afraid to start".
6. Guidance re: program and billing issues for aging population.
7. Develop definitions and billing procedures for the Advisor model.
8. Curriculum and plan for developing technology competence in staff and individuals, including developing statewide augmentative and alternative communication expertise..
9. Finalizing goods and services guidance and materials.
10. Explore using BHDDH "family-to-family service" to develop a network of family mentors in high schools.
11. To bridge the gap between school exit and the start of adult services, developing a mechanism for identifying providers and/or self-direct "guides" earlier and invite them to transition meetings.
12. RIDE and BHDDH policies and procedures that will continue current practices need to be finalized.
13. Updating employment training.
14. Identifying non-traditional populations for recruiting DSPs.
15. Developing one set of metrics to assess both statewide metrics and changes in individual lives.